**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

BERNARDO MARTINAJ, JOHN AMANTE, FABIAN
ARISMENDI, STEVE ARMENTO, CHASE BURNETT,
PHILLIP COPELAND, HONG JI, JAMES LARNEY,
ERIC LAUNDER, ANTHONY MACK, RUDOLPH
MANZELLA, GEORGE MELENDEZ, MANUEL
NUNEZ, SCOTT ROSS, CHARLES W. TOLAND, JR.,
and SCOTT YOUNG,

9:18-cv-00257 (BKS/DJS)

                              Plaintiffs,

v.

SUPERINTENDENT DONALD UHLER, JOSEPH
BELLNIER, SUPERINTENDENT STEVEN RACETTE,
FIRST DEPUTY SUPERINTENDENT DONALD
QUINN, C.O. CHAD STICKNEY, C.O. TAMMER, C.O.
J. BISONETTE, CERT. OFFICER WIDDUN, C.O.
SHUTTS, C.O. ST. LOUIS, CERT OFFICER No. 3441 or
3448, CERT OFFICER No. 1537, STATE TROOPERS 1–
20, CERT OFFICERS 1–20, CIU OFFICERS 1–20, and
CORRECTION OFFICERS 1–20,

                              Defendants.

---

**Appearances:**

*For Plaintiffs:*
Alan D. Levine
Office of Alan D. Levine
80-02 Kew Gardens Road, Suite 307
Kew Gardens, NY 11415

*For Defendants Uhler, Racette, Bellnier, Quinn, St. Louis, Bisonette, and Stickney:*
Letitia A. James
Attorney General of the State of New York
David A. Rosenburg
Assistant Attorney General, of Counsel
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

This action arises from alleged constitutional violations that occurred at Clinton Correctional Facility ("Clinton") and Upstate Correctional Facility ("Upstate") in the aftermath of David Sweat and Richard Matt's escape from Clinton in June 2015. Plaintiffs are sixteen inmates who were incarcerated at Clinton at the time of the escape and subsequently transferred to Upstate's Special Housing Unit ("SHU"). (Dkt. No. 1, ¶¶ 6–21). They bring this action under 42 U.S.C. § 1983, alleging that Defendant New York State Department of Corrections and Community Supervision ("DOCCS") superintendents, supervisors, Corrections Emergency Response Team ("CERT") officers, Crisis Intervention Unit ("CIU") officers, and correction officers confiscated their personal property and violated their First, Eighth, and Fourteenth Amendment rights through various acts of violence and misconduct. (*Id.*). Defendants Uhler, Bellnier, Racette, Quinn, Stickney, Bisonette,[1] and St. Louis (the "Moving Defendants") move to dismiss certain of the claims asserted against them, (Dkt. No. 9-1), and Plaintiffs oppose the motion, (Dkt. No. 16). For the following reasons, Defendants' motion is granted in part and denied in part.

## II.    FACTS[2]

### A.    Events at Clinton

At approximately 11:00 p.m. on June 5, 2015, David Sweat and Richard Matt escaped from the A Block (the "Honor Block") at Clinton. (Dkt. No. 1, ¶ 40). Plaintiffs were all confined

---

[1] Defendants indicate that the correct spelling of Bisonette is "Bissonette." (Dkt. No. 9-1, at 4).

[2] All facts are taken from the Complaint and are assumed to be true for purposes of the parties' motions. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

to the same block as Sweat and Matt. (*Id.* ¶ 41). They variously allege that, during the investigation that followed Sweat and Matt's escape, they were beaten, threatened, interrogated, strip-searched, deprived of their personal possessions, and denied medical attention by named and unnamed Clinton Defendants. (*See, e.g.*, *id.* ¶¶ 40–52, 74–77, 90–103). For example, Plaintiff Martinaj alleges that, after Matt and Sweat escaped on June 5, 2015, three Defendants who were not wearing nametags came to his cell, called him a racial slur, and threatened him with violence if he "did not tell them the information they were insisting he knew." (*Id.* ¶¶ 43–45). The unnamed Defendants took Martinaj to a utility closet, "termed by the inmates as the 'beat up closet,' and proceeded to choke him and smash the back of his head on a pipe for approximately twenty minutes." (*Id.* ¶ 46). After repeatedly punching him in his sides and threatening to waterboard him, the three Defendants returned Martinaj to his cell and instructed him "not to request medical assistance for the injuries they had just inflicted upon him." (*Id.* ¶ 50). Five days later, Martinaj was transferred to the SHU at Upstate. (*Id.* ¶ 51). Other Plaintiffs allege that they suffered similar acts of physical violence by Defendants while at Clinton before being transferred to the SHU at Upstate.[3] (*See id.* ¶¶ 93–99 (Arismendi), 132–135 (Burnett), 161–173 (Ji), 190–192 (Larney), 221–224 (Mack), 245–247 (Manzella), 278–281 (Nunez), 291 (Ross), 306–314 (Toland), 334–368 (Young)).

All Plaintiffs, except for Plaintiff Young,[4] allege that they were transferred from the Honor Block at Clinton to the Upstate SHU without a hearing, disciplinary report, or interview

---

[3] Plaintiff Copeland has withdrawn his excessive force claim, (Dkt. No. 16, at 2; Dkt. No. 19), and the Moving Defendants do not move to dismiss any other of Plaintiffs' excessive force claims. Accordingly, the Court need not further recite the facts underlying Plaintiffs' remaining excessive force claims, which are not at issue for the purposes of this motion.

[4] Plaintiff Young, who was not transferred to Upstate, is the only Plaintiff who does not assert a Fourteenth Amendment due process claim. (Dkt. No. 1, ¶¶ 332–372).

concerning their placement in SHU in violation of their Fourteenth Amendment right to procedural due process. (*See, e.g.*, *id.* ¶¶ 68, 84, 113, 127, 140, 156).

