UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------X
BERNARDO MARTINAJ, JOHN AMANTE, FABIAN
ARISMENDI, STEVE ARMENTO, CHASE BURNETT,
PHILLIP COPELAND, HONG JI, JAMES LARNEY,
ERIC LAUNDER, ANTHONY MACK, RUDOLPH
MANZELLA, GEORGE MELENDEZ, MANUEL NUNEZ,     18 CV 0257 (BKS)(DJS)
SCOTT ROSS,CHARLES W. TOLAND, JR.
and SCOTT YOUNG,                                  SECOND AMENDED
                                                  COMPLAINT
                            Plaintiffs,           AND JURY TRIAL
                                                  DEMAND
             - against -

SUPERINTENDENT DONALD UHLER,
SUPERINTENDENT STEVEN RACETTE,
JOSEPH BELLNIER, FIRST DEPUTY
SUPERINTENDENT DONALD QUINN, C.O. CHAD
STICKNEY, C.O. TAMMER, C.O. J. BISSONETTE,
CERT OFFICER WIDDUN, LIEUTENANT BRUCE
SHUTTS, C.O. ST. LOUIS, CERT OFFICER No. 3441 or
3448, CERT OFFICER No. 1537, STATE TROOPERS 1-20,
CERT OFFICERS 1-20, CIU OFFICERS 1-20 and
CORRECTION OFFICERS 1-20,

                            Defendants.
-----------------------------------------------------------------------------X

     Plaintiffs, BERNARDO MARTINAJ, JOHN AMANTE, FABIAN ARISMENDI,

STEVE ARMENTO, CHASE BURNETT, PHILLIP COPELAND, HONG JI, JAMES

LARNEY, ERIC LAUNDER, ANTHONY MACK, RUDOLPH MANZELLA, GEORGE

MELENDEZ, MANUEL NUNEZ, SCOTT ROSS, CHARLES TOLAND and SCOTT

YOUNG, by their attorney, ALAN D. LEVINE, ESQ., complaining of the defendants

herein, respectfully allege as follows, upon information and belief:

## **JURISDICTION**

     1.     This is a civil action, seeking compensatory damages, punitive damages

and attorney's fees.

2.     This action is brought pursuant to 42 U.S.C. §§1983 and 1988 and the first, fourth, eighth and fourteenth amendments to the Constitution of the United States.

3.     Jurisdiction is founded upon 28 U.S.C. §§1331 and 1343.

## VENUE

4.     Venue is properly alleged in the Northern District of New York in that the acts complained of herein occurred within this District.

## JURY TRIAL DEMAND

5.     Plaintiffs hereby demand a trial by jury of all issues in this action that are so triable.

## PARTIES

6.     At all times relevant hereto, plaintiff BERNARDO MARTINAJ was and is an inmate in the custody of the New York State Department of Correction and Community Supervision ("hereinafter "DOCCS").

7.     At all times relevant hereto, plaintiff JOHN AMANTE was and is an inmate in the custody of DOCCS.

8.     At all times relevant hereto, plaintiff FABIAN ARISMENDI was and is an inmate in the custody of DOCCS.

9.     At all times relevant hereto, plaintiff STEVE ARMENTO was and is an inmate in the custody of DOCCS.

10.     At all times relevant hereto, plaintiff CHASE BURNETT was and is an inmate in the custody of DOCCS.

11.     At all times relevant hereto, plaintiff PHILLIP COPELAND was and is an inmate in the custody of DOCCS.

12.     At all times relevant hereto, plaintiff HONG JI was and is an inmate in the custody of DOCCS.

13.     At all times relevant hereto, plaintiff JAMES LARNEY was and is an inmate in the custody of DOCCS.

14.     At all times relevant hereto, plaintiff ERIC LAUNDER was and is an inmate in the custody of DOCCS.

15.     At all times relevant hereto, plaintiff ANTHONY MACK was and is an inmate in the custody of DOCCS.

16.     At all times relevant hereto, plaintiff RUDOLPH MANZELLA was and is an inmate in the custody of DOCCS.

17.     At all times relevant hereto, plaintiff GEORGE MELENDEZ was and is an inmate in the custody of DOCCS.

18.     At all times relevant hereto, plaintiff MANUEL NUNEZ was and is an inmate in the custody of DOCCS.

19.     At all times relevant hereto, plaintiff SCOTT ROSS was and is an inmate in the custody of DOCCS.

20.     At all times relevant hereto, plaintiff CHARLES TOLAND was and is an inmate in the custody of DOCCS.

21.     At all times relevant hereto, plaintiff, SCOTT YOUNG, was and is an inmate in the custody of DOCCS.

22.     At all times relevant hereto, defendant SUPERINTENDENT DONALD UHLER (hereinafter "UHLER") was and is a natural person, employed by DOCCS as the superintendent of Upstate Correctional Facility.

23.     At all times relevant hereto, defendant SUPERINTENDENT STEVEN RACETTE (hereinafter "RACETTE") was and is a natural person, employed by DOCCS as the superintendent of Clinton Correctional Facility.

24.     At all times relevant hereto, defendant JOSEPH BELLNIER (hereinafter "BELLNIER") was and is a natural person, employed by DOCCS as the Deputy Commissioner, Correctional Facilities Operations.

25.     At all times relevant hereto, defendant FIRST DEPUTY SUPERINTENDENT DONALD QUINN (hereinafter "QUINN") was and is a natural person, employed by DOCCS as the deputy superintendent of Clinton Correctional Facility.

26.     At all times relevant hereto, defendant CERT OFFICER WIDDUN (hereinafter "WIDDUN") was and is a natural person, employed by DOCCS as a CERT officer.

27.     At all times relevant hereto, defendant LIEUTENANT BRUCE SHUTTS (hereinafter "SHUTTS") was and is a natural person, employed by DOCCS, at the time of the incidents alleged herein, as a sergeant at Clinton Correctional Facility.

28.     At all times relevant hereto, defendant C.O. ST. LOUIS (hereinafter "ST. LOUIS") was and is a natural person, employed by DOCCS as a correction officer at Clinton Correctional Facility.

29.     At all times relevant hereto, defendant CERT OFFICER No. 3441 or 3448 was and is a natural person, employed by DOCCS as a CERT officer.

30.     At all times relevant hereto, defendant CERT OFFICER No. 1537 was and is a natural person, employed by DOCCS as a CERT officer.

31.     At all times relevant hereto, defendant C.O. CHAD STICKNEY (hereinafter "STICKNEY") was and is a natural person, employed as a correction officer by DOCCS.

32.     At all times relevant hereto, defendant C.O. TAMMER was and is a natural person, employed as a correction officer by DOCCS.

33.     At all times relevant hereto, defendant C.O. J. BISSONETTE was and is a natural person, employed as a correction officer by DOCCS.

34.     At all times relevant hereto, defendants STATE TROOPERS 1-20 were and are natural persons, employed as state troopers by the New York State Police, who were responsible for investigating an escape of two inmates from Clinton Correctional Facility that took place on or about June 5, 2016.

35.     At all times relevant hereto, defendants CERT OFFICERS 1-20 were and are natural persons, employed as members of the Correction Emergency Response Team (hereinafter "CERT") by DOCCS who were responsible for investigating the escape of inmates Matt and Sweat from Clinton Correctional Facility that took place on or about June 5, 2016.

36.     At all times relevant hereto, defendants CIU OFFICERS 1-20 were and are natural persons, employed as members of the Crisis Intervention Unit (hereinafter "CIU") by DOCCS, who were responsible for investigating the escape of inmates Matt and Sweat from Clinton Correctional Facility that took place on or about June 5, 2016.

37.     At all times relevant hereto, defendants CORRECTION OFFICERS 1-20 were and are natural persons, employed by DOCCS as correction officers at Clinton Correctional Facility.

38.     The defendants are sued in their individual capacities.

**FACTS COMMON TO ALL CAUSES OF ACTION**

39.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "38" hereinabove as if more fully set forth at length herein.

40.     On or about June 5, 2015, at approximately 11:00 P.M., two inmates, Richard Matt and David Sweat, who had been incarcerated in the A Block, or Honor Block, at Clinton Correctional Facility, escaped from the aforementioned facility.

41.     On the date that the aforementioned escape took place, all plaintiffs in this action were inmates at Clinton Correctional Facility, confined to the same block as the two inmates who escaped.

42.     The escape of inmates Matt and Sweat resulted in an investigation that was characterized by the abuses of plaintiffs described hereinbelow, which abuses were violative of rights guaranteed to plaintiffs pursuant to the first, fourth, eighth and fourteenth amendments to the Constitution of the United States.

43.     Ultimately, it was determined that Matt and Sweat had been aided in their escape, not by any persons incarcerated at Clinton Correctional Facility, but by employees of DOCCS.

### AS AND FOR A FIRST CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF BERNARDO MARTINAJ
### (42 U.S.C. §1983)

44.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "43" hereinabove as if more fully set forth at length herein.

45.     On or about June 6, 2015, the date following the aforementioned escape, three of the individual defendants, whom plaintiff MARTINAJ did not recognize as being

employed at Clinton Correctional Facility and who were not wearing visible shields or nametags, but were wearing long-sleeved jackets that each had a patch on one of its sleeves indicating that they were employees of the Department of Corrections and Community Supervision, came to plaintiff MARTINAJ's cell.