### B.      Events at Upstate

Plaintiffs allege that, upon arrival at Upstate, they were immediately admitted to the SHU by order of Defendant Bellnier. (*See, e.g.*, Dkt. No. 1, ¶¶ 54, 80, 106, 118, 136, 150). They allege that Defendants Racette and Uhler, in violation of title 7, section 301.7(a) of the Official Compilation of Codes, Rules, and Regulations of the State of New York ("NYCRR"), denied them "the opportunity to be interviewed by an official" about their confinement to SHU. (*See, e.g.*, *id.* ¶¶ 70, 86, 113, 127, 140, 156). While they all generally allege that they were held in a "very restrictive form of solitary confinement," most of the Plaintiffs do not provide individualized, detailed facts regarding the conditions of their confinement necessary for the Court to determine whether they have plausibly alleged that their experience in SHU was atypical. (*See, e.g.*, *id.* ¶¶ 71, 114, 128, 141, 157, 180). Each Plaintiff's specific allegations relevant to their transfer and confinement at the Upstate SHU are described below.

#### 1.      Plaintiff Martinaj

Plaintiff Martinaj was transferred to Upstate on June 10, 2015. (Dkt. No. 1, ¶ 54). A sign was placed on the door of his cell "warning all employees not to speak with him"; accordingly, "no correction officer, nurse or counselor had any verbal contact with [him] for more than two weeks." (*Id.* ¶¶ 56–57). Martinaj was told that his mother had written to him and that she had tried to visit him on three occasions; however, her letters were intercepted by prison officials and she was not allowed inside the prison. (*Id.* ¶¶ 60–61). Martinaj was "deprived of the medication prescribed to treat his migraine headaches, resulting in his suffering both pain and vomiting" while in SHU. (*Id.* ¶ 64). After Martinaj was transferred to Upstate, "one or more of the individual defendants removed and either destroyed or discarded the contents of his cell." (*Id.*

¶¶ 65–66). Except for three interrogation sessions by unnamed Defendants, Martinaj "was maintained in complete isolation" for 16 days, from the evening of June 10, 2015 until June 26, 2015. (*Id.* ¶¶ 54–55, 58).

### 2. Plaintiff Amante

Plaintiff Amante alleges that he arrived at Upstate on June 16, 2015, where he was "immediately placed in SHU" with a "sign placed on [his] door, warning all employees not to speak to him." (Dkt. No. 1, ¶¶ 81–80). Amante was confined to SHU at Upstate for 28 days, until July 14, 2015. (*Id.* ¶ 82).

### 3. Plaintiff Arismendi

Plaintiff Arismendi alleges that he was transferred from Clinton to Upstate on June 15, 2015. (Dkt. No. 1, ¶ 90). He alleges that, during his transfer, two unnamed "employees of DOCCS[] burst into his cell and began to scream at him." (*Id.* ¶ 91). They "struck him in the face several times, turned him around, threw him against a wall[,] and repeatedly punched him in his back." (*Id.* ¶ 93). Arismendi was then transported to Upstate, where he was immediately confined to SHU with a sign on his door "warning all employees not to speak to him." (*Id.* ¶¶ 90, 106–107). His personal property "was taken from him and never returned." (*Id.* ¶ 111). Arismendi was confined to SHU at Upstate for 18 days, until July 3, 2018. (*Id.* ¶ 109).

### 4. Plaintiff Armento

Plaintiff Armento alleges that he was transferred from Clinton to Upstate on June 12, 2015, where he was placed in SHU with a sign on his door "warning all employees not to speak to him." (Dkt. No. 1, ¶¶ 117–119). His "medical records, specifically with regard to prescription medicines he was to be given on a daily basis, were not transferred to Upstate," which "prevented him from receiving his prescribed medicine." (*Id.* ¶¶ 121, 128). He was "denied

access to writing materials and he was not even provided with a grievance form." (*Id.* ¶ 123). Armento was confined to SHU at Upstate until June 26, 2015, for a total of 14 days. (*Id.* ¶ 124).

### 5. Plaintiff Burnett

Plaintiff Burnett alleges that he was transferred to Upstate "[o]n or about June 10 or June 15, 2015." (Dkt. No. 1, ¶ 131). During the transfer, "he was physically abused by [an unnamed] [D]efendant who removed him from his cell" and "was punched in the back of his head by Defendant Stickney while he was handcuffed." (*Id.* ¶ 132). As Defendant Stickney walked Burnett to board the bus to Upstate, Stickney "forcefully threw the handcuffed and shackled Plaintiff Burnett down [a] flight of stairs, causing injury to his right leg, lower back and head." (*Id.* ¶ 135). Burnett was immediately placed in SHU upon arrival to Upstate "with a sign posted on his cell door forbidding anyone to speak to him." (*Id.* ¶¶ 136, 140). He requested "medical treatment for the injuries that had been caused by [D]efendant Stickney's assault upon him," but his requests "were consistently denied." (*Id.* ¶ 137). While confined in SHU, Burnett "was not permitted to call his wife, was given no writing materials, was denied soap and shampoo for personal hygiene, and was denied a visit with his wife when she came to the prison to see him." (*Id.* ¶ 138). The Complaint does not indicate the precise date on which he was transferred out of Upstate, but Plaintiff Burnett alleges that was confined to SHU for "more than one month." (*Id.* ¶ 136).

### 6. Plaintiff Copeland

Plaintiff Copeland alleges that he was transferred to Upstate on approximately June 10, 2015, where he "was immediately placed in a cell in SHU, which had a sign on its cell door denoting the fact that he was an inmate transferred from Clinton Correctional Facility and instructing that no one was to talk to him." (Dkt. No. 1, ¶¶ 144, 150). While confined in SHU, he was denied access to writing materials and was denied medical care for his pre-existing high

blood pressure." (*Id.* ¶ 152). Copeland was transferred out of Upstate on July 13, 2015, after spending approximately 33 days in SHU. (*Id.* ¶ 153).

### 7. Plaintiff Ji

Plaintiff Ji was transferred to Upstate on June 10, 2015. (Dkt. No. 1, ¶ 160). He alleges that, while handcuffed during the transfer out of Clinton, Defendant CERT Officers called him racial slurs, beat in his ribs and back with batons, slammed him into a wall, punched him, and choked, kicked and stomped him while he was on the ground. (*Id.* ¶¶ 161, 170–173). Upon arrival to Upstate, Ji was immediately placed in SHU with a sign on his "door stating that no one was to talk to him." (*Id.* ¶ 174). While in SHU, he "was not permitted visits, medical care, law library access, a change of clothes, or access to mental health" services. (*Id.* ¶ 176). After 15 days in SHU, Ji was transferred out of Upstate on June 25, 2015. (*Id.* ¶ 177).