46.    The aforementioned three defendants are all described as white males, with short hair, standing approximately six feet tall and in their mid 30s.

47.    The aforementioned three defendants, referring to plaintiff MARTINAJ as a "fucking sand nigger," accused him of knowing where the two escaped inmates had gone and told him they would "beat the shit out of [him]" if he did not tell them the information they were insisting he knew.

48.    The aforementioned three defendants took plaintiff MARTINAJ to a utility closet, termed by the inmates the "beat up closet," and proceeded to choke him and smash the back of his head on a pipe for approximately twenty minutes.

49.    The aforementioned three defendants continued to curse at plaintiff MARTINAJ, while they punched him in his right and left sides.

50.    The aforementioned three defendants threatened plaintiff MARTINAJ with waterboarding and told him that, if he told anyone what they were doing to him, he would be killed.

51.    Plaintiff MARTINAJ was handcuffed and taken back to his cell.

52.    When he was placed back into his cell, one of the aforementioned three defendants told plaintiff MARTINAJ not to request medical assistance for the injuries they had just inflicted upon him because he would not receive any medical help.

53.     On or about June 10, 2015, at approximately 11:00 P.M., defendants CERT OFFICERS 1-20 came to plaintiff MARTINAJ's cell, grabbed him, handcuffed him, dragged him out and took him to another room, where he was strip searched.

54.     Once plaintiff MARTINAJ had been searched, he was given new state-issued inmate clothing, shackled hand and foot, and put on a bus with five other inmates.

55.     The aforementioned bus drove plaintiff MARTINAJ to Upstate Correctional Facility, which is located in Malone, New York.

56.     At Upstate Correctional Facility, plaintiff MARTINAJ, pursuant to an order of defendant BELLNIER, was immediately placed in the Special Housing Unit (hereinafter "SHU"), where he remained confined from June 10, 2015, until June 26, 2015.

57.     Plaintiff MARTINAJ was maintained in complete isolation, except for the interrogations hereinbelow described, for the entire time he was kept in the SHU at Upstate Correctional Facility.

58.     A sign was placed on plaintiff MARTINAJ's door, warning all employees not to speak to him.

59.     Thus, no correction officer, nurse or counselor had any verbal contact with plaintiff MARTINAJ for more than two weeks.

60.     On June 11, June 13, and June 16, 2015, different defendants, upon information and belief employees of both DOCCS and the State Police, interrogated plaintiff MARTINAJ, with regard to the escape of Matt and Sweat.

61.     On or about June 20, 2015, plaintiff MARTINAJ was double-bunked with another inmate, although he still remained in SHU.

62.     Plaintiff MARTINAJ was now informed by a female counselor that his mother had come to the prison three times to visit him but had not been allowed in.

63.     In addition, plaintiff MARTINAJ was informed that his mother had written to him during the period he was confined to SHU but that the correspondence had been intercepted by prison officials.

64.     Plaintiff MARTINAJ was removed from SHU on June 26, 2015, and ultimately taken to Auburn Correctional Facility, arriving there on June 29, 2015.

65.     At Auburn Correctional Facility, plaintiff MARTINAJ was housed in general population.

66.     During the period between plaintiff MARTINAJ's being removed from Clinton Correctional Facility and his double-bunking at Upstate Correctional Facility, he was deprived of the medication prescribed to treat his migraine headaches, resulting in his suffering both debilitating pain and vomiting.

67.     No charges that would have justified confining plaintiff MARTINAJ to SHU at Upstate Correctional Facility were ever brought against him.

68.     Defendant BELLNIER deprived plaintiff MARTINAJ of his right to due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that, acting under color of state law, he ordered that plaintiff MARTINAJ be placed in SHU without plaintiff MARTINAJ's having been charged in a misbehavior report or having received an administrative segregation report and without any hearing whatsoever.

69.     7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

70.     Defendant BELLNIER is the person who ordered that plaintiff MARTINAJ be placed in SHU as hereinabove described. However, as described hereinabove, plaintiff MARTINAJ was not allowed the opportunity to be interviewed by an official designated by either defendant RACETTE or defendant UHLER. Rather, plaintiff MARTINAJ was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him. This violation of 7 NYCRR §301.7(a) constitutes a violation by defendants RACETTE, UHLER and BELLNIER of plaintiff MARTINAJ's right to procedural due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States.

71.     The designated defendants, acting under color of state law, violated plaintiff MARTINAJ's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; his right to be free from cruel and unusual punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him using excessive force; and held him in a very restrictive form of solitary confinement for approximately one month without due process, all of which caused him a denial of liberty, severe and permanent injury and great mental anguish.

72.     As a result of the aforementioned violation of plaintiff MARTINAJ's rights to be free from the use of excessive force and from cruel and unusual punishments, and to be afforded due process of law, by the designated defendants, while they were acting under color of state law, plaintiff MARTINAJ has been damaged in an amount sufficient to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

### AS AND FOR A SECOND CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF JOHN AMANTE
### (42U.S.C. §1983)

73.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "72" hereinabove as if more fully set forth at length herein.

74.     On the morning of June 16, 2015, the individual defendants who were, upon information and belief, assigned to CERT, entered plaintiff AMANTE's cell and threatened him with injury if he moved.

75.     The aforementioned defendants pinned plaintiff AMANTE to his bed, tightly handcuffed him, pulled him off his bed, stood him up and, after pat frisking him, told him that he was to keep his head down, was to look at his feet, and was not to speak.

76.     Dressed only in his underwear, plaintiff AMANTE was taken to an area of the prison where he was interrogated and threatened with regard to the escape of Matt and Sweat for approximately three hours by defendants who are members of the State Police and defendants who are employed by the Office of Special Investigations ("OSI") of DOCCS.

77.     At the end of the approximately three-hour period, plaintiff AMANTE was taken to a different area of the prison, where he was issued a new set of state-issued inmate clothing and boots and was ordered to sit down on a long bench, with other inmates.

78.     Plaintiff AMANTE was once again instructed by the aforementioned defendants not to speak and to not look up, but rather to keep his eyes on his feet.

79.     After approximately one additional hour had passed, plaintiff AMANTE was fully shackled and placed in a van that transported him to Upstate Correctional Facility.

80.     At Upstate Correctional Facility, plaintiff AMANTE, pursuant to an order of defendant BELLNIER, was immediately placed in SHU.

81.     No charges that might have constituted a reason for confining plaintiff AMANTE in SHU at Upstate Correctional Facility were ever brought against him.

82.     A sign was placed on plaintiff AMANTE's door, warning all employees not to speak to him.

83.     Plaintiff AMANTE was maintained in complete isolation, except for the interrogations hereinbelow described, for the entire time he was kept in the SHU at Upstate Correctional Facility.

84.     While he was being held in SHU, plaintiff AMANTE continued to be interrogated by defendants hereto with regard to the escape of Matt and Sweat.

85.     Plaintiff AMANTE was held in SHU in the conditions hereinabove described until July 14, 2015.

86.     On July 14, 2015, plaintiff AMANTE was transferred to Wende Correctional Facility.

87.     Defendant BELLNIER deprived plaintiff AMANTE of his right to due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that, acting under color of state law, he ordered that plaintiff AMANTE be placed in SHU without plaintiff AMANTE's having been charged in a misbehavior report or having received an administrative segregation report and without any hearing whatsoever.

88.     7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

89.     Defendant BELLNIER is the person who ordered that plaintiff AMANTE be placed in SHU as hereinabove described.  However, as described hereinabove, plaintiff AMANTE was not allowed the opportunity to be interviewed by an official designated by either defendant RACETTE or defendant UHLER.  Rather, plaintiff AMANTE was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him.   This violation of 7 NYCRR §301.7(a) constitutes a violation by defendants RACETTE, UHLER and BELLNIER of plaintiff AMANTE's right to procedural due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States.

90.     The designated defendants, acting under color of state law, violated plaintiff AMANTE's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; his right to be free from cruel and unusual

punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him; confiscated his clothing; and held him in a very restrictive form of solitary confinement for approximately one month without due process, all of which caused him a denial of liberty, severe and permanent injury and great mental anguish.

91.     As a result of the aforementioned violation of plaintiff AMANTE's rights to be free from the use of excessive force and from cruel and unusual punishments and to be afforded due process of law, by the designated defendants, while they were acting under color of state law, plaintiff AMANTE has been damaged in an amount sufficient to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

### AS AND FOR A THIRD CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF FABIAN ARISMENDI
### (42 U.S.C. §1983)

92.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "91" hereinabove as if more fully set forth at length herein.

93.     On or about June 15, 2015, at approximately 8:00 P.M., plaintiff ARISMENDI was showering in his cell.

94.     Two of the individual defendants hereto, upon information and belief employees of DOCCS, burst into his cell and began to scream at him.

95.     Plaintiff ARISMENDI responded to them in Spanish, telling them that he neither spoke nor understood English.

96.    The aforementioned defendants struck him in the face several times, turned him around, threw him against a wall and repeatedly punched him in his back.

97.    The aforementioned defendants handed plaintiff ARISMENDI his underwear and told him to put it on.

98.    Plaintiff ARISMENDI complied with the order to put his underwear on.

99.    The aforementioned defendants rear-handcuffed plaintiff ARISMENDI, pushed him out of his cell, wearing only underwear and nothing on his feet, and walked him down the corridor.