### 8. Plaintiff Larney

Plaintiff Larney was transferred to Upstate on June 12, 2015, where he was "immediately placed in solitary confinement in SHU." (Dkt. No. 1, ¶¶ 193, 195). While in SHU, a sign was placed on his door "notifying anyone who passed by" that he "was not allowed to speak to anyone." (*Id.* ¶¶ 196–197). Larney was "not permitted to make phone calls, nor to have pen, paper, envelopes or stamps. He was also denied access to the law library." (*Id.* ¶ 199). Larney "never received all of his property back." (*Id.* ¶ 202). He was transferred out of Upstate on June 26, 2015, after spending 14 days in SHU. (*Id.* ¶ 200).

### 9. Plaintiff Launder

Plaintiff Launder was transferred to Upstate on June 12, 2015 and "immediately placed in solitary confinement in SHU." (Dkt. No. 1, ¶¶ 208–209). While in SHU, a sign was "posted on his cell door forbidding anyone to speak to him." (*Id.* ¶ 217). He was not provided with a change of underwear for four days, and he "was not permitted any privileges, nor was he permitted to

speak with anyone [or] to be spoken to." (*Id.* ¶ 211). "Much of plaintiff Launder's property . . . [was] never returned to him." (*Id.* ¶¶ 214–215). Launder was held at Upstate until approximately June 25, 2015, spending a total of 13 days in SHU. (*Id.* ¶ 212).

### 10. Plaintiff Mack

Plaintiff Mack was transferred to Upstate on June 15, 2015. (Dkt. No. 1, ¶ 221). He alleges that, during the transfer, unnamed Defendant CERT Officers "tightly handcuffed and shackled" his hands and feet "so tightly that they bled," "intentionally banged [his head] against the cell bars," and forcibly held "his arms up behind him and bending them over his head from the shoulder." (*Id.* ¶¶ 221–224). He "was compelled to leave his clothing, toiletries and legal papers," at Clinton, and he was "not permitted to take his C-Pap machine, which is a device he sleeps with because of a chronic lung condition" and costs approximately $400.00. (*Id.* ¶¶ 234–235). Upon arrival at Upstate, Plaintiff Mack was "immediately placed in SHU" where "a sign was placed on the door of his cell reading 'Clinton—No Talk.'" (*Id.* ¶¶ 228–229). While in SHU, he was "not permitted to speak to correction personnel, nor were they permitted to speak to him." (*Id.* ¶ 230). He was "denied the right to contact his family, either in writing or by telephone." (*Id.* ¶ 231). Mack was transferred out of Upstate on July 3, 2015, after being confined to SHU for 18 days. (*Id.* ¶ 232).

### 11. Plaintiff Manzella

Plaintiff Manzella was transferred to Upstate on June 15, 2015. (Dkt. No. 1, ¶ 242). During the transfer, unnamed Defendant CERT Officers handcuffed him, "pushed him into the cell bars and punched him in the ribs." (*Id.* ¶ 242). They "screamed obscenities" at Manzella and dragged him "into a hallway where they beat and kicked him." (*Id.* ¶ 247). Upon arrival at Upstate, he was "immediately placed in SHU, where he was not allowed to speak or be spoken to, and was denied "the same privileges as have been alleged by his fellow plaintiffs." (*Id.*

¶ 252). Manzella spent approximately 28 days in SHU before he was transferred out of Upstate on or about July 13, 2015. (*Id.* ¶ 252).

### 12. Plaintiff Melendez

On June 22, 2015, Plaintiff Melendez was sent from Clinton to Alice Hyde Medical Center in Malone, New York, to have his gallbladder surgically removed. (Dkt. No. 1, ¶ 263). Following surgery, he was transported to the infirmary at Upstate on June 24, 2015 "without being able to bring any of his personal property with him." (*Id.* ¶¶ 265–267). On June 29, 2015, Melendez was transferred to SHU "in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him." (*Id.* ¶¶ 268, 274). While in SHU, he was "provided only with over-the-counter pain medications, although he was in a post-surgical condition." (*Id.* ¶ 270). Melendez was transferred from Upstate on July 24, 2015 after spending 25 days in SHU. (*Id.* ¶ 269).

### 13. Plaintiff Nunez

Plaintiff Nunez was transferred to Upstate on June 16, 2015. (Dkt. No. 1, ¶ 278). During the transfer from Clinton, unnamed Defendant CERT Officers "threw him down on his bed and twisted his wrists, all the while yelling at him not to resist." (*Id.* ¶ 278). He was "tightly shackled, particularly on his right ankle," and "punched by several of the individual [D]efendants as they walked past him" while he waited to board the bus to Upstate. (*Id.* ¶ 281). Upon arrival to Upstate, he "was immediately placed in a cell in SHU" with "[a] sign reading 'Clinton—No talk' . . . placed on the front of [his] cell door." (*Id.* ¶¶ 282–283). Nunez was confined in SHU for 16 days before he was transferred to another correctional facility on July 2, 2005. (*Id.* ¶ 284).

### 14. Plaintiff Ross

Plaintiff Ross was transferred to Upstate on June 15, 2015. (Dkt. No. 1, ¶ 290). He alleges that, during the transfer, two unnamed Defendant CERT Officers "handcuffed him and

dragged him through [Clinton], twisting one of his already handcuffed wrists, stomping on his left ankle, and pushing him down a flight of stairs." (*Id.* ¶ 291). At Upstate, "he was immediately assigned to a cell in SHU" with "[a] sign reading 'Clinton—No talk' . . . placed on the front of [his] cell door," causing him to "not hav[e] any idea as to when, if ever, he might be released from SHU." (*Id.* ¶¶ 293, 296). Ross "was forced to wear the same clothing he had been wearing" when he was removed from Clinton for the duration of the time he was in SHU. (*Id.* ¶ 295). He had "no clean underwear, no outer garments . . . no stamps or writing material and none of his legal papers" while he was at Upstate. (*Id.*). He did not receive personal property that he had been forced to leave at Clinton until July 3, 2015. (*Id.* ¶ 297). Plaintiff Ross was transferred out of Upstate on July 13, 2015 after spending a total of 28 days in SHU. (*Id.* ¶ 298).