100.   While the two aforementioned defendants were walking plaintiff ARISMENDI down the corridor, one of them forcibly held his head down so that he could look only at the floor.

101.   Plaintiff ARISMENDI was taken into a room where other inmates were being held.

102.   Plaintiff ARISMENDI was thrown against a wall by one of the aforementioned defendants.

103.   Defendants, believed to be employees of DOCCS and the State Police, interrogated plaintiff ARISMENDI with regard to the escape of Matt and Sweat.

104.   Plaintiff ARISMENDI's handcuffs were removed.

105.   Plaintiff ARISMENDI observed that there were other persons whom he believed were DOCCS personnel in the room, some of whom were striking some of the other inmates being held therein.

106.   After being scanned, plaintiff ARISMENDI was handed new inmate clothes and his shoes.

107.   Upon his dressing himself, plaintiff ARISMENDI was shackled.

108.    Plaintiff ARISMENDI and approximately fourteen other inmates were all placed on a bus and ordered to look at the floor, not at each other or out of the window.

109.    Plaintiff ARISMENDI was transported to Upstate Correctional Facility.

110.    At Upstate Correctional Facility, plaintiff ARISMENDI, pursuant to an order of defendant BELLNIER, was immediately placed in SHU.

111.    No charges that might have constituted a reason for confining plaintiff ARISMENDI in SHU at Upstate Correctional Facility were ever brought against him.

112.    A sign was placed on plaintiff ARISMENDI's cell door, warning all employees not to speak to him.

113.    As a result of plaintiff ARISMENDI's not being able to speak to any of the employees at Upstate Correctional Facility while he was in SHU, he was unable to obtain any medical treatment for the injuries that he had suffered as a result of the aforementioned beatings and abuse that he had been subjected to at Clinton Correctional Facility.

114.    While he was being held in SHU, plaintiff ARISMENDI continued to be interrogated by defendants hereto with regard to the escape of Matt and Sweat.

115.    Plaintiff ARISMENDI remained in SHU at Upstate Correctional Facility until July 3, 2015.

116.    On or about July 3, 2015, plaintiff ARISMENDI was transferred to Downstate Correctional Facility.

117.    On or about July 6, 2015, plaintiff ARISMENDI was transferred to Auburn Correctional Facility.

118.    7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

119.   Defendant BELLNIER is the person who ordered that plaintiff ARISMENDI be placed in SHU as hereinabove described. However, as described hereinabove, plaintiff ARISMENDI was not allowed the opportunity to be interviewed by an official designated by either defendant RACETTE or defendant UHLER. Rather, plaintiff ARISMENDI was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him. This violation of 7 NYCRR §301.7(a) constitutes a violation by defendants RACETTE, UHLER and BELLNIER of plaintiff ARISMENDI's right to procedural due process guaranteed to him by the fourteenth amendment to the Constitution of the United States.

120.   The designated defendants, acting under color of state law, violated plaintiff ARISMENDI's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; his right to be free from cruel and unusual punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him; confiscated his clothing; confiscated and never returned all of his personal property; and held him in a very restrictive form of solitary confinement for more than two weeks without due process, all of which caused him a denial of liberty, severe and permanent injury and great mental anguish.

121.    As a result of the aforementioned violation of plaintiff ARISMENDI's rights to be free from the use of excessive force and from cruel and unusual punishments and to be afforded due process of law, by the designated defendants, while they were acting under color of state law, plaintiff ARISMENDI has been damaged in an amount sufficient to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

### AS AND FOR A FOURTH CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF STEVE ARMENTO
### (42 U.S.C. §1983)

122.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "121" hereinabove as if more fully set forth at length herein.

123.    On or about June 12, 2015, plaintiff ARMENTO was removed from his cell at Clinton Correctional Facility, interrogated, placed in a van and driven to Upstate Correctional Facility.

124.    During the aforementioned interrogation, plaintiff ARMENTO was threatened by defendants hereto with an increase in his sentence if he did not provide them with information about the escape of Matt and Sweat.

125.    At Upstate Correctional Facility, pursuant to an order of defendant BELLNIER, plaintiff ARMENTO was immediately placed in SHU.

126.    No charges that might have constituted a reason for confining plaintiff ARMENTO in SHU at Upstate Correctional Facility were ever brought against him.

127.    A sign was placed on plaintiff ARMENTO's cell door, warning all employees not to speak to him.

128.   Plaintiff ARMENTO remained in SHU at Upstate Correctional Facility until June 26, 2015.

129.   When plaintiff ARMENTO was removed without notice from Clinton Correctional Facility and moved to Upstate Correctional Facility, his medical records, specifically with regard to prescription medicines for high blood pressure and chronic back pain that he was to be given on a daily basis, were not transferred to Upstate Correctional Facility.

130.   During plaintiff ARMENTO's confinement in SHU at Upstate Correctional Facility, no one was permitted to speak to him, he was denied access to writing materials and he was not even provided with a grievance form.

131.   While he was being held in SHU, plaintiff ARMENTO continued to be interrogated by defendants hereto with regard to the escape of Matt and Sweat.

132.   On or about June 26, 2015, plaintiff ARMENTO was transferred to Downstate Correctional Facility and then, on June 29, 2015, he was transferred to Auburn Correctional Facility.

133.   Plaintiff ARMENTO did not receive his property that had been left behind at Clinton Correction Facility until July 2, 2015.

134.   7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

135.   Defendant BELLNIER is the person who ordered that plaintiff ARMENTO be placed in SHU as hereinabove described.   However, as described hereinabove,

plaintiff ARMENTO was not allowed the opportunity to be interviewed by an official designated by either defendant RACETTE or defendant UHLER.   Rather, plaintiff ARMENTO was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him.  This violation of 7 NYCRR §301.7(a) constitutes a violation by defendants RACETTE, UHLER and BELLNIER of plaintiff ARMENTO's right to procedural due process guaranteed to him by the fourteenth amendment to the Constitution of the United States.

136.   The designated defendants, acting under color of state law, violated plaintiff ARMENTO's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; right to be free from cruel and unusual punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him using excessive force; confiscated his clothing; confiscated and never returned all of his personal property; prevented him from receiving his prescribed medicine; and held him in a very restrictive form of solitary confinement for approximately two weeks without due process, all of which caused him a denial of liberty, severe and permanent injury and great mental anguish.

137.   As a result of the aforementioned violation of plaintiff ARMENTO's right to be free the use of excessive force and from cruel and unusual punishments and to be afforded due process of law, by the designated defendants, while they were acting under color of state law, plaintiff ARMENTO has been damaged in an amount sufficient

to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

### AS AND FOR A FIFTH CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF CHASE BURNETT
### (42 U.S.C. §1983)

138.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "137" hereinabove as if more fully set forth at length herein.

139.    On or about June 10 or June 15, 2015, plaintiff BURNETT was removed from his cell at Clinton Correctional Facility and was transferred to Upstate Correctional Facility.

140.    Before plaintiff BURNETT was put on the bus that took him to Upstate Correctional Facility, he was physically abused by the defendant who removed him from his cell, was punched in the back of his head by defendant STICKNEY while he was handcuffed, was cursed at, was not allowed to speak, and was forced to walk with his head down.

141.    Defendant STICKNEY walked plaintiff BURNETT through the prison.

142.    While plaintiff BURNETT was being walked through the prison by defendant STICKNEY, they arrived at a flight of stairs.

143.    Defendant STICKNEY forcefully threw the handcuffed and shackled plaintiff BURNETT down the aforementioned flight of stairs, causing injury to his right leg, lower back and head.

144.    At Upstate Correctional Facility, plaintiff BURNETT, pursuant to an order of defendant BELLNIER, was immediately placed in SHU, where he remained for more than one month.

145. A sign was placed on plaintiff BURNETT's cell door instructing DOCCS personnel employed at Upstate Correctional Facility not to speak to him.

146. No charges that might have constituted a reason for confining plaintiff BURNETT were ever brought against him.

147. While he was being held in SHU, plaintiff BURNETT continued to be interrogated by defendants hereto with regard to the escape of Matt and Sweat.

148. While confined in SHU at Upstate Correctional Facility, plaintiff BURNETT's requests for medical treatment for the injuries that had been caused by defendant STICKNEY's assault upon him were consistently ignored because the DOCCS employees at Upstate Correctional Facility were not permitted to speak to him.

149. Plaintiff BURNETT even resorted to lying prone on the floor of his cell in the hope that an employee who observed him would believe that he had passed out and would thus come to his aid. This tactic was, however, unsuccessful.

150. During his incarceration in SHU at Upstate Correctional Facility, plaintiff BURNETT was not permitted to call his wife, was given no writing materials, was denied soap and shampoo for personal hygiene, and was denied a visit with his wife when she came to the prison to see him. Perhaps most significantly, the shower in plaintiff BURNETT's cell was turned off, thereby preventing him from taking a shower for the entire time he was confined to SHU at Upstate Correctional Facility.

151. 7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

152.    Defendant BELLNIER is the person who ordered that plaintiff BURNETT be placed in SHU as hereinabove described.   However, as described hereinabove, plaintiff BURNETT was not allowed the opportunity to be interviewed by an official designated by either defendant RACETTE or defendant UHLER.    Rather, plaintiff BURNETT was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him.   This violation of 7 NYCRR §301.7(a) constitutes a violation by defendants RACETTE and BELLNIER of plaintiff BURNETT's right to procedural due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States.