### 15. **Plaintiff Toland**

Plaintiff Toland was transferred to Upstate on or about June 15, 2015. (Dkt. No. 1, ¶ 306). During the transfer, unnamed Defendant CERT Officers "handcuffed him very tightly[,] forcibly removed him from his cell," "twice slammed his head into a wall," and "grabbed the seat of [his] pants in such a manner as to force him to walk on his toes as they made their way through the prison." (*Id.* ¶¶ 306–308). While Toland was waiting to board the bus to Upstate, one of the unnamed Defendant CERT Officers slapped him on the face. (*Id.* ¶¶ 312–314). Upon arrival to Upstate, Toland "was immediately put in a cell in SHU" with a sign on the door that "stated that he was a Clinton inmate who was not to be spoken to." (*Id.* ¶ 317). He was not given "any soap or toiletries that he could use to wash or clean himself with" for the first four days he was in SHU. (*Id.* ¶ 318). Toland, who is Muslim, told Defendant Uhler and unnamed Defendant Correction Officers at SHU that "he needed his Quran for prayer and study during Ramadan," which began while he was in SHU. (*Id.* ¶¶ 322–325). His requests, however, were denied. (*Id.* ¶ 326). Furthermore, Toland alleges that he was forced to leave his personal property behind at

Clinton, including photographs of . . . Toland's deceased brother and father, letters that . . . Toland had received from his deceased brother, legal documents, ear buds, books, food products, [and] personal hygiene products, all of which were allegedly destroyed, thrown away or stolen by Defendant Bisonette." (*Id.* ¶¶ 319–320). Defendant Bisonette "also intentionally broke certain other items belonging to plaintiff Toland, namely, his trimmers, headphones, hot pot, back brace and two knee braces, which he had been prescribed by prison medical staff." (*Id.* ¶ 321). After being confined to SHU for a period of 18 days, Plaintiff Toland was transferred out of Upstate on July 3, 2015. (*Id.* ¶ 327).

## III.    STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). When deciding a motion to dismiss, the Court's review is ordinarily limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

## IV.    DISCUSSION

### A.    Claims Withdrawn

As an initial matter, Plaintiffs concede to dismissal of several of the claims asserted in the Complaint. (Dkt. No. 16, at 3–4). Specifically, Plaintiff Toland withdraws his First Amendment freedom of religion claim as against Defendant Uhler only; all Plaintiffs withdraw their Eighth Amendment medical indifference claims; Plaintiff Copeland withdraws his Eighth Amendment excessive force claim; and all Plaintiffs withdraw their "claims with regard to destruction of their personal property." (*Id.*; Dkt. No. 19).[5] Furthermore, Plaintiffs contend that the Complaint does not assert an Eighth Amendment conditions of confinement claim, but rather that their allegations regarding conditions in SHU at Upstate support their assertion that, with regard to their Fourteenth Amendment due process claim, they were deprived of a liberty interest. (Dkt. No. 16, at 9). To the extent the Complaint asserts that the conditions of confinement in SHU violated their rights under the Eighth Amendment, those claims are dismissed. Accordingly, of the claims for which the Moving Defendants seek dismissal, only Plaintiffs' Fourteenth Amendment procedural due process claims remain for determination by the Court.

---

[5] The Court notes that Plaintiffs' memorandum of law in opposition to Defendants' motion appears to omit portions of at least two sentences regarding their intention to withdraw certain of their claims. (*See* Dkt. No. 16, at 3–4). On January 24, 2019, the Court issued a text order directing Plaintiffs to clarify which claims they are withdrawing, (Dkt. No. 18), and Plaintiffs submitted a letter on January 31, 2019 informing the Court of their intentions, as described above, (Dkt. No. 19). Plaintiff Young states that he "maintains his claim for first amendment retaliation," and seeks to "conduct discovery aimed at learning the names of the" Doe Defendants, but has not responded to the moving Defendants argument that this claim should be dismissed as to them for lack of personal involvement. (Dkt. No. 16, at 4; Dkt. No. 19). The Court accordingly deems Plaintiff Young's First Amendment retaliation claim against the Moving Defendants to have been abandoned. *See Mainella v. Golub Corp.*, No. 15-cv-1082, 2018 WL 1587049, at *7, 2018 U.S. Dist. LEXIS 51119, at *20 (N.D.N.Y. Mar. 28, 2018) ("Where a plaintiff fails to respond to a defendant's arguments regarding some of her claims but responds to its arguments regarding other claims, the courts generally assume that the plaintiff has abandoned those claims.").

### B.    Procedural Due Process Claims

To successfully state a denial of due process claim under § 1983, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (internal quotation marks omitted). Defendants move to dismiss Plaintiffs' Fourteenth Amendment procedural due process claims against the Moving Defendants on the basis that: (i) Plaintiffs' have failed to allege that they were confined to SHU for a period of time sufficient to constitute deprivation of a liberty interest; (ii) violations of 7 NYCRR § 301.7(a) do not constitute denial of due process; and (iii) the Complaint fails to plausibly allege the personal involvement of Defendants Racette or Uhler. (Dkt. No. 17, at 4–10).

### 1.    Liberty Interest

In *Sandin v. Conner*, the Supreme Court "made clear that a prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions and duration of the prisoner's confinement 'impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Sealey v. Giltner*, 197 F.3d 578, 583 (2d Cir. 1999) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). "[N]othing in *Sandin*," however, "suggests that a protected liberty interest arises in the absence of a particular state regulation or statute that . . . would create one." *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996). To establish a liberty interest, a plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin*, and that the state has granted its inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier*, 81 F.3d at 317.

### a.     Atypical and Significant Hardship

Determining whether restrictive confinement constitutes an "atypical and significant hardship" is necessarily a fact-intensive analysis. *See Sealy*, 116 F.3d at 52 (explaining that the Second Circuit has "indicated the desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement"). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)). In evaluating the severity of the hardship imposed, a district court must consider both the duration and conditions of the confinement, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealy*, 197 F.3d at 586.[6]

The Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer*, 364 F.3d at 64. Generally, courts have found that periods of confinement in SHU lasting fewer than 101 days do not, considered alone, amount to atypical and significant hardship. *See Sealy*, 197 F.3d at 588–90 (finding that 101 days "not an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"); *Ortiz*, 380 F.3d at 655 (finding that conditions such as

---

[6] Plaintiffs erroneously argue that "the length of time one is confined to SHU is not relevant if the confinement results from a complete lack of any procedure whatsoever." (Dkt. No. 16, at 5). "No right to due process is implicated in the prison context *unless* a liberty interest has been deprived." *Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998). Thus, regardless of the process (or lack of process) Plaintiffs allege they received before confinement to SHU, this Court "must examine the circumstances of [Plaintiffs'] confinement to determine whether the confinement affected a liberty interest" in the first place. *Miller v. Selsky*, 111 F.3d 7, 9 (2d Cir. 1997). Contrary to Plaintiffs' assertion, "[d]uration is one of the most important factors in that analysis." *Silva v. Sanford*, No. 91-cv-1776, 1998 WL 205326, at *15, 1998 U.S. Dist. LEXIS 5905, at *46 (S.D.N.Y. Apr. 24, 1998).