153.    The designated defendants, acting under color of state law, violated plaintiff BURNETT's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; right to be free from cruel and unusual punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him; denied him needed medical care; confiscated his clothing; confiscated and never returned all of his personal property; and held him in a very restrictive and unsanitary form of solitary confinement for approximately one month without due process, all of which caused him a denial of liberty, severe and permanent injury and great mental anguish.

154.    As a result of the aforementioned violation of plaintiff BURNETT's right to be free from the use of excessive force and from cruel and unusual punishments and to

be afforded due process of law by the designated defendants, while they were acting under color of state law, plaintiff BURNETT has been damaged in an amount sufficient to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

### AS AND FOR A SIXTH CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF PHILLIP COPELAND
### (42 U.S.C. §1983)

155.   Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "154" hereinabove as if more fully set forth at length herein.

156.   On or about June 10, 2015, plaintiff COPELAND had just gotten out of the shower when he was taken out of his cell by one or more of the individual defendants hereto who were assigned to CERT.

157.   Plaintiff COPELAND was walked by the aforementioned defendants to a room where other inmates were also being held.

158.   Defendant officers assigned to CERT threatened and cursed at plaintiff COPELAND while they searched and interrogated him.

159.   The aforementioned interrogation, search and abuse of plaintiff COPELAND and the other inmates present in the room were done in the presence of defendants RACETTE and QUINN.

160.   Plaintiff COPELAND was placed on a bench along with other inmates and was forced to look down at his feet for approximately three hours.

161.   After approximately three hours, plaintiff COPELAND and approximately nine other inmates were put on a bus and transported to Upstate Correctional Facility.

162.    At Upstate Correctional facility, pursuant to an order of defendant BELLNIER, plaintiff COPELAND was immediately placed in a cell in SHU, which had a sign on its cell door denoting the fact that he was an inmate transferred from Clinton Correctional Facility and instructing that no one was to talk to him.

163.    Plaintiff COPELAND is a Rastafarian and, thus, a vegetarian.

164.    Because he was not able to speak to any correction personnel during the time he was in SHU at Upstate Correctional Facility, he was unable to convey the fact that he was to receive a special diet and, thus, was forced to subsist on bread and water the entire time that he was in SHU.

165.    No charges that might have constituted a reason for confining plaintiff COPELAND in SHU at Upstate Correctional Facility were ever brought against him.

166.    On or about June 14, 2015, plaintiff COPELAND was interviewed by defendants employed by the New York State Police and the Office of Special Investigations (OSI).

167.    During plaintiff COPELAND's confinement in SHU at Upstate Correctional Facility, he was denied access to writing materials and was denied medical care for his pre-existing high blood pressure.

168.    Plaintiff COPELAND was receiving medication for his high blood pressure while he was incarcerated at Clinton Correctional Facility but, because employees at Upstate Correctional Facility were not permitted to speak to him, he was unable to request his medication or to sign up for sick call while he was confined in SHU, thus resulting in his being denied treatment for the aforementioned serious medical condition, which dangerously worsened as a result of his being denied his medication.

169.   Plaintiff COPELAND was held in SHU until July 13, 2015, at which point he was transferred to Wende Correctional Facility.

170.   7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

171.   Defendant BELLNIER is the person who ordered that plaintiff COPELAND be placed in SHU as hereinabove described. However, as described hereinabove, plaintiff COPELAND was not allowed the opportunity to be interviewed by an official designated by either defendant RACETTE or defendant UHLER.   Rather, plaintiff COPELAND was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him.  This violation of 7 NYCRR §301.7(a) constitutes a violation by defendants RACETTE, UHLER and BELLNIER of plaintiff COPELAND's right to procedural due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States.

172.   The designated defendants, acting under color of state law, violated plaintiff COPELAND's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; right to be free from cruel and unusual punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him; confiscated his clothing; confiscated

and never returned all of his personal property; held him in a very restrictive form of solitary confinement for approximately one month without due process; and intentionally and maliciously deprived him of medication that had been prescribed to treat him for a serious and potentially life-threatening medical condition, all of which caused him a denial of liberty, severe and permanent injury, a loss of his property, and great mental anguish.

173. As a result of the aforementioned violation of plaintiff COPELAND's right to be free from the use of excessive force and from cruel and unusual punishments and to have due process of law by the designated defendants, while they were acting under color of state law, plaintiff COPELAND has been damaged in an amount sufficient to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF JI HONG
### (42 U.S.C. §1983)

174. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "173" hereinabove as if more fully set forth at length herein.

175. On or about June 10, 2015, at approximately 9:30 P.M., individual defendants assigned to CERT stormed into plaintiff HONG's cell and forcibly removed him.

176. The aforementioned defendants commenced beating plaintiff HONG in his ribs and his back with batons.

177. At least one of the aforementioned defendants choked plaintiff HONG, demanding that he provide information on the two escapees.

178.   The two escapees had left two notes along their escape route inside the prison.

179.   One of the aforementioned notes was a crude caricature of an Asian with "have a nice day" written on it.

180.   The aforementioned defendants falsely and maliciously accused plaintiff HONG of having provided the aforementioned racist caricature to the escapees.

181.   The aforementioned defendants directed racist insults at plaintiff HONG while they were in the course of beating him.

182.   Before entering plaintiff HONG's cell, the defendant members of the CERT team had ordered him to turn around, with his back to the bars.

183.   The defendant members of the CERT team handcuffed him tightly and directed him to back out of his cell slowly, with his head down.

184.   Plaintiff HONG was told that if he looked at any of the members of the CERT team, they would kill him.

185.   As plaintiff HONG proceeded to walk down the corridor with the aforementioned defendants, one of them slammed his head into a wall, whereupon he was punched, choked and cursed at.

186.   Plaintiff HONG fell to the floor, whereupon several of the aforementioned defendants kicked and stomped him.

187.   After a period of three to five minutes, plaintiff HONG was dragged to a visiting room, stripped naked, interrogated, and told that if he ever related any information regarding this incident to anyone, he would be beaten by correction officers, no matter what state prison he was in.

188.   Plaintiff HONG was smacked very hard one last time and told to put his "fucking clothes" on by one or more of the aforementioned defendants.

189.   Plaintiff HONG was put on a bus and was sent to Upstate Correctional Facility, where, pursuant to an order of defendant BELLNIER, he was immediately placed in a cell in SHU, which cell had a sign on its door stating that no one was to talk to him.

190.   No charges that might have constituted a reason for confining plaintiff HONG in SHU at Upstate Correctional Facility were ever brought against him.

191.   While he was being held in SHU, plaintiff HONG continued to be interrogated by defendants hereto with regard to the escape of Matt and Sweat.

192.   Plaintiff HONG was sent to Upstate Correctional Facility without any of his property.

193.   During the time that plaintiff HONG was confined in SHU at Upstate Correctional Facility, he was not permitted visits, medical care, including treatment for the injuries he had suffered at Clinton Correctional Facility described hereinabove, law library access, a change of clothes, or access to mental health.

194.   Plaintiff HONG was transferred to Auburn Correctional Facility on June 25, 2015.

195.   7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

196. Defendant BELLNIER is the person who ordered that plaintiff HONG be placed in SHU as hereinabove described. However, as described hereinabove, plaintiff HONG was not allowed the opportunity to be interviewed by an official designated by either defendant RACETTE or defendant UHLER. Rather, plaintiff HONG was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him. This violation of 7 NYCRR §301.7(a) constitutes a violation by defendants RACETTE, UHLER and BELLNIER of plaintiff HONG's right to procedural due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States.

197. The designated defendants, acting under color of state law, violated plaintiff HONG's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; right to be free from cruel and unusual punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him; confiscated his clothing; confiscated and never returned all of his personal property; and held him in a very restrictive form of solitary confinement for approximately two weeks without due process, all of which caused him a denial of liberty, severe and permanent injury and great mental anguish.

198. As a result of the aforementioned violation of plaintiff HONG's right to be free from the use of excessive force and from cruel and unusual punishments and to have due process of law, by the designated defendants, while they were acting under color of state law, plaintiff HONG has been damaged in an amount sufficient to

compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

## AS AND FOR A NINTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF JAMES LARNEY
### (42 U.S.C. §1983)

199.  Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "198" hereinabove as if more fully set forth at length herein.

200.  On or about June 6, 2015, plaintiff LARNEY was taken out of his cell, physically restrained with a security belt a/k/a belly chain, and escorted to one of the officers' stations located within the honor block.

201.  At the officers' station, plaintiff LARNEY was interrogated by two of the State Trooper defendants and one of the CIU defendants.

202.  Plaintiff LARNEY was interrogated with regard to Matt and Sweat and was then taken back to his cell.

203.  On or about June 7, 2015, plaintiff LARNEY was again restrained with a security belt and taken out of his cell.

204.  Plaintiff LARNEY was escorted to one of the areas of the prison in which disciplinary hearings are usually held.

205.  In the aforesaid area, plaintiff LARNEY was violently interrogated by three defendants wearing jackets with the letters "CIU" stenciled on them.