"solitary confinement for twenty-three hours a day" and "two showers per week" for fewer than 101 days does not constitute atypical and significant hardship). Periods of 305 days or more have been found to be both atypical and significant even without further consideration of severity of conditions. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (finding that 305 days of SHU confinement was "a sufficient departure from the ordinary incidents of prison life to require procedural due process"). In instances where the duration of confinement lasted between 101 and 305 days, the "Second Circuit has remanded cases to the district courts instructing them to establish a detailed record regarding the harshness of the confinement." *Dawkins*, 646 F. Supp. 2d 594, 606 (S.D.N.Y. 2009) (citing *Howard*, 215 F.3d at 232, and *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000)).

Here, Plaintiffs variously allege that they were confined to SHU for periods ranging from approximately 14 days to 33 days. "[R]estrictive confinements of less than 101 days," however, "do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (holding that forty-one days in administrative confinement could represent deprivation of a liberty interest, depending on the conditions to which plaintiff was subjected). The Second Circuit has indicated that it "has affirmed dismissal of due process claims only in cases where the time spent in SHU was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65–66.

To implicate deprivation of a liberty interest, plaintiffs must allege that their loss of privileges created "a hardship that is substantially more grave than hardships they would be likely to endure" under typical SHU conditions or in general population. *Welch v. Bartlett*, 196

F.3d 389, 392 (2d Cir. 1999) (stating further that, where "a prison makes a practice of imposing for non-punitive reasons a constraint endured under similar conditions and for a similar duration with sufficient regularity, then freedom from the deprivation is not a right of 'real substance' which due process protects"). "While the Second Circuit has declined to 'delineate the precise contours of "normal" SHU confinement . . . it is sufficient to note that, ordinarily, SHU prisoners are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week.'" *Thomas v. DeCastro*, No. 14-cv-6409, 2018 WL 1322207, at \*6, 2018 U.S. Dist. LEXIS 41121, at \*20 (quoting *Ortiz*, 380 F.3d at 655). The facts alleged in the Complaint do not indicate that Plaintiffs were confined to their cells for longer than the typical duration per day, that they were denied exercise or adequate showers, or that most of the Plaintiffs were otherwise exposed to conditions constituting atypical and significant hardships.

Plaintiffs Armento, Copeland, Ji, Larney, Mack, and Toland variously assert that they were denied access to various personal items generally permitted in SHU, including writing materials, (*id.* ¶¶ 123, 152, 176, 199), soap or toiletries for four days, (*id.* ¶ 318), a "Quran for use during Ramadan," (*id.* ¶¶ 323–25), personal photos and correspondence, (*id.* ¶ 320), and personal legal materials, (*id.* ¶¶ 234, 320).[7] They also allege that they were denied privileges generally extended to SHU inmates, including mail, (*id.* ¶¶ 61, 199, 231), visits, (*id.* ¶ 176), and access to law library materials, (*id.* ¶¶ 176, 199). The Court recognizes that DOCCS policy

---

[7] Several Plaintiffs generally allege that they were deprived of personal items. (*See, e.g.*, Dkt. No. 1, ¶¶ 111 ("Plaintiff Arismendi's personal property . . . was taken from him and never returned."); 125 ("Plaintiff Armento did not receive his property that had been left behind at Clinton . . . ."); 154 ("Items of plaintiff Copeland's personal property were lost or destroyed."); 175 ("Plaintiff [Ji] was sent to Upstate . . . without any of his property."); 198 ("Plaintiff Larney's property remained at Clinton Correctional Facility.")). And, while several inmates allege that they were deprived of or denied access to additional items of personal property, (*see, e.g.*, Dkt. No. 1, ¶¶ 202, 214, 235, 321), DOCCS regulations indicate that those items are not typically permitted in SHU, N.Y. Comp. Codes R. & Regs. tit. 7, § 302.2.

regulating conditions in SHU provide for access to certain privileges and personal items,[8] and

that such deprivations may, in some circumstances, constitute an atypical and significant

hardship. *See Palmer*, 364 F.3d at 66 (concluding that deprivation of personal clothing, hygienic

products, reading materials, and family pictures, among other restrictions, was sufficient to raise

triable issue of fact notwithstanding the "comparative shortness" of plaintiff's 77-day

confinement to SHU). The Court, however, must also consider the "exceedingly short" period of

time Plaintiffs were confined to SHU, *id.* at 65–66, and the fact that in general, "lost privileges

do not constitute an atypical and significant hardship because they are within the expected

parameters of the sentence imposed by a court of law." *Branch v. Goord*, No. 05-cv-6495, 2006

WL 2807168, at *4, 2006 U.S. Dist. LEXIS 71086, at *10 (S.D.N.Y. Sept. 28, 2006) (internal

quotation marks omitted); *see also Thomas*, 2018 WL 1322207, at *6, 2018 U.S. Dist. LEXIS

41121, at *20 (finding no atypical and significant hardship where plaintiff made "no allegations

about the conditions of his keeplock beyond the withholding of privileges" during 10-day

confinement).