206.  None of the three aforementioned CIU defendants wore name tags on their jackets and none of them were assigned to Clinton Correctional Facility.

207.  When plaintiff LARNEY informed the three CIU defendants that he knew nothing about the escape or the escapees' plans, he was repeatedly smacked in the

back of his head and threatened with being "fucked up" if he did not tell the CIU defendants what they wanted to know.

208.   After being subjected to the aforementioned treatment for approximately fifteen to twenty minutes, plaintiff LARNEY was taken back to his cell.

209.   Plaintiff LARNEY was taken out of his cell and subjected to the treatment that he had received on June 7, 2015 on two more occasions, always by three CIU defendants.

210.   On or about June 12, 2015, several of the individual defendants hereto removed plaintiff LARNEY from his cell, handcuffed and shackled him and placed him in a van.

211.   Along with fourteen other inmates, plaintiff LARNEY was taken to Upstate Correctional Facility.

212.   At Upstate Correctional Facility, plaintiff LARNEY was immediately placed in solitary confinement in SHU, pursuant to an order of defendant BELLNIER.

213.   No charges that might have constituted a reason for confining plaintiff LARNEY in SHU at Upstate Correctional Facility were ever brought against him.

214.   While confined to the aforementioned cell in SHU, plaintiff LARNEY was not allowed to speak to anyone, nor did anyone speak to him.

215.   A sign was placed on his cell door notifying anyone who passed by of these restrictions.

216.   While in SHU, plaintiff LARNEY was not permitted to make phone calls, nor to have pen, paper, envelopes or stamps.  He was also denied access to the law library.

217.   While he was being held in SHU, plaintiff LARNEY continued to be interrogated by defendants hereto with regard to the escape of Matt and Sweat.

218.   On or about June 26, 2015, plaintiff LARNEY was transported to Downstate Correctional Facility.

219.   On or about June 29, 2015, plaintiff LARNEY was transferred to Auburn Correctional Facility.

220.   7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

221.   Defendant BELLNIER is the person who ordered that plaintiff LARNEY be placed in SHU as hereinabove described.   However, as described hereinabove, defendant LARNEY was not allowed the opportunity to be interviewed by an official designated by either defendant RACETTE or defendant UHLER.   Rather, plaintiff LARNEY was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him.  This violation of 7 NYCRR §301.7(a) constitutes a violation by defendants RACETTE, UHLER and BELLNIER of plaintiff LARNEY's right to procedural due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States.

222.   The designated defendants, acting under color of state law, violated plaintiff LARNEY's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; right to be free from cruel and unusual punishments,

guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him; confiscated his clothing; confiscated and never returned all of his personal property; and held him in a very restrictive form of solitary confinement for approximately two weeks without due process, all of which caused him a denial of liberty, severe and permanent injury and great mental anguish.

223.   As a result of the aforementioned violation of plaintiff LARNEY's right to be free from the use of excessive force and from cruel and unusual punishments and to be afforded due process of law by the designated defendants, while they were acting under color of state law, plaintiff LARNEY has been damaged in an amount sufficient to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

### AS AND FOR A TENTH CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF ERIC LAUNDER
### (42 U.S.C. §1983)

224.   Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "223" hereinabove as if more fully set forth at length herein.

225.   On or about June 12, 2015, at approximately 1:00 P.M., plaintiff LAUNDER was taken from his cell by several of the individual defendants, stripped, searched, put into a van with five other inmates, and transported to Upstate Correctional Facility.

226.   At Upstate Correctional Facility, plaintiff LAUNDER was immediately placed in solitary confinement in SHU, pursuant to an order of defendant BELLNIER.

227.   No charges that might have constituted a reason for confining plaintiff LAUNDER in SHU at Upstate Correctional Facility were ever brought against him.

228.   Not until four days after arriving at Upstate Correctional Facility, was plaintiff LAUNDER was provided with a change of underwear.

229.   While restricted to solitary confinement in SHU, plaintiff LAUNDER was not permitted any privileges, nor was he permitted to speak with anyone, nor to be spoken to.

230.   While he was being held in SHU, plaintiff LAUNDER continued to be interrogated by defendants hereto with regard to the escape of Matt and Sweat.

231.   On or about June 25, 2015, plaintiff LAUNDER was transported to Downstate Correctional Facility.

232.   On or about June 26, 2015, plaintiff LAUNDER was transported to Auburn Correctional Facility.

233.   7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

234.   Defendant BELLNIER is the person who ordered that plaintiff LAUNDER be placed in SHU as hereinabove described.   However, as described hereinabove, defendant LAUNDER was not allowed the opportunity to be interviewed by an official designated by either defendant RACETTE or defendant UHLER.   Rather, plaintiff LAUNDER was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him. This violation of 7 NYCRR §301.7(a) constitutes a

violation by defendants RACETTE, UHLER and BELLNIER of plaintiff LAUNDER's right to procedural due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States.

235.   The designated defendants, acting under color of state law, violated plaintiff LAUNDER's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; right to be free from cruel and unusual punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him; confiscated his clothing; confiscated and never returned all of his personal property; and held him in a very restrictive form of solitary confinement for approximately two weeks without due process, all of which caused him a denial of liberty, severe and permanent injury and great mental anguish.

236.   As a result of the aforementioned violation of plaintiff LAUNDER's right to be free from the use of excessive force and from cruel and unusual punishments and to be afforeded due process of law, by the designated defendants, while they were acting under color of state law, plaintiff LAUNDER has been damaged in an amount sufficient to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF ANTHONY MACK
### (42 U.S.C. §1983)

237.   Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "236" hereinabove as if more fully set forth at length herein.

238.   On or about June 15, 2015, plaintiff MACK was removed from his cell by several of the CERT defendants herein, was tightly handcuffed and shackled and had his head intentionally banged against the cell bars.

239.   Plaintiff MACK was walked through the prison with orders to keep his head down.

240.   While plaintiff MACK was being walked through the prison from his cell block, the aforementioned CERT defendants were forcibly holding his arms up behind him and bending them over his head from the shoulder.

241.   Plaintiff MACK was taken to a visiting area where his wrists were very tightly cuffed and his ankles were shackled so tightly that they bled.

242.   While in the visiting area, plaintiff MACK was interrogated regarding Matt and Sweat.

243.   Plaintiff MACK heard a supervisor of the CERT team, who upon information and belief was defendant WIDDUN, order the members of the team who were doing the cuffing and shackling to make the restraints so tight that the inmates' veins would burst.

244.   Plaintiff MACK believes that the CERT team members were from other correctional facilities and not from Clinton Correctional Facility.

245.    Plaintiff MACK and the other inmates present in the visiting room, were forced by the aforementioned CERT team members to remain seated with their chins pressed against their chests for nearly three hours, while they were interrogated.

246.    Despite the fact that the inmates were ordered to keep their heads down while the entire process was taking place, plaintiff MACK was able to see that one of the aforementioned team members had an ID or shield number of either 3441 or 3448.

247.    On the same date, plaintiff MACK was placed on a bus and transported to Upstate Correctional Facility, where he was immediately placed in SHU, pursuant to an order of defendant BELLNIER.

248.    No charges that might have constituted a reason for confining plaintiff MACK in SHU at Upstate Correctional Facility were ever brought against him.

249.    While plaintiff MACK was incarcerated in a cell in SHU at Upstate Correctional Facility, a sign was placed on the door of his cell reading "Clinton - - No talk."

250.    During the time he was in SHU, plaintiff MACK was thus not permitted to speak to correction officers or medical personnel, nor were they permitted to speak to him.

251.    While he was in SHU, plaintiff MACK was denied the right to contact his family, either in writing or by telephone.

252.    Moreover, plaintiff MACK was often unable to eat the food that was provided to him while he was in SHU because it had been contaminated with saliva and urine.

253.    On other occasions while he was in SHU at Upstate Correctional Facility, he was not fed at all.

254. While he was being held in SHU, plaintiff MACK continued to be interrogated by defendants hereto with regard to the escape of Matt and Sweat.

255. Plaintiff MACK remained in SHU at Upstate Correctional Facility until July 3, 2015, when he was transported to Downstate Correctional Facility.

256. On July 6, 2015, plaintiff MACK was transported to Auburn Correctional Facility.

257. When plaintiff MACK was removed from Clinton Correctional Facility, he was not permitted to take his CPAP machine, which is a device that he must use when he sleeps because he suffers from sleep apnea, a potentially serious sleep disorder in which breathing repeatedly stops and starts.

258. Plaintiff MACK has never been provided with a replacement CPAP machine. Thus, his health has been, and remains, endangered.

259. 7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

260. Defendant BELLNIER is the person who ordered that plaintiff MACK be placed in SHU as hereinabove described. However, as described hereinabove, plaintiff MACK was not allowed the opportunity to be interviewed by an official designated by either defendant RACETTE or defendant UHLER. Rather, plaintiff MACK was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him. This violation of 7 NYCRR §301.7(a) constitutes a violation by defendants RACETTE, UHLER and BELLNIER of plaintiff MACK's right to procedural

due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States.