Plaintiffs Amante, Arismendi, Launder, Manzella, and Nunez assert virtually no

allegations at all regarding the conditions to which they were exposed in SHU, aside from the

---

[8] *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 7, §§ 302.2(c) (providing that, "[a]s soon as possible, but no more than 24 hours after admission, each inmate will be issued," *inter alia*, soap, a toothbrush, and toothpaste); 302.2(d) (providing that "[u]pon request, each inmate will be issued . . . (1) writing paper; (2) envelopes; and (3) mini pen"); 302.2(e)(1)–(2) (providing that, "no more than 24 hours after admission, inmates will be permitted . . . personally owned items" including "(iv) prescriptions medicines as authorized by medical staff" and "(ix) 1 religious book; (x) photographs . . . (xi) personal mail . . . (xiii) stamps . . . (xv) personal legal materials" within 72 hours after admission); 302.2(i)(1)(i)–(ii) (providing that SHU inmates "will be permitted" one nonlegal visit per week and that "[t]here will be no limits on the number of legal visits"); 304.4(c)(2) (SHU inmates "who request[] to see a medical practitioner will be permitted an opportunity to do so in accord with all good security precautions"); 304.7 (providing that SHU "inmate[s] may obtain legal material from the law library" by ordering up to two items at a time for delivery); 304.12 (providing for limited general library materials to SHU inmates); 304.13(a) (providing that SHU inmates "shall be permitted to send and receive privileged and regular correspondence"). Although some Plaintiffs allege that they were denied telephone privileges, (*see* Dkt. No. 1, ¶¶ 138, 199, 231), "[t]elephone calls are prohibited" in SHU, "except for emergency calls and legal telephone calls as approved by the superintendent." N.Y. Comp. Codes R. & Regs. tit. 7, § 302.2(i)(2).

fact that prison employees were prohibited from speaking with them. (Dkt. No. 1, ¶¶ 80–82, 107, 209–211, 252–253, 282–284). Although all Plaintiffs who were transferred to Upstate allege that prison personnel were prohibited from speaking to them during their confinement at Upstate, this allegation, without more, is insufficient to plausibly allege an atypical and significant hardship under *Sandin*. *See Ochoa v. DeSimone*, No. 06-cv-119, 2008 WL 4517806, at *4, 2008 U.S. Dist. LEXIS 112421, at *10–11 (N.D.N.Y. Sept. 10, 2008) (concluding that, "without more," plaintiff's 30-day confinement in SHU was insufficient to "assert[] that he has a liberty interest at stake"), *report and recommendation adopted*, 2008 WL 4517806, 2008 U.S. Dist. LEXIS 76256 (N.D.N.Y. Sept. 30, 2008); *cf. Zenon v. Downey*, No. 18-cv-0458, 2018 WL 6702851, at *4–5, 2018 U.S. Dist. LEXIS 215589, at *14 (N.D.N.Y. Dec. 20, 2018) (denying motion to dismiss where plaintiff alleged that he was "locked up for twenty-four hours per day without contact with his family or medical attention," after having suffered physical abuse during transfer, and that "no one told him whether or when he would be released from solitary" during 31-day confinement).

The Court recognizes that medical deprivation claims "may properly be considered as part of the liberty interest analysis under *Sandin*." *LaBounty v. Kinkhabwala*, 2 F. App'x 197, 201 (2d Cir. 2001) (summary order). The Court notes, however, that many of the Plaintiffs' claims are lacking in detail. While Plaintiff Armento alleges that "his medical records . . . with regard to prescription medicines he was to be given on a daily basis" were not transferred to Upstate, (Dkt. No. 1, ¶ 121), he does not describe his ailment or allege that he was actually denied prescribed medication and, if so, how he was affected during SHU. Plaintiff Copeland generally alleges that he was "denied medical care for his pre-existing high blood pressure," (*id.* ¶ 152), but he does not describe what "medical care" was denied or indicate whether he was

denied treatment that he received prior to admission to SHU. Plaintiff Ji generally alleges that he "was not permitted . . . medical care . . . or access to mental health," (*id.* ¶ 176), but gives no indication as to what injuries, ailments, or conditions for which he was denied treatment. Plaintiff Melendez asserts that he was "provided only with over-the-counter pain medications" after undergoing gallbladder surgery, (*id.* ¶ 270), but he alleges nothing from which to plausibly infer that the treatment he received in SHU was in any way different from that he would have received in the infirmary or in general population. And, while Plaintiff Mack alleges that he was forced to leave his C-Pap machine at Clinton, (*id.* ¶ 235), he does not allege that he sought or was denied medical care for his condition during his confinement to SHU.

In sum, accepting all of their allegations as true, and considering the relatively short confinement, the facts in the Complaint do not plausibly suggest that Amante, Arismendi, Armento, Copeland, Ji, Larney, Launder, Mack, Manzella, Melendez, Nunez, or Toland endured "a dramatic departure from the basic conditions" typically experienced by inmates confined to SHU or general population. *Sandin*, 515 U.S. at 485; *see also Frazier*, 81 F.3d at 317–18 (holding that denial of "certain privileges that prisoners in the general population enjoy" during 12 days of pre-hearing confinement to SHU did not implicate a liberty interest); *Arce*, 139 F.3d at 336 (affirming district court's conclusion that exercise deprivation and verbal harassment during 18-day confinement in SHU did not implicate liberty interest); *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 277 (N.D.N.Y. 2018) (holding that, while conditions alleged during plaintiffs' 14-day confinement in SHU at Upstate "were less than ideal," they did not "give rise to a protected liberty interest, particularly in light of the relative brevity of that confinement" (internal quotation marks omitted)); *Miller v. Bradley*, No. 09-cv-1035, 2010 WL 3810001, at *3, 2010 U.S. Dist. LEXIS 99589, at *8 (N.D.N.Y. Aug. 6, 2010) (holding that 43 days in SHU

is insufficient to implicate a liberty interest "absent additional egregious circumstances"), *report and recommendation adopted*, 2010 WL 3809995, 2010 U.S. Dist. LEXIS 99584 (N.D.N.Y. Sept. 22, 2010). Those claims are therefore dismissed.