261.   The designated defendants, acting under color of state law, violated plaintiff MACK's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; right to be free from cruel and unusual punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him; forced him to sit for three hours in a constricted and unnatural position; confiscated his clothing; confiscated and never returned his CPAP machine; and held him in a very restrictive form of solitary confinement for approximately three weeks without due process, all of which caused him a denial of liberty, severe and permanent injury, including an exacerbation of the sleep apnea from which he suffers, scarring to his wrists; permanent damage to his laryngeal prominence a/k/a Adam's apple; and post traumatic stress disorder, anxiety and depression, for which he has been prescribed medication by medical personnel at Auburn Correctional Facility and Mid-State Correction Facility.

262.   As a result of the aforementioned violation of plaintiff MACK's right to be free from the use of excessive force and from cruel and unusual punishments and to be afforded due process of law by the designated defendants, while they were acting under color of state law, plaintiff MACK has been damaged in an amount sufficient to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

## AS AND FOR A TWELFTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF RUDOLPH MANZELLA
### (42 U.S.C. §1983)

263.   Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "262" hereinabove as if more fully set forth at length herein.

264.   On or about June 15, 2015, one of the CERT defendants stormed into plaintiff MANZELLA's cell, handcuffed him, pushed him into the cell bars and punched him in the ribs.

265.   The aforementioned defendant ordered plaintiff MANZELLA not to look at any of the officers present in the area and to keep his eyes on the floor at all times.

266.   Plaintiff MANZELLA was walked by the aforementioned defendant to the end of his company where several CERT defendants were gathered.

267.   As plaintiff MANZELLA attempted to move through the group of officers, he was roughly shoved from one to the other and was struck several times.

268.   While acting in the manner described hereinabove, the aforementioned defendants screamed obscenities at plaintiff MANZELLA.

269.   Next, the aforementioned defendants dragged plaintiff MANZELLA into a hallway where they beat and kicked him.

270.   Eventually, plaintiff MANZELLA was pulled to his feet and brought to the roll call room located next to the tier office, across from the package room.

271.   In the roll call room, plaintiff MANZELLA was made to remove his clothing, was questioned about Matt and Sweat and was verbally threatened by the CERT defendants.

272. After a period of time, plaintiff MANZELLA was given his clothes back and was shackled.

273. Plaintiff MANZELLA was put on a bus with approximately fourteen other inmates and was transported to Upstate Correctional Facility.

274. At Upstate Correctional Facility, plaintiff MANZELLA, pursuant to an order of defendant BELLNIER, was immediately placed in SHU, where he was not allowed to speak or be spoken to, and was denied the same necessities as have been alleged by his fellow plaintiffs.

275. No charges that might have constituted a reason for confining plaintiff MANZELLA in SHU at Upstate Correctional Facility were ever brought against him.

276. While he was being held in SHU, plaintiff MANZELLA continued to be interrogated by defendants hereto with regard to the escape of Matt and Sweat.

277. On or about July 13, 2015, plaintiff MANZELLA was removed from SHU at Upstate Correctional Facility and was transported to Attica Correctional Facility.

278. On or about August 17, 2015, plaintiff MANZELLA was transported to Wende Correctional Facility.

279. 7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

280. Defendant BELLNIER is the person who ordered that plaintiff MANZELLA be placed in SHU as hereinabove described. However, as described hereinabove, plaintiff MANZELLA was not allowed the opportunity to be interviewed by an official

designated by either defendant RACETTE or defendant UHLER.   Rather, plaintiff MANZELLA was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him.  This violation of 7 NYCRR §301.7(a) constitutes a violation by defendants RACETTE, UHLER and BELLNIER of plaintiff MANZELLA's right to procedural due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States.

281.   The designated defendants, acting under color of state law, violated plaintiff MANZELLA's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; right to be free from cruel and unusual punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him; confiscated his clothing; confiscated and never returned all of his personal property; and held him in a very restrictive form of solitary confinement for approximately one month without due process, all of which caused him a denial of liberty, severe and permanent injury and great mental anguish.

282.   As a result of the aforementioned violation of plaintiff MANZELLA's right to be free from the use of excessive force and from cruel and unusual punishments and to be afforded due process of law, by the designated defendants, while they were acting under color of state law, plaintiff MANZELLA has been damaged in an amount sufficient to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF GEORGE MELENDEZ
### (42 U.S.C. §1983)

283.   Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "282" hereinabove as if more fully set forth at length herein.

284.   Following the discovery, on June 6, 2015, that Matt and Sweat had escaped from Clinton Correctional Facility, the prison was locked down.

285.   The prison remained locked down until June 21, 2015.

286.   Plaintiff MELENDEZ remained in Clinton Correctional Facility throughout the period of the lockdown.

287.   On or about June 22, 2015, plaintiff MELENDEZ was sent to Alice Hyde Medical Center in Malone, New York, to have his gallbladder removed, on an emergency basis.

288.   Plaintiff MELENDEZ had his gallbladder surgically removed on or about June 23, 2015.

289.   Plaintiff MELENDEZ was released from Alice Hyde Medical Center on or about June 24, 2015.

290.   Upon his release, plaintiff MELENDEZ was transported to Upstate Correctional Facility.

291.   Upon arrival at Upstate Correctional Facility, plaintiff MELENDEZ was placed in the infirmary.

292.   On June 29, 2015, plaintiff MELENDEZ, pursuant to an order of defendant BELLNIER, was moved from the infirmary to a cell in the Upstate Correctional Facility SHU.

293.   No charges that might have constituted a reason for confining plaintiff MELENDEZ in SHU at Upstate Correctional Facility were ever brought against him.

294.   Plaintiff MELENDEZ remained in SHU at Upstate Correctional Facility until July 24, 2015.

295.   During his time in the infirmary and in SHU at Upstate Correctional Facility, plaintiff MELENDEZ was provided only with over-the-counter pain medications, although he was in a painful post-surgical condition, as a result of having had an organ removed.

296.   While he was being held in SHU, plaintiff MELENDEZ continued to be interrogated by defendants hereto with regard to the escape of Matt and Sweat.

297.   On or about July 24, 2015, plaintiff MELENDEZ was transported to Wende Correctional Facility.

298.   7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

299.   Defendant BELLNIER is the person who ordered that plaintiff MELENDEZ be placed in SHU as hereinabove described.  However, as described hereinabove, plaintiff MELENDEZ was not allowed the opportunity to be interviewed by an official designated by either defendant RACETTE or defendant UHLER.   Rather, plaintiff MELENDEZ was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him.  This violation of 7 NYCRR §301.7(a) constitutes a violation by defendants RACETTE, UHLER and BELLNIER of plaintiff MELENDEZ's

right to procedural due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States.

300.   The designated defendants, acting under color of state law, violated plaintiff MELENDEZ's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; right to be free from cruel and unusual punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that they, without any cause or justification therefor, deprived him of needed post-surgical care; confiscated his clothing; confiscated and never returned all of his personal property, including his legal papers; and held him in a very restrictive form of solitary confinement for approximately four weeks without probable cause, all of which caused him a denial of liberty, severe and permanent injury and great mental anguish.

301.   As a result of the aforementioned violation of plaintiff MELENDEZ's right to be free from the use of excessive force and from cruel and unusual punishments and to be afforded due process of law, by the designated defendants, while they were acting under color of state law, plaintiff MELENDEZ has been damaged in an amount sufficient to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF MANUEL NUNEZ
### (42 U.S.C. §1983)

302.  Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "301" hereinabove as if more fully set forth at length herein.

303.  On or about June 16, 2015, several of the CERT defendants ran into plaintiff NUNEZ's cell, threw him down on his bed and twisted his wrists, all the while yelling at him to not resist.

304.  Plaintiff NUNEZ was cuffed and chained and then walked to the aforementioned room where other inmates had been taken.

305.  Plaintiff NUNEZ, as were the other inmates being held in the aforementioned room, was told to keep his head down and not look at the faces of any of the CERT defendants, lest they break his face.

306.  Plaintiff NUNEZ was interrogated regarding Matt and Sweat's escape.

307.  Plaintiff NUNEZ was shackled, particularly tightly on his left ankle, and lined up to board a bus that would take him and other inmates to Upstate Correctional Facility.

308.  As plaintiff NUNEZ waited to board the bus, he was punched by several of the individual defendants as they walked past him.

309.  At Upstate Correctional Facility, plaintiff NUNEZ, pursuant to an order of defendant BELLNIER, was immediately placed in a cell in SHU.

310.  No charges that might have constituted a reason for confining plaintiff NUNEZ in SHU at Upstate Correctional Facility were ever brought against him.

311.   A sign reading "Clinton – No talk" was placed on the front of plaintiff NUNEZ's cell door.

312.   Plaintiff NUNEZ remained in solitary confinement in SHU at Upstate Correctional Facility until July 2, 2015, on which date he was transported to another correctional facility.

313.   While he was being held in SHU, plaintiff NUNEZ continued to be interrogated by defendants hereto with regard to the escape of Matt and Sweat.

314.   7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

315.   Defendant BELLNIER is the person who ordered that plaintiff NUNEZ be placed in SHU as hereinabove described.  However, as described hereinabove, plaintiff NUNEZ was not allowed the opportunity to be interviewed by an official designated by either defendant RACETTE or defendant UHLER.  Rather, plaintiff NUNEZ was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him.  This violation of 7 NYCRR §301.7(a) constitutes a violation by defendants RACETTE, UHLER and BELLNIER of plaintiff NUNEZ's right to procedural due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States.