On the other hand, liberally construing the Complaint, Plaintiffs Burnett, Martinaj, and Ross have alleged additional facts—beyond being deprived of their personal property, certain SHU privileges, and any contact with prison officials—which plausibly indicate that the conditions to which they were subjected were sufficiently atypical and harsh so as to implicate denial of a liberty interest.[9] Plaintiff Burnett alleges that he was thrown down a flight of stairs by Defendant Stickney before transfer to Upstate, causing injuries to his right leg, lower back, and head, (Dkt. No. 1, ¶ 135), and that, during his month-long confinement to SHU at Upstate, his "requests for medical treatment for the injuries that had been caused by defendant Stickney's assault upon him were consistently denied." (*Id.* ¶ 137). Burnett also alleged that he was denied soap and shampoo during this confinement. (*Id.* ¶ 138). Plaintiff Martinaj alleges that he was denied "medication prescribed to treat his migraine headaches, resulting in his suffering both pain and vomiting" while in SHU for sixteen days. (*Id.* ¶ 64). Plaintiff Ross alleges that he "was forced to wear the same clothing" during his 28-day confinement to SHU, as he was provided

---

[9] Plaintiffs also argue that they suffered a deprivation of liberty by virtue of their transfer from Honor Block to the SHU. (Dkt. No. 16, at 6–7). The Complaint, however, does not contain any facts regarding Honor Block or the privileges Plaintiffs enjoyed while housed there. In any event, Defendants argue that the loss of privileges, such as Honor Block privileges, does not impose an "atypical and significant hardship," (Dkt. No. 17, at 6–7), and Plaintiffs have not cited any caselaw in support of their claim that they had a liberty interest in Honor Block privileges. *See Thompson v. LaClair*, No. 08-cv-0037, 2009 WL 2762164, at *5, 2009 U.S. Dist. LEXIS 75816, at *17 (N.D.N.Y. Jan. 30, 2009) ("Courts considering inmate claims regarding [the] denial of participation in or access to prison programs or privileges under *Sandin* have uniformly concluded that inmates do not enjoy a protected liberty interest in such aspects of prison life."), *report and recommendation adopted*, 2009 WL 2762164, 2009 U.S. Dist. LEXIS 75227 (N.D.N.Y. Aug. 25, 2009); *cf. Shariff v. Artuz*, No. 99-cv-0321, 2000 WL 1219381, at *6, 2000 U.S. Dist. LEXIS 12248, at *18 (S.D.N.Y. Aug. 28, 2000) (concluding that, even assuming that "the State has granted inmates, by regulation or statute, a protected liberty interest . . . in participating in Honor Block, it is clear that the mere denial of the extra privileges associated with Honor Block does not impose an 'atypical and significant hardship' on plaintiffs").

"no clean underwear [and] no outer garments" while at Upstate. (*Id.* ¶ 295). Ross further alleges

that, as a result of the "no talk" sign in front of his cell, he had no "idea as to when, if ever, he

might be released from SHU." (*Id.* ¶ 296). Considering "the extent to which the conditions of the

disciplinary segregation differ from other routine prison conditions[] and . . . the duration of the

disciplinary segregation imposed," *LaBounty*, 2 F. App'x at 201 (alterations in original) (quoting

*Sims*, 230 F.3d at 22), at this preliminary stage of the case, the Court concludes that dismissal of

these Plaintiffs' claims is not warranted.

### b. State-Created Interest in Remaining Free from Segregated Confinement

Defendants have not argued that Plaintiffs lacked a state-created liberty interest in

remaining free from SHU confinement. State statutes and regulations may be said to grant

inmates a protected liberty interest if they "require, in language of an unmistakably mandatory

character, that a prisoner not suffer a particular deprivation absent specified predicates." *Tellier*

*v. Fields*, 280 F.3d 69, 81 (2d Cir. 2000). New York's regulations, promulgated pursuant to the

directives of the New York Correction Law, provide that an inmate may be placed in SHU for:

disciplinary reasons, N.Y. Comp. Codes R. & Regs. tit. 7, § 301.2; protective reasons, *id.*

§ 301.5; administrative reasons, *id.* § 301.4; or "any other reason, with the approval of the deputy

commissioner for facility operations," *id.* § 301.7(a). Then-Judge Sotomayor, after considering

each of these regulations, concluded that "New York neither in its regulations nor practice has

retained or exercised unfettered discretion to place inmates in segregated confinement whether

for punitive or non-punitive reasons." *Lee v. Coughlin*, 26 F. Supp. 2d 615, 633 (S.D.N.Y. 1998)

(further noting that "New York prison officials themselves recognize the limited nature of their

use of their discretion in that the 'catchall' provision of New York regulation that permits

placement in SHU 'for any other reason' is used only in 'emergency or unusual situations'").

The Court therefore concludes that there is a state-created liberty interest in remaining free from SHU confinement.

### 2. "Without Due Process"

As stated above, New York regulations provide that, in addition to disciplinary and administrative reasons, inmates can be confined to SHU "for any other reason." N.Y. Comp. Codes R. & Regs. tit. 7, § 301.7(a). The regulation further requires that "[t]he inmate shall be allowed the opportunity to be interviewed by an official designated by the superintendent concerning the inmate's placement" in SHU. *Id.* The regulation does not specify a time period for this interview. Plaintiffs Burnett, Martinaj, and Ross, who have plausibly alleged that they were deprived of a liberty interest, have alleged that they were denied the opportunity to be interviewed by a designated official either before or during their confinement in SHU at Upstate. Defendants argue that a violation of this regulation would not, in and of itself, establish a constitutional violation, and that, in any event, the regulation does not mandate any specific time frame for the interview. (Dkt. No. 9-1, at 10–11). Defendants, however, fail to address what process was due or how due process was satisfied here. In a similar case, this Court ruled that a plaintiff with a liberty interest was entitled to notice of the reasons for confinement and "an opportunity to present his views" within a reasonable time following his transfer. *Zenon*, 2018 WL 6702851, at *5, 2018 U.S. Dist. LEXIS 215589, at *15; *see also Wright v. Smith*, 21 F.3d 496, 499–500 (2d Cir. 1994). Absent any such process, at this preliminary stage, the Court declines to dismiss Plaintiffs Burnett, Martinaj, and Ross's procedural due process claims.

### 3. Racette and Uhler's Personal Involvement

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Wright*, 21 F.3d at 501 (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930,

934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under Section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). With respect to individuals sued based on their supervisory capacities, like Defendants Racette and Uhler in this action, it is well settled that "vicarious liability is inapplicable to . . . [Section] 1983 suits." *Iqbal*, 556 U.S. at 676.

The Complaint alleges that Racette and Uhler—superintendents of Clinton and Upstate, respectively—denied Plaintiffs' procedural due process rights when Plaintiffs were confined to SHU at Upstate and "not allowed the opportunity to be interviewed by an official designated by either" Defendant Racette or Uhler. (*See, e.g.*, Dkt. No. 1, ¶¶ 70, 113, 127, 156, 179). Prior to the Supreme Court's decision in *Iqbal*, the Second Circuit held that supervisory personnel may be considered "personally involved" under five different circumstances. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). In particular, supervisors can be found personally involved if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Id.* (citing *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986)).