316.   The designated defendants, acting under color of state law, violated plaintiff NUNEZ's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the

Constitution of the United States; right to be free from cruel and unusual punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him; confiscated his clothing; confiscated and never returned all of his personal property; and held him in a very restrictive form of solitary confinement for approximately three weeks without due process, all of which caused him a denial of liberty, severe and permanent and disfiguring injury to his left ankle and great mental anguish.

317.   As a result of the aforementioned violation of plaintiff NUNEZ's right to be free from the use of excessive force and from cruel and unusual punishments and to be afforded due process of law, by the designated defendants, while they were acting under color of state law, plaintiff NUNEZ has been damaged in an amount sufficient to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF SCOTT ROSS
### (42 U.S.C. §1983)

318.   Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "316" hereinabove as if more fully set forth at length herein.

319.   On or about June 15, 2015, at approximately 8:00 P.M., plaintiff ROSS was forcibly removed from his cell by several of the CERT defendants.

320.   Two of the aforementioned CERT defendants handcuffed him and dragged him through the prison, twisting one of his already handcuffed wrists, stomping on his left ankle, and pushing him down a flight of stairs.

321.   Plaintiff ROSS was placed on a bus with fourteen other inmates and transported to Upstate Correctional Facility, where, pursuant to an order of defendant BELLNIER, he was immediately assigned to a cell in SHU.

322.   No charges that might have constituted a reason for confining plaintiff ROSS in SHU at Upstate Correctional Facility were ever brought against him.

323.   Plaintiff ROSS was sent to Upstate Correctional Facility with only the clothes he was wearing at the time he was snatched out of his cell.  He had no personal property, not even clean underwear, with him.

324.   Plaintiff ROSS was imprisoned in SHU at Upstate Correctional Facility for twenty-nine days.

325.   During his period in SHU, plaintiff ROSS was forced to wear the same clothing he had been wearing when he was forcibly removed from his cell and taken out of Clinton Correctional Facility.  He had no clean underwear, no outer garments, no shower shoes, no stamps or writing material and none of his legal papers during the time he was housed in SHU.

326.   A sign reading "Clinton – No talk" was placed on the front of plaintiff ROSS's cell door, resulting in plaintiff ROSS's not having any idea as to when, if ever, he might be released from SHU.

327.   Upon information and belief, while he was being held in SHU, plaintiff ROSS continued to be interrogated by defendants hereto with regard to the escape of Matt and Sweat.

328.    Plaintiff ROSS was released from SHU at Upstate Correctional Facility on July 13, 2015, and he was transferred to Auburn Correctional Facility.

329.    7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

330.    Defendant BELLNIER is the person who ordered that plaintiff ROSS be placed in SHU as hereinabove described.  However, as described hereinabove, plaintiff ROSS was not allowed the opportunity to be interviewed by an official designated by either defendant RACETTE or UHLER.   Rather, plaintiff ROSS was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him.   This violation of 7 NYCRR §301.7(a) constitutes a violation by defendants RACETTE, UHLER and BELLNIER of plaintiff ROSS's right to procedural due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States.

331.    The designated defendants, acting under color of state law, violated plaintiff ROSS's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; right to be free from cruel and unusual punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment to the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him; confiscated his clothing; confiscated

and never returned all of his personal property; and held him in a very restrictive form of solitary confinement for approximately twenty-nine days without due process, all of which caused him a denial of liberty, severe and permanent injury and great mental anguish.

332. As a result of the aforementioned violation of plaintiff ROSS's right to be free from the use of excessive force and from cruel and unusual punishments and to be afforded due process of law, by the designated defendants, while they were acting under color of state law, plaintiff ROSS has been damaged in an amount sufficient to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION ON BEHALF OF PLAINTIFF CHARLES W. TOLAND, JR. (42 U.S.C. §1983)

333. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "332" hereinabove as if more fully set forth at length herein.

334. On or about June 9, or June 10, 2015, two correction officers entered plaintiff TOLAND's cell and removed his television set, his lamp, his winter gloves, his books and his spare bed linens.

335. At some point between June 10 and June 15, 2015, plaintiff TOLAND was told to pack up his cell because he would be leaving Clinton Correctional Facility.

336. On or about June 15, 2015, at approximately 7:30 P.M., several of the CERT defendants came into plaintiff TOLAND's cell, handcuffed him very tightly and forcibly removed him from his cell.

337.   As the aforementioned CERT defendants walked plaintiff TOLAND through the prison, they twice slammed his forehead into a wall.

338.   The aforementioned CERT defendants grabbed the seat of defendant TOLAND's pants in such a manner as to force him to walk on his toes as they made their way through the prison.

339.   Plaintiff TOLAND was taken to a room where other inmates were present.

340.   In the aforementioned room, plaintiff TOLAND was questioned about Matt and Sweat, forced to strip, was searched, was given a new set of prison greens, was shackled and was taken outside.

341.   Once outside, plaintiff TOLAND was ordered by one of the CERT defendants to look only at the ground.

342.   One of the CERT defendants slapped plaintiff TOLAND.

343.   Plaintiff TOLAND glanced sideways at the CERT defendant who had slapped him.

344.   The aforementioned CERT defendant told plaintiff TOLAND that if he looked at him again, he would be looking at his teeth lying on the ground next to his boots.

345.   Plaintiff TOLAND was put inside a bus with other inmates and was transported to Upstate Correctional Facility.

346.   At Upstate Correctional Facility, pursuant to an order of defendant BELLNIER, plaintiff TOLAND was immediately put in a cell in SHU.

347.   No charges that might have constituted a reason for confining plaintiff TOLAND in SHU at Upstate Correctional Facility were ever brought against him.

348.   A sign on the door of plaintiff TOLAND's cell stated that he was a Clinton inmate who was not to be spoken to.

349.   For the first four days plaintiff TOLAND was in the aforementioned cell, he was not given any soap or toiletries that he could use to wash or clean himself with.

350.   One June 16, 2015, which was the day after plaintiff TOLAND was moved to Upstate Correctional Facility, defendant BISSONETTE packed up the personal property that plaintiff TOLAND had been forced to leave behind at Clinton Correctional Facility when he was sent to Upstate Correctional Facility.

351.   Defendant BISSONETTE, while packing plaintiff TOLAND's property, maliciously and intentionally urinated on several articles of plaintiff TOLAND's clothing, opened and dumped the contents of two five-pound bags of flour into two separate bags containing plaintiff TOLAND's property, and threw away, or stole, photographs of plaintiff TOLAND's deceased brother and father, letters that plaintiff TOLAND had received from his deceased brother, legal documents, ear buds, books, food products, personal hygiene products, and bowls and small storage containers.

352.   Defendant BISSONETTE also intentionally broke certain other items belonging to plaintiff TOLAND, namely, his trimmers, headphones, hot pot, back brace and two knee braces, which he had been prescribed by prison medical staff.

353.   Plaintiff TOLAND is a Muslim.

354.   While plaintiff TOLAND was being held in SHU, Ramadan commenced.

355.   Plaintiff TOLAND requested that he be permitted to have his Quran for use during Ramadan.

356.   Plaintiff TOLAND told several correction officials, including defendants UHLER and CORRECTION CAPTAIN DOE that he needed his Quran, which is the basis of his religion, for prayer and study during Ramadan.

357.   Defendant UHLER intentionally failed and refused to have plaintiff TOLAND's Quran made available to him.

358.   CORRECTION CAPTAIN DOE told plaintiff TOLAND that he was going to deny him his Quran, which he, indeed, did.

359.   Thus, plaintiff TOLAND was unreasonably prevented from practicing his religious rites and celebrating Ramadan.

360.   Upon information and belief, while he was being held in SHU, plaintiff TOLAND continued to be interrogated by defendants hereto with regard to the escape of Matt and Sweat.

361.   Plaintiff TOLAND was transported to Downstate Correctional Facility on July 3, 2015, and then to Auburn Correctional Facility on July 6, 2015.

362.   7 NYCRR §301.7(a), in effect at the time of the events alleged herein, provided as follows:

> An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities. The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

363.   Defendant BELLNIER is the person who ordered that plaintiff TOLAND be placed in SHU as hereinabove described.  However, as described hereinabove, plaintiff TOLAND was not allowed the opportunity to be interviewed by an official designated by either defendant RACETTE or UHLER.  Rather, plaintiff TOLAND was kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to

him.   This violation of 7 NYCRR §301.7(a) constitutes a violation by defendants RACETTE, UHLER and BELLNIER of plaintiff TOLAND's right to procedural due process, guaranteed to him by the fourteenth amendment to the Constitution of the United States.

364.   The designated defendants, acting under color of state law, violated plaintiff TOLAND's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; right to be free from cruel and unusual punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; his right to due process of law, guaranteed to him by the fourteenth amendment to the Constitution of the United States; and his right to practice his religion, guaranteed to him by the first amendment to the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him; confiscated his clothing; deprived him of his Quran, confiscated and never returned all of his personal property; and held him in a very restrictive form of solitary confinement for approximately three weeks, all of which caused him a denial of liberty, severe and permanent injury and great mental anguish.

365.   As a result of the aforementioned violation of plaintiff TOLAND's rights to be free from the use of excessive force and from cruel and unusual punishments, to be afforded due process of law, and to practice his religion, by the designated defendants, while they were acting under color of state law, plaintiff TOLAND has been damaged in an amount sufficient to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF SCOTT YOUNG
### (42 U.S.C. §1983)

366.   Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "365" hereinabove as if more fully set forth at length herein.