In *Iqbal*, however, the Supreme Court explained that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the

Constitution." *Iqbal*, 556 U.S. at 676. The Court noted that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id.* There, the alleged constitutional violation was discrimination based on race, religion, or national origin in violation of the First and Fifth Amendments. *Id.* at 668–69. For such claims, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 677. The Court rejected the plaintiff's argument that a supervisor may be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees," because "purpose, rather than knowledge is required" to impose liability. *Id.* at 677.

In this Circuit, "*Iqbal* has engendered conflict . . . about the continued vitality of the supervisory liability test set forth in *Colon*," *Reynolds v. Barrett*, 685 F.3d 205 n.14 (2d Cir. 2012), and the Second Circuit has not resolved the conflict. *See, e.g.*, *Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal*, . . . 'may have heightened the requirements for showing a supervisors' personal involvement with respect to certain constitutional violations.'" (quoting *Grullon v. New Haven*, 720 F.3d 133, 139 (2d Cir. 2013))).

Recently, this Court had occasion to consider the impact of *Iqbal* on the supervisor liability/personal involvement test set forth in *Colon. Montanez v. City of Syracuse*, No. 16-cv-0550, 2019 WL 315058, 2019 U.S. Dist. LEXIS 10351 (N.D.N.Y. Jan. 23, 2019). In that case, the Court concluded that the *Colon* analysis still applies where the constitutional claim asserted does not require a showing of discriminatory intent, "insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.'" *Id.* at *18, *50 (citing *Delgado v. Bezio*, No. 09-cv-6899, 2011 WL 1842294, at *9, 2011 U.S. Dist. LEXIS 51917, at *25 (S.D.N.Y. May 9, 2011) (quoting *Qasem v. Toro*, 737 F. Supp. 2d 147, 151–52 (S.D.N.Y.

2010))); *see also Marom v. City of New York*, No. 15-cv-2017, 2016 WL 916424, at *15, 2016 U.S. Dist. LEXIS 28466, at *48 (S.D.N.Y. Mar. 7, 2016); *Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009). Because the constitutional claim asserted in this case (Fourteenth Amendment procedural due process) does not require a showing of discriminatory intent, the Court will apply the *Colon* factors.

Here, Plaintiffs allege that they were placed in SHU "pursuant to an order of defendant Bellnier," the Deputy Commissioner of Correctional Facilities Operations, and that they were denied "the opportunity to be interviewed by an official designated by" the superintendents of Clinton and Upstate, Defendants Racette and Uhler. (*See*, *e.g.*, Dkt. No. 1, ¶¶ 24, 54, 68, 70). While the regulation permitting this transfer required Bellnier's approval, it also stated that the "inmate shall be allowed the opportunity to be interviewed by an official designated by the superintendent concerning the inmate's placement in SHU." N.Y. Comp. Codes R. & Regs. tit. 7, § 301.7(a). Although it may be the case that Defendant Bellnier determined the procedure that would be followed with respect to the transferred inmates, in light of this regulation providing for the superintendent's role in the process that was allegedly denied, the Plaintiffs have plausibly alleged Defendant Uhler's personal involvement in their due process claim. Plaintiffs, however, have failed to allege facts plausibly indicating any personal involvement by Racette— the superintendent at Clinton—under any of the *Colon* categories described above. There are no allegations from which to infer that Defendant Racette was involved in the decision to transfer Plaintiffs to Upstate from Clinton or any determination regarding the process due. Without more, his supervisory position at Clinton is insufficient to establish his personal liability, and the procedural due process claims against him must be dismissed.[10]

---

[10] Although Plaintiffs correctly note that this Court declined to dismiss a claim against Defendant Racette in another case arising out of incidents following the escape of David Sweat and Richard Matt, *Alexander v. Cuomo*, No. 17-cv-

## V.      LEAVE TO AMEND

Defendants seek dismissal of the Complaint with prejudice. (Dkt. No. 9-1, at 28). In general, "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). The Court will permit a limited opportunity to amend, as set forth below. Any amended complaint will replace the existing complaint; it must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

## VI.     CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants Uhler, Bellnier, Racette, Quinn, Stickney, Bisonette, and St. Louis' partial motion to dismiss (Dkt. No. 9-1) is **GRANTED in part and denied in part**; and it is further

**ORDERED** that Plaintiffs Amante, Arismendi, Armento, Copeland, Ji, Larney, Launder, Mack, Manzella, Melendez, Nunez, and Toland's Fourteenth Amendment procedural due process claims are **DISMISSED without prejudice**; and it is further

**ORDERED** that all of the Plaintiffs' Fourteenth Amendment procedural due process claims against Defendant Racette are **DISMISSED without prejudice**; and it is further

**ORDERED** that Plaintiffs' (i) Eighth Amendment conditions of confinement and medical indifference claims and (ii) personal property claims against Defendants Uhler, Bellnier,

---

309, 2018 WL 2041576, at *6, 2018 U.S. Dist. LEXIS 219712, at *18–19 (N.D.N.Y. Feb. 26, 2018), that was with regard to an Eighth Amendment excessive force claim concerning conduct at Clinton.

Racette, Quinn, Stickney, Bisonette, and St. Louis are **DISMISSED without prejudice**; and it is further

ORDERED that Plaintiff Copeland's Eighth Amendment excessive force claim is **DISMISSED without prejudice**; and it is further

ORDERED that Plaintiff Toland's First Amendment freedom of religion claim against Defendant Uhler is **DISMISSED without prejudice**;

ORDERED that Plaintiff Young's First Amendment retaliation claim against Defendants Uhler, Bellnier, Racette, Quinn, Stickney, Bisonette, and St. Louis is **DISMISSED without prejudice**; and it is further

ORDERED that Plaintiffs may amend the Complaint within **THIRTY (30) days** of the date of this Order, in accordance with the conclusions stated above; and it is further

ORDERED that Defendants' motion (Dkt. No. 9) is otherwise **DENIED** in its entirety.

**IT IS SO ORDERED.**

Brenda K. Sannes
U.S. District Judge

Dated: February 15, 2019
     Syracuse, New York