367.   On or about June 10, 2015, at approximately 9:30 P.M., several Clinton correction officers, sergeants and CERT personnel stormed into plaintiff YOUNG's cell, while he was sleeping and dressed only in underpants.

368.   The aforementioned defendants beat plaintiff YOUNG, pulled him out of his bed and threw him onto the floor.

369.   When plaintiff YOUNG asked one of the correction officer defendants what was going on, he was told, "Shut the fuck up.  This is what happens when people escape."

370.   Several of the aforementioned defendants twisted plaintiff YOUNG's arms behind his back and handcuffed him very tightly.

371.   Correction officer defendants violently pulled plaintiff YOUNG up off the floor, using the handcuff chain, followed immediately by a CERT defendant punching him so hard in the ribs that he keeled over.

372.   One of the CERT defendants bore Shield No. 1537.

373.   A correction officer defendant now punched plaintiff YOUNG so hard in the back of his head and the side of his temple that he dropped back onto the floor.

374.   While he was lying on the floor, one of plaintiff YOUNG's arms was bent by a sergeant while another sergeant twisted one of his legs.

375.   The aforementioned sergeants dragged plaintiff YOUNG along the floor to the back of his cell, then pulled him up and turned him around.

376.   The two sergeants banged plaintiff YOUNG's head, hard, on the back wall of his cell, causing plaintiff YOUNG to yell at them, "What are you doing?  You're trying to kill me?"

377.   Several of the defendants dragged plaintiff YOUNG, still wearing nothing but his underpants, out of his cell and then dragged him all the way down the company while one of the defendant correction officers squeezed the aforementioned handcuffs so as to further tighten them.

378.   When plaintiff YOUNG and the aforementioned defendants reached the hallway at the end of the company, plaintiff YOUNG was thrown into a wall and then had his face pressed hard into the wall.

379.   Plaintiff YOUNG was taken by the defendants to the visiting room area, where plaintiff YOUNG noticed several other inmates who had been pulled out of their cells.

380.   Several of the defendants took plaintiff YOUNG into a small room where, after making him undergo a frisk, one of the CERT defendants struck him hard in his testicles.

381.   Plaintiff YOUNG was forced to stand against the wall and was warned by one of the defendants that if he came off the wall, he would be beaten even more.

382.   Plaintiff YOUNG was dressed in prison greens and fully shackled, with the ankle shackles intentionally made so tight that he could barely walk.

383.   The aforementioned defendants removed plaintiff YOUNG from the small room.

384.   When plaintiff YOUNG was returned to the area where the other inmates were present, a defendant captain asked for the person who was assigned to the cell next to plaintiff YOUNG's cell.

385.   No one responded to the captain's request.

386.   The aforementioned captain now asked plaintiff YOUNG who was assigned to the cell with the number of his.

387.   Plaintiff YOUNG responded that he was assigned to the cell whose number had just been called out.

388.   Plaintiff YOUNG was asked for his name.

389.   When plaintiff YOUNG responded with his name, DIN and cell number, the defendant captain told one of the sergeants who had brought plaintiff YOUNG to the room that plaintiff YOUNG was not the person who was supposed to have been brought there.

390.   The sergeant responded to the captain that he had brought the right person.

391.   The captain told the sergeant to look at a document that he was holding.

392.   The sergeant looked at the document and now stated that he was supposed to have brought the inmate who occupied the cell next to plaintiff YOUNG's.

393.   The captain then told the sergeant to send plaintiff YOUNG back, as he was not the person who was supposed to have been brought to the room they were in.

394.   Plaintiff YOUNG's shackles were removed, leaving him in handcuffs, and he was sent back to his cell.

395.   Plaintiff YOUNG informed defendant SHUTTS that he needed medical attention as a result of the beating he had just been administered.

396.   However, he was told by two of the Clinton correction officer defendants that he was not going to see anyone from the medical department.

397.   Plaintiff YOUNG was escorted back to his cell block by defendant SHUTTS and one of the other Clinton correction officer defendants.

398.   Defendant ST. LOUIS placed him back in his cell, where plaintiff YOUNG spend the night urinating and spitting up blood.

399.   Plaintiff YOUNG was not taken to see a nurse until two days later, June 12, 2015.

400.   The aforementioned nurse noted plaintiff YOUNG's injuries but did not perform a physical examination.

401.   Plaintiff YOUNG was interviewed in the infirmary by Sergeant Silver and Lieutenant Burnette.

402.   Plaintiff YOUNG was not shipped out of Clinton Correctional Facility.

403.   However, several weeks after the aforementioned incident, when he filed a grievance with regard to it, he was falsely and maliciously issued a disciplinary violation accusing him of having stolen a t-shirt when he was working in the tailor shop.

404.   As a result of the aforementioned ticket, plaintiff YOUNG was sentenced to twenty days in keeplock.

405.   The designated defendants, acting under color of state law, violated plaintiff YOUNG's right to be free from the use of excessive force against him in the course of an investigation of a crime, guaranteed to him by the fourth amendment to the Constitution of the United States; right to be free from cruel and unusual punishments, guaranteed to him by the eighth amendment to the Constitution of the United States; and his right to due process of law, guaranteed to him by the fourteenth amendment to

the Constitution of the United States, in that they, without any cause or justification therefor, interrogated and physically assaulted him and held him in keeplock for approximately twenty days without due process, all of which caused him severe and permanent injury and severe mental anguish.

406.    As a result of the aforementioned violation of plaintiff YOUNG's right to be free from the use of excessive force and from cruel and unusual punishments, by the aforementioned designated defendants, while they were acting under color of state law, plaintiff YOUNG has been damaged in an amount sufficient to compensate him for his injuries and damages as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

WHEREFORE, plaintiffs, BERNARDO MARTINAJ, JOHN AMANTE, FABIAN ARISMENDI, STEVE ARMENTO, CHASE BURNETT, PHILLIP COPELAND, HONG JI, JAMES LARNEY, ERIC LAUNDER, ANTHONY MACK, RUDOLPH MANZELLA, GEORGE MELENDEZ, MANUEL NUNEZ, SCOTT ROSS, CHARLES W. TOLAND, JR. and SCOTT YOUNG, demand judgment against defendants, SUPERINTENDENT DONALD UHLER, JOSEPH BELLNIER, SUPERINTENDENT STEVEN RACETTE, FIRST DEPUTY SUPERINTENDENT DONALD QUINN, C.O. CHAD STICKNEY, C.O. TAMMER, C.O. J. BISSONETTE, CERT OFFICER WIDDUN, LIEUTENANT BRUCE SHUTTS, C.O. ST. LOUIS, CERT OFFICER No. 3441 or 3448, CERT OFFICER No. 1537, STATE TROOPERS 1-20, CERT OFFICERS 1-20, CIU OFFICERS 1-20 and CORRECTION OFFICERS 1-20, as follows:

FIRST CAUSE OF ACTION:    An amount sufficient to compensate plaintiff MARTINAJ for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants;

SECOND CAUSE OF ACTION:   An amount sufficient to compensate plaintiff AMANTE for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants;

THIRD CAUSE OF ACTION:      An amount sufficient to compensate plaintiff ARISMENDI for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants;

FOURTH CAUSE OF ACTION:   An amount sufficient to compensate plaintiff ARMENTO for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants;

FIFTH CAUSE OF ACTION:      An amount sufficient to compensate plaintiff BURNETT for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants;

SIXTH CAUSE OF ACTION:      An amount sufficient to compensate plaintiff COPELAND for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants;

SEVENTH CAUSE OF ACTION: An amount sufficient to compensate plaintiff HONG for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants;

EIGHTH CAUSE OF ACTION:      An amount sufficient to compensate plaintiff LARNEY for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants;

NINTH CAUSE OF ACTION:      An amount sufficient to compensate plaintiff LAUNDER for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants;

TENTH CAUSE OF ACTION:    An amount sufficient to compensate plaintiff MACK for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants;

ELEVENTH CAUSE OF ACTION:    An amount sufficient to compensate plaintiff MANZELLA for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants;

TWELFTH CAUSE OF ACTION: An amount sufficient to compensate plaintiff MELENDEZ for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants;

THIRTEENTH CAUSE OF ACTION:    An amount sufficient to compensate plaintiff NUNEZ for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants;

FOURTEENTH CAUSE OF ACTION:    An amount sufficient to compensate plaintiff ROSS for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants;

FIFTEENTH CAUSE OF ACTION:    An amount sufficient to compensate plaintiff TOLAND for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants; and

SIXTEENTH CAUSE OF ACTION:    An amount sufficient to compensate plaintiff YOUNG for his injuries as enumerated hereinabove and, in addition, seeks punitive damages against the designated defendants.

In addition, plaintiffs demand the costs and disbursements of this action, including their attorney's fees, pursuant to 42 U.S.C. §1988.

Dated:  Kew Gardens, New York
       July 31, 2019

ALAN D. LEVINE, ESQ.
Attorney for Plaintiff
80-02 Kew Gardens Road, Suite 307
Kew Gardens, New York 11415
(718) 793-6363
Our File No:  2334

