**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

BERNARDO MARTINAJ, JOHN AMANTE, FABIAN
ARISMENDI, STEVE ARMENTO, CHASE BURNETT,
PHILLIP COPELAND, HONG JI, JAMES LARNEY,
ERIC LAUNDER, ANTHONY MACK, RUDOLPH
MANZELLA, GEORGE MELENDEZ, MANUEL
NUNEZ, SCOTT ROSS, CHARLES W. TOLAND, JR.,
and SCOTT YOUNG,

                                    Plaintiffs,                    9:18-cv-00257 (BKS/DJS)

v.

SUPERINTENDENT DONALD UHLER, JOSEPH
BELLNIER, SUPERINTENDENT STEVEN RACETTE,
FIRST DEPUTY SUPERINTENDENT DONALD
QUINN, C.O. CHAD STICKNEY, C.O. TAMMER, C.O.
J. BISSONETTE, CERT. OFFICER WIDDUN,
LIEUTENANT BRUCE SHUTTS, C.O. ST. LOUIS,
CERT OFFICER No. 3441 or 3448, CERT OFFICER No.
1537, STATE TROOPERS 1–20, CERT OFFICERS 1–20,
CIU OFFICERS 1–20, and CORRECTION OFFICERS 1–
20,

                                    Defendants.

---

**Appearances:**

*For Plaintiffs:*
Alan D. Levine
Office of Alan D. Levine
80-02 Kew Gardens Road, Suite 307
Kew Gardens, NY 11415

*For Defendants Uhler, Racette, Bellnier, Quinn, St. Louis, Bissonette, Stickney, and Shutts:*
Letitia A. James
Attorney General of the State of New York
Erik Pinsonnault
Kostas D. Leris
Assistant Attorneys General, of Counsel
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

This action arises from alleged constitutional violations that occurred at Clinton Correctional Facility ("Clinton") and Upstate Correctional Facility ("Upstate") in the aftermath of David Sweat and Richard Matt's escape from Clinton in June 2015. Plaintiffs are sixteen inmates[1] who were incarcerated at Clinton at the time of the escape. (Dkt. No. 40, ¶¶ 6–21). They bring this action under 42 U.S.C. § 1983, alleging that Defendant New York State Department of Corrections and Community Supervision ("DOCCS") superintendents, supervisors, Corrections Emergency Response Team ("CERT") officers, Crisis Intervention Unit ("CIU") officers, and correctional officers confiscated their personal property and violated their First, Fourth, Eighth, and Fourteenth Amendment rights through various acts of violence and misconduct. (Dkt. No. 40). Defendants Uhler, Bellnier, Racette, Quinn, Stickney, Bissonette, and St. Louis previously moved to dismiss the Complaint, (Dkt. No. 9), which the Court granted in part and denied in part. *Martinaj v. Uhler ("Martinaj I")*, No. 18-cv-00257, 2019 WL 652251, 2019 U.S. Dist. LEXIS 24896 (N.D.N.Y. Feb. 15, 2019). Plaintiffs then submitted a Second Amended Complaint.[2] (Dkt. No. 40). Defendants Uhler, Bellnier, Racette, Quinn, Stickney, Bissonette, St. Louis, and Shutts (the "Defendants" or "Moving Defendants") now move to dismiss certain of the claims asserted against them. (Dkt. No. 42). The parties have filed responsive briefings. (Dkt. Nos. 46, 49). The Court heard oral argument on the motion on July 7,

---

[1] The causes of action in the Second Amended Complaint are separated by plaintiff. (*See* Dkt. No. 40). The Second Amended Complaint contains sixteen plaintiffs, but seventeen causes of action, because there is no seventh cause of action. (*See id.*, at 24–27).

[2] The Court gave Plaintiffs leave to amend. On May 17, 2019, Plaintiffs filed an Amended Complaint, and on July 31, 2019, by agreement between the parties, Plaintiffs filed a Second Amended Complaint. (Dkt. Nos. 27, 35, 40).

2020. For the following reasons, Moving Defendants' motion is granted in part and denied in part.

## II.     FACTS[3]

### A.     Events at Clinton

At approximately 11:00 p.m. on June 5, 2015, David Sweat and Richard Matt escaped from the A Block (the "Honor Block") at Clinton. (Dkt. No. 40, ¶ 40). Plaintiffs were all confined to the same block as Sweat and Matt. (*Id.* ¶ 41). They variously allege that, during the investigation that followed Sweat and Matt's escape, they were beaten, threatened, interrogated, strip-searched, deprived of their personal possessions, and denied medical attention by named and unnamed Clinton Defendants. (*See, e.g.*, *id.* ¶¶ 40–54, 74–77, 93–107). For example, Plaintiff Martinaj alleges that, after Matt and Sweat escaped on June 5, 2015, three Defendants who were not wearing nametags came to his cell, called him a racial slur and threatened him with violence if he "did not tell them the information they were insisting he knew." (*Id.* ¶¶ 45–47). The unnamed Defendants took Martinaj to a utility closet, "termed by the inmates as the 'beat up closet,' and proceeded to choke him and smash the back of his head on a pipe for approximately twenty minutes." (*Id.* ¶ 48). After repeatedly punching him in his sides and threatening to waterboard him, the three Defendants returned Martinaj to his cell and instructed him "not to request medical assistance for the injuries they had just inflicted upon him." (*Id.* ¶¶ 49–52). Five days later, Martinaj was transferred to Upstate and placed in the Special Housing Unit ("SHU"). (*Id.* ¶¶ 53–55). Other Plaintiffs allege that they suffered similar acts of physical violence by Defendants while at Clinton before being transferred to SHU at Upstate. (*See id.* ¶¶ 96–102

---

[3] The facts are drawn from the Second Amended Complaint. (Dkt. No. 40). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

(Arismendi), 140–143 (Burnett), 176–188 (Ji), 205–209 (Larney), 238–240 (Mack), 264–269

(Manzella), 303–308 (Nunez), 320 (Ross), 337–342 (Toland), 368–380 (Young)).

All Plaintiffs, except for Plaintiff Young, allege that they were transferred from the

Honor Block at Clinton to Upstate, where they were placed in SHU without a hearing,

disciplinary report, or interview, in violation of their Fourteenth Amendment right to procedural

due process. (*See, e.g.*, *id.* ¶¶ 68, 87, 119, 135, 152, 171). Each of the Plaintiffs placed in SHU

alleges that he were "kept isolated in solitary confinement with a sign posted on his cell door

forbidding anyone to speak to him." (*See, e.g.*, *id.* ¶¶ 70, 89, 119, 135, 152, 171).

Plaintiff Young alleges that on June 10, 2015, "several Clinton correction[al] officers,

sergeants and CERT personnel stormed into [his] cell," "beat [him], pulled him out of his bed

and threw him onto the floor." (*Id.* ¶¶ 367–68). They "twisted [Young's] arms behind his back

and handcuffed him very tightly," and then "violently pulled [him] up off the floor, using the

handcuff chain, followed immediately by a CERT defendant punching him so hard in the ribs

that he keeled over." (*Id.* ¶¶ 370–71). "A correction[al] officer defendant [then] punched

[Young] so hard in the back of his head and the side of his temple that he dropped back onto the

floor." (*Id.* ¶ 373). Two sergeants then "banged [his] head, hard, on the back wall of his cell."

(*Id.* ¶ 376).

Young was then dragged out of his cell, and when they "reached the hallway at the end of

the company, [he] was thrown into a wall and then had his face pressed hard into the wall." (*Id.* ¶

378). He was taken to the "visiting room area," and "into a small room, where . . . one of the

CERT defendants struck him hard in his testicles." (*Id.* ¶¶ 379–80). Young was sent back to his

cell," and he informed Shutts "that he needed medical attention as a result of the beating he had

just been administered." (*Id.* ¶¶ 394–95). His request was denied. (*Id.* ¶ 396). He "spen[t] the

night urinating and spitting up blood." (*Id.* ¶ 398). Several weeks later, Young filed a grievance and was "falsely and maliciously issued a disciplinary violation accusing him of having stolen a t-shirt when he was working in the tailor shop." (*Id.* ¶ 403). He "was sentenced to twenty days in keeplock." (*Id.* ¶ 404).

### B.       Events at Upstate

Plaintiffs allege that Defendant Bellnier ordered them to be placed in SHU immediately upon arrival at Upstate. (*See, e.g.*, Dkt. No. 40, ¶¶ 56, 80, 110, 125, 144, 162). They allege that Defendants Racette and Uhler, in violation of title 7, section 301.7(a) of the Official Compilation of Codes, Rules, and Regulations of the State of New York ("NYCRR"), denied them "the opportunity to be interviewed by an official" about their confinement to SHU. (*See, e.g.*, *id.* ¶¶ 70, 89, 119, 137, 152, 171). While they all generally allege that they were held in a "very restrictive form of solitary confinement," many Plaintiffs do not provide individualized, detailed facts regarding the conditions of their confinement. (*See, e.g.*, *id.* ¶¶ 71, 90, 120, 136, 153, 172). Each Plaintiff's specific allegations relevant to their transfer and confinement at the Upstate SHU are described below.

### 1.       Plaintiff Martinaj

Martinaj was transferred to Upstate on June 10, 2015 and immediately placed in SHU. (Dkt. No. 40, ¶¶ 53–56). A sign was placed on the door of his cell "warning all employees not to speak with him." (*Id.* ¶ 58). "No correction[al] officer, nurse or counselor had any verbal contact with" Martinaj "for more than two weeks," except for on three occasions when "employees of both DOCCS and the State Police . . . interrogated" him. (*Id.* ¶¶ 59–60). Martinaj was told that his mother had written to him and that she had tried to visit him on three occasions; however, her letters were intercepted by prison officials, and she was not allowed inside the prison. (*Id.* ¶¶ 62– 63). Martinaj was "deprived of the medication prescribed to treat his migraine headaches,

resulting in his suffering both debilitating pain and vomiting" while in SHU. (*Id.* ¶ 66). Martinaj was kept "in complete isolation . . . for the entire time he was kept in the SHU," though he was "double-bunked with another inmate" in SHU on June 20, 2015. (*Id.* ¶¶ 57, 61). Martinaj "was removed from SHU on June 26, 2015," (*id.* ¶ 64), meaning he was in SHU for 16 days, from the evening of June 10, 2015 until June 26, 2015. (*Id.* ¶¶ 53–54, 64).

### 2. Plaintiff Amante

On June 16, 2015, CERT defendants "entered [Amante's] cell and threatened him with injury if he moved." (*Id.* ¶ 74). "Dressed only in his underwear," he was "taken to an area of the prison where he was interrogated and threatened with regard to the escape" for approximately three hours "by defendants who are members of the State Police and defendants who are employed by the Office of Special Investigations ('OSI') of DOCCS." (*Id.* ¶ 76). He was then transferred to Upstate, where he was "immediately placed in SHU" with a "sign placed on [his] door, warning all employees not to speak to him." (*Id.*, ¶¶ 74, 80–82). Amante "was maintained in complete isolation," except when he was "interrogated by defendants" regarding "the escape of Matt and Sweat." (*Id.* ¶¶ 83–84). Amante was confined to SHU at Upstate for 28 days, until July 14, 2015. (*Id.* ¶ 86).

### 3. Plaintiff Arismendi

On June 15, 2015, two unnamed DOCCS employees "burst into [Arismendi's] cell and began to scream at him." (*Id.* ¶ 94). They "struck him in the face several times, turned him around, threw him against a wall and repeatedly punched him in his back." (*Id.* ¶ 96). They then walked him down the corridor and to a room "where other inmates were being held." (*Id.* ¶¶ 100–01). Arismendi was "thrown against the wall by one of the aforementioned defendants." (*Id.* ¶ 102). He observed some DOCCS personnel "striking some of the other inmates." (*Id.* ¶ 105). He was then transported to Upstate, where he was immediately confined to SHU with a sign on

his door "warning all employees not to speak to him." (*Id.* ¶¶ 109–110, 112). "As a result of [Arismendi] not being able to speak to any of the employees at [Upstate] while he was in SHU, he was unable to obtain any medical treatment for the injuries he had suffered as a result of the . . . . beatings and abuse that he had been subjected to at [Clinton]." (*Id.* ¶ 113). Arismendi was confined to SHU at Upstate for 18 days, until July 3, 2018. (*Id.* ¶ 115).

### 4.   **Plaintiff Armento**

Armento was transferred from Clinton to Upstate on June 12, 2015, where he was placed in SHU with a sign on his door "warning all employees not to speak to him." (*Id.* ¶¶ 123, 125, 127). During the transfer, he was "interrogated" and "threatened by defendants . . . with an increase in his sentence if he did not provide them with information about the escape of Matt and Sweat." (*Id.* ¶¶ 123–24). His "medical records, specifically with regard to prescription medicines for high blood pressure and chronic back pain that he was to be given on a daily basis, were not transferred to Upstate." (*Id.* ¶ 129). He "did not receive his property that had been left behind at Clinton." (*Id.* ¶ 133). He was also "denied access to writing materials" and was not "provided with a grievance form." (*Id.* ¶ 130). Armento was confined in SHU at Upstate until June 26, 2015, for a total of 14 days. (*Id.* ¶ 128).

### 5.   **Plaintiff Burnett**

"On or about June 10 or June 15, [Burnett] was removed from his cell at [Clinton] and was transferred to [Upstate]." (*Id.* ¶ 139). Before the transfer, "he was physically abused by the defendant who removed him from his cell, [and] was punched in the back of his head by [Stickney] while he was handcuffed." (*Id.* ¶ 140). As Defendant Stickney walked Burnett to board the bus to Upstate, Stickney "forcefully threw the handcuffed and shackled [Burnett] down [a] flight of stairs, causing injury to his right leg, lower back and head." (*Id.* ¶ 143). Burnett was immediately placed in SHU upon arrival to Upstate "with a sign posted on his cell door

forbidding anyone to speak to him." (*Id.* ¶¶ 144–45). He requested "medical treatment for the injuries that had been caused by [Stickney's] assault upon him," but his requests "were consistently ignored." (*Id.* ¶ 148). He "resorted to lying prone on the floor of his cell in the hope that an employee who observed him would believe that he had passed out and come to his aid," but this was "unsuccessful." (*Id.* ¶ 149). While confined in SHU, Burnett "was not permitted to call his wife, was given no writing materials, was denied soap and shampoo for personal hygiene, and was denied a visit with his wife when she came to the prison to see him." (*Id.* ¶ 150). "[T]he shower in [Burnett's] room was turned off, thereby preventing him from taking a shower for the entire time he was confined to SHU." (*Id.*). The Second Amended Complaint does not indicate the precise date on which he was transferred out of Upstate, but Burnett alleges that was confined to SHU for "approximately one month." (*Id.* ¶ 153).

### 6.   Plaintiff Copeland

On June 10, 2015, Copeland was transferred to Upstate. (*Id.* ¶¶ 156, 161). Before the transfer, he was "threatened and cursed at . . . while [CERT defendants] searched and interrogated him." (*Id.* ¶ 158). The "interrogation, search and abuse of [Copeland] and the other inmates present in the room were done in the presence of [Racette] and [Quinn]." (*Id.* ¶ 159). He was then "placed on a bench with other inmates and was forced to look down at his feet for approximately three hours." (*Id.* ¶ 160). When Copeland arrived at Upstate, he "was immediately placed in a cell in SHU, which had a sign on its cell door denoting the fact that he was an inmate transferred from [Clinton] and instructing that no one was to talk to him." (*Id.* ¶ 162). Copeland "is a Rastafarian and, thus, a vegetarian." (*Id.* ¶ 163). "Because he was not able to speak to any correction personnel during the time he was in SHU at [Upstate], he was unable to convey the fact that he was to receive a special diet and thus, was forced to subsist on bread and water the entire time he was in SHU." (*Id.* ¶ 164). He was also "denied medical care for his pre-existing

high blood pressure" because "he was unable to request his medication or to sign up for sick call while he was confined in SHU." (*Id.* ¶¶ 167–68). He was also "denied access to writing materials." (*Id.* ¶ 167). Copeland was transferred out of Upstate on July 13, 2015, after spending approximately 33 days in SHU. (*Id.* ¶ 169).

### 7. Plaintiff Ji

On June 10, 2015, "individual defendants assigned to CERT stormed into [Ji's] cell and forcibly removed him." (*Id.* ¶ 175). They "commenced beating [Ji] in his ribs and his back with batons." (*Id.* ¶ 176). "At least one of the aforementioned defendants choked [Ji], demanding that he provide information on the two escapees." (*Id.* ¶ 177). Matt and Sweat had "left two notes along their escape route inside the prison," and "[o]ne of the . . . notes was a crude caricature of an Asian with 'have a nice day' written on it." (*Id.* ¶ 179). Defendants "falsely and maliciously accused [Ji] of having provided the aforementioned racist caricature to the escapees." (*Id.* ¶ 180). While he was being beaten, Defendants "directed racist insults" at Ji. (*Id.* ¶ 181). "The defendant members of the CERT team handcuffed him tightly and directed him to back out of his cell slowly, with his head down," and he "was told that if he looked at any of the members of the CERT team, they would kill him." (*Id.* ¶¶ 183–84). As he "proceeded down the corridor," "one [defendant] slammed his head into a wall, whereupon he was punched, choked and cursed at." (*Id.* ¶ 185). He "fell to the floor, whereupon several of the aforementioned defendants kicked and stomped him." (*Id.* ¶ 186). "After a period of three to five minutes," Ji was "dragged to a visiting room, stripped naked, interrogated, and told that if he ever related any information regarding this incident to anyone, he would be beaten by correction[al] officers, no matter what prison he was in." (*Id.* ¶ 187). He was "smacked very hard one last time and told to put his 'fucking clothes' on." (*Id.* ¶ 188). He was sent to Upstate "without any of his property." (*Id.* ¶ 192). Ji was immediately placed in SHU with a sign on his "door stating that no one was to talk to him." (*Id.*

¶ 189). While he was in SHU he "was not permitted visits, medical care, including treatment for the injuries he had suffered at Clinton Correctional facility . . . law library access, a change of clothes, or access to mental health." (*Id.* ¶ 193). After 15 days in SHU, Ji was transferred out of Upstate on June 25, 2015. (*Id.* ¶ 194).

### 8.   Plaintiff Larney

On June 6, 2015, Larney "was taken out of his cell" and "interrogated by two of the State Trooper defendants and one of the CIU defendants." (*Id.* ¶ 201). The next day, he was "violently interrogated by three defendants wearing jackets with the letters 'CIU' stenciled on them." (*Id.* ¶ 205). When he told them that "he knew nothing about the escape or the escapees' plans, he was repeatedly smacked in the back of his head and threatened with being 'fucked up' if he did not tell the CIU defendants what they wanted to know." (*Id.* ¶ 207). This lasted "fifteen to twenty minutes." (*Id.* ¶ 208). Larney "was taken out of his cell and subjected to the treatment that he had received on June 7, 2015 on two more occasions, always by three CIU defendants." (*Id.* ¶ 209). On June 12, 2015, he was transferred to Upstate. (*Id.* ¶ 210–11). He was "immediately placed in solitary confinement in SHU." (*Id.* ¶ 212). A sign was placed on his door "notifying anyone who passed by" that he "was not allowed to speak to anyone." (*Id.* ¶¶ 214–15). Larney was "not permitted to make phone calls, nor to have pen, paper, envelopes or stamps. He was also denied access to the law library." (*Id.* ¶ 216). He was transferred out of Upstate on June 26, 2015, after spending 14 days in SHU. (*Id.* ¶ 219).

### 9.   Plaintiff Launder

Launder was transferred to Upstate on June 12, 2015 and "immediately placed in solitary confinement in SHU." (*Id.* ¶¶ 224, 226). While in SHU, a sign was "posted on his cell door forbidding anyone to speak to him." (*Id.* ¶ 234). He was not provided with a change of underwear for four days, and he "was not permitted any privileges, nor was he permitted to speak

with anyone [or] to be spoken to." (*Id.* ¶¶ 228–29). Launder was held at Upstate until approximately June 25, 2015, spending a total of 13 days in SHU. (*Id.* ¶ 231).

### 10.    Plaintiff Mack

Mack was transferred to Upstate on June 15, 2015. (*Id.* ¶ 238). During the transfer, unnamed Defendant CERT Officers "handcuffed and shackled" his hands and feet "so tightly that they bled," "intentionally banged [his head] against the cell bars," and forcibly held "his arms up behind him and bending them over his head from the shoulder." (*Id.* ¶¶ 238–241). Mack heard Widdun, a CERT team supervisor, "order the members of the team who were doing the cuffing and shackling to make the restraints so tight that the inmates' veins would burst." (*Id.* ¶ 243). He was "not permitted to take his CPAP machine, which is a device that he must use when he sleeps because he suffers from sleep apnea." (*Id.* ¶ 257). He "has never been provided with a replacement CPAP machine." (*Id.* ¶ 258). Upon arrival at Upstate, Plaintiff Mack was "immediately placed in SHU" where "a sign was placed on the door of his cell reading 'Clinton—No Talk.'" (*Id.* ¶¶ 247, 249). While in SHU, he was "not permitted to speak to correction personnel, nor were they permitted to speak to him." (*Id.* ¶ 250). He was "denied the right to contact his family, either in writing or by telephone." (*Id.* ¶ 251). He "was often unable to eat the food that was provided to him while he was in SHU because it had been contaminated with saliva and urine." (*Id.* ¶ 252). "On other occasions . . . he was not fed at all." (*Id.* ¶ 253). Mack was transferred out of Upstate on July 6, 2015, after being confined to SHU for 21 days. (*Id.* ¶ 256).

### 11.    Plaintiff Manzella

Manzella was transferred to Upstate on June 15, 2015. (*Id.* ¶ 264). During the transfer, unnamed defendant CERT officers handcuffed him, "pushed him into the cell bars and punched him in the ribs." (*Id.*). They "screamed obscenities" at Manzella and dragged him "into a hallway

where they beat and kicked him." (*Id.* ¶¶ 268–69). Upon arrival at Upstate, he was "immediately placed in SHU, where he was not allowed to speak or be spoken to, and was denied the same privileges as have been alleged by his fellow plaintiffs." (*Id.* ¶ 274). Manzella spent approximately 28 days in SHU before he was transferred out of Upstate on or about July 13, 2015. (*Id.* ¶ 277).

### 12. Plaintiff Melendez

On June 22, 2015, Melendez was sent from Clinton to Alice Hyde Medical Center in Malone, New York, to have his gallbladder surgically removed. (*Id.* ¶ 287). Following surgery, he was transported to the infirmary at Upstate on June 24, 2015. (*Id.* ¶¶ 289–90). On June 29, 2015, Melendez was transferred to SHU "in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him." (*Id.* ¶¶ 292, 299). While at Upstate, he was "provided only with over-the-counter pain medications, although he was in a painful post-surgical condition, as a result of having an organ removed." (*Id.* ¶ 295). Melendez was transferred from Upstate on July 24, 2015 after spending 25 days in SHU. (*Id.* ¶ 297).

### 13. Plaintiff Nunez

Nunez was transferred to Upstate on June 16, 2015. (*Id.* ¶¶ 303, 309). During the transfer from Clinton, unnamed Defendant CERT Officers "threw him down on his bed and twisted his wrists, all the while yelling at him not to resist." (*Id.* ¶ 303). He was "tightly shackled, particularly on his left ankle," and "punched by several of the individual [D]efendants as they walked past him" while he waited to board the bus to Upstate. (*Id.* ¶ 307). Upon arrival to Upstate, he "was immediately placed in a cell in SHU" with "[a] sign reading 'Clinton—No talk' . . . placed on the front of [his] cell door." (*Id.* ¶¶ 309–311). Nunez was confined in SHU for 16 days before he was transferred to another correctional facility on July 2, 2005. (*Id.* ¶ 312).

### 14.   Plaintiff Ross

Ross was transferred to Upstate on June 15, 2015. (*Id.* ¶ 318). He alleges that, during the transfer, two unnamed Defendant CERT Officers "handcuffed him and dragged him through [Clinton], twisting one of his already handcuffed wrists, stomping on his left ankle, and pushing him down a flight of stairs." (*Id.* ¶ 320). At Upstate, "he was immediately assigned to a cell in SHU" with "[a] sign reading 'Clinton—No talk' . . . placed on the front of [his] cell door," causing him to "not hav[e] any idea as to when, if ever, he might be released from SHU." (*Id.* ¶¶ 320, 326). Ross "was forced to wear the same clothing he had been wearing" when he was removed from Clinton for the duration of the time he was in SHU. (*Id.* ¶ 325). He had "no clean underwear, no outer garments . . . no stamps or writing material and none of his legal papers" while he was at Upstate. (*Id.*). Plaintiff Ross was transferred out of Upstate on July 13, 2015 after spending a total of 28 days in SHU. (*Id.* ¶ 328).

### 15.   Plaintiff Toland

Toland was transferred to Upstate on or about June 15, 2015. (*Id.* ¶ 336). During the transfer, unnamed CERT Defendant Officers "handcuffed him very tightly[,] forcibly removed him from his cell," "twice slammed his forehead into a wall," and "grabbed the seat of [his] pants in such a manner as to force him to walk on his toes as they made their way through the prison." (*Id.* ¶¶ 336–38). While Toland was waiting to board the bus to Upstate, he "was ordered by one of the CERT defendants to look only at the ground," and then one of the unnamed Defendant CERT Officers "slapped" him. (*Id.* ¶¶ 341–42). "He told [Toland] that if [Toland] looked at him again, he would be looking at his teeth lying on the ground next to his boots." (*Id.* ¶ 344). Upon arrival to Upstate, Toland "was immediately put in a cell in SHU" with a sign on the door that "stated that he was a Clinton inmate who was not to be spoken to." (*Id.* ¶¶ 346, 348). He was not given "any soap or toiletries that he could use to wash or clean himself with"

13

for the first four days he was in SHU. (*Id.* ¶ 349). Toland, who is Muslim, told Defendant Uhler

and unnamed Defendant Correction Officers at SHU that "he needed his Quran," and that it was

"the basis of his religion, for prayer and study during Ramadan," which commenced while he

was being held in SHU. (*Id.* ¶¶ 353–356). His requests, however, were denied. (*Id.* ¶ 358).

Furthermore, Toland alleges that he was forced to leave his personal property behind at Clinton,

including "photographs of [Toland's] deceased brother and father, letters that [he] had received

from his deceased brother, legal documents, ear buds, books, food products, personal hygiene

products, and bowls and small storage containers." (*Id.* ¶¶ 350–51). Defendant Bissonette

"packed up [this] personal property" and, in the process, "urinated on several articles of

[Toland's] clothing, opened and dumped the contends of two five-pound bags of flour into two

separate bags containing [Toland's] property, and threw away, or stole, photographs." (*Id.*). He

"also intentionally broke certain other items belonging to [Toland], namely, his trimmers,

headphones, hot pot, back brace and two knee braces, which he had been prescribed by prison

medical staff." (*Id.* ¶ 352). After being confined to SHU for a period of 18 days, Plaintiff Toland

was transferred out of Upstate on July 3, 2015. (*Id.* ¶ 361).

## III.     STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim

to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d

129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Although a complaint need not contain detailed factual allegations, it may not rest on mere

labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the

factual allegations 'must be enough to raise a right to relief above the speculative level.'"

*Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist.

LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). The Court

must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

## IV.   DISCUSSION

### A.   Procedural Due Process Claims

The Court assumes the parties' familiarly with its previous memorandum-decision and order, in which it partially granted Moving Defendants' motion to dismiss and held that "considering the relatively short confinement, the facts in the Complaint do not plausibly suggest that Amante, Arismendi, Armento, Copeland, Ji, Larney, Launder, Mack, Manzella, Melendez, Nunez, or Toland endured 'a dramatic departure from the basic conditions' typically experienced by inmates confined to SHU or general population." *Martinaj I*, 2019 WL 652251, at *9, 2019 U.S. Dist. LEXIS 24896, at *26 (quoting *Sandin v. Conner*, 515 U.S. 472, 485 (1995)). However, with regard to Burnett, Martinaj, and Ross, the Court found that they "alleged additional facts—beyond being deprived of their personal property, certain SHU privileges, and any contact with prison officials—which plausibly indicate that the conditions to which they were subjected were sufficiently atypical and harsh so as to implicate denial a liberty interest." *Id.* at *10, 2019 U.S. Dist. LEXIS 24896, at *27. The Court incorporates its prior recitation of the due process standard.

Here, Moving Defendants contend that all due process claims should be dismissed because a violation of NYCRR § 301.7(a) would not, in and of itself, establish a constitutional violation and furthermore, it is not a procedural regulation. (Dkt. No. 42-1, at 15–16). The Court previously considered and rejected this argument. 2019 WL 652251, at *11, 2019 U.S. Dist. LEXIS 24896, at *30–31. Moving Defendants offer no new arguments, and accordingly, the Court declines to dismiss Plaintiffs' due process claims on this ground. *Id.*

Alternatively, Moving Defendants argue "the Court should dismiss Plaintiffs' Fourteenth Amendment Due Process claims because, even after amending their pleadings, Plaintiffs fail to allege that they were deprived of an actual protected liberty interest by being *temporarily* confined in the [SHU] at Upstate for periods of ranging from 13 days to 33 days." (Dkt. No. 42-1, at 8). Plaintiffs contend that "the nature of solitary confinement each was given with no end in sight [is] enough to allege a due process violation," and furthermore, they "allege . . . acts taken against them by various defendants that cannot be considered standard incidents of life in prison." (Dkt. No. 46, at 11).[4]

All of the Plaintiffs were, as Moving Defendants argue, confined for a relatively brief time; with the exception of Copeland and Burnett, all of the Plaintiffs were confined for less than the thirty days the *Sandin* plaintiff spent in SHU.[5] While "especially harsh conditions endured for a brief interval" might be atypical, *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999), the Court concluded in *Martinaj I* that "considering the relatively short confinement," and the caselaw concerning such periods of confinement, most of the Plaintiffs failed to plausibly allege that they endured a significant and atypical deprivation under *Sandin*. *Martinaj*, 2019 WL 652251 at *2, 2019 U.S. Dist. LEXIS 24896, at *26. The Court noted that "most of the Plaintiffs do not provide individualized, detailed facts regarding the conditions of their confinement necessary for the Court to determine whether they have plausibly alleged that their experience in

---

[4] Plaintiffs also argue that "the fact that no charges that might have constituted reasons for confining any one of them to SHU were ever brought . . . by itself constitutes a violation of due process." (Dkt. No. 46, at 11). This argument was raised, and rejected, in *Martinaj I*, 2019 WL 652251, at *7 n.6, 2019 U.S. Dist. LEXIS 24896, at 19 n.6 (stating that "regardless of the process (or lack of process) Plaintiffs allege they received before confinement to SHU, this Court 'must examine the circumstances of [Plaintiff's] confinement to determine whether the confinement affected a liberty interest' in the first place"); *see also Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998) ("No right to due process is implicated in the prison context unless a liberty interest has been deprived.").

[5] Copeland was in SHU for thirty-three days and Burnett was in SHU "for approximately one month." (Dkt. No. 40 ¶¶ 153, 156, 269).

SHU was atypical," and gave Plaintiffs an opportunity to amend the complaint. 2019 WL 652251 at *2, 13, 2019 U.S. Dist. LEXIS 24896, at *4, 22. However, as set forth in *Martinaj I*, and below, in light of the unusual facts of this case, including the allegation that the communication ban precluded Plaintiffs from reporting serious medical and dietary needs to prison officials, and at this early stage of the case, the Court has denied the motion to dismiss as to certain Plaintiffs, in order to create a factual record of the conditions of the confinement relative to ordinary prison conditions. *See Palmer*, 364 F.3d at 65–66 (noting that "[i]n the absence of a detailed factual record, [the Second Circuit has] affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions"); *Davis v. Barrett*, 576 F.3d 129, 134 (reversing summary judgment and remanding for further fact-finding to determine whether the plaintiff demonstrated a liberty interest when he alleges that he served forty-one days of administrative confinement, in a cell for twenty-four hours a day where his clothes and food had to be kept on the floor, "his mattress was 'infected' with body waste," and the cell "was subject to 'daily flooding,' and feces and urine thrown by other inmates").

### 1. Length of Confinement to a Cell, Amount of Exercise and Showers

In *Martinaj I*, the Court noted that "[t]he facts alleged in the Complaint do not indicate that Plaintiffs were confined to their cells for longer than the typical duration per day, [or] that they were denied exercise or adequate showers." 2019 WL 652251, at *8, 2019 U.S. Dist. LEXIS 24896, at *22. The Second Amended Complaint did not add any allegations regarding exercise or how long Plaintiffs were confined to their cells. Plaintiffs did add a new allegation regarding showers: Plaintiffs allege that Burnett was "prevent[ed] . . . from taking a shower for the entire time he was confined to SHU." (*Id.* ¶ 150).

In their response to the Moving Defendants' motion, Plaintiffs argue that, with the exception of Plaintiff Young, each of the Plaintiffs "was kept isolated to the point where he was not permitted to have any normal human conversation with anyone." (Dkt. No. 46, at 16). Plaintiffs request that "if they have not made sufficiently explicit the fact that they were not allowed any time whatsoever out of the cells in which they were kept isolated, that . . . the court take judicial notice of the fact that they have implied such when they state that they were not permitted to speak to any DOCCS personnel while they were at Upstate." (Dkt. No. 46, at 16).

The Court, however, made clear in its previous decision that it did not consider Plaintiffs' allegations to imply that they were kept confined in their cells 24 hours a day, without the opportunity to exercise. Plaintiffs failed to add such allegations to the Second Amended Complaint. Plaintiffs did add a new allegation that that Amante was "maintained in complete isolation." (Dkt. No. 40, ¶ 83). But given the fact that SHU exercise may be solitary in a SHU cage or pen, *see*, *e.g.*, *McClary v. Coughlin*, 87 F. Supp. 2d 205, 209 (W.D.N.Y. 2000), and the fact that the Court gave Plaintiffs an opportunity to amend the complaint after specifically identifying the facts that that would be relevant to the Court's determination of whether the Plaintiffs had plausibly alleged a liberty interest, the Court does not find it reasonable to construe "complete isolation" to mean that Amante never received the daily hour of exercise generally provided to inmates in SHU. Similarly, the Court does not find it reasonable to construe Plaintiffs' allegations that they were not permitted to speak to mean that they never received exercise.[6]

---

[6] Plaintiffs' suggestion that the Court should take judicial notice is without merit. There is no basis for "judicial notice" of any fact. *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute.").

2.      **Leave to Amend**

Plaintiffs alternatively request that the Court "permit each plaintiff to specifically allege

in a further amended pleading, that he was not permitted any time out of his cell while in SHU."

(Dkt. No. 46, at 16). Moving Defendants object and argue that "Plaintiffs should not be

permitted yet another opportunity to amend their pleading to add a wholly new factual allegation

about the conditions of their confinement at Upstate." (Dkt. No. 49, at 7).

The Court notes that a plaintiff's "failure to adequately plead his claims despite sufficient

opportunity to do so is, by itself, a sufficient basis for denying leave to amend." *Sauer v. Xerox*

*Corp.*, 173 F.R.D. 78, 80 (W.D.N.Y. 1997); *see also Denny v. Barber*, 576 F.2d 465, 471 (2d

Cir. 1978) (affirming the district court's denial of leave to amend for a second time when the

court, "in dismissing the initial complaint, had put plaintiff's counsel on the plainest notice of

what was required"). For the claims dismissed in *Martinaj I*, the Court clearly laid out the basis

for its decision and gave notice of what would be required for the Court to determine whether

Plaintiffs adequately alleged a liberty interest. Plaintiffs' response does not identify any

explanation for the failure to include, in the Second Amended Complaint, allegations regarding

exercise or the period of confinement to a cell. Plaintiffs have not identified any other facts they

seek to add to the complaint. Having given Plaintiffs notice and ample opportunity to amend

once, this second request to amend the complaint is denied.

The Court notes that, even if it did permit the Plaintiffs to amend to add an allegation that

the Plaintiffs were confined to their cells twenty-four hours a day without exercise, given the

relative brevity of the periods of confinement here, all less than the thirty days the *Sandin*

plaintiff spent in SHU, amendment would be futile because, as further described below, Plaintiffs

Amante, Arismendi, Ji, Larney, Launder, Manzella, Melendez, Nunez, Toland, and Young have

still failed to plausibly allege deprivations of sufficient gravity that are not endured by other

19

prisoners. *See Welch v. Bartlett*, 196 F.3d 389, 394 (2d Cir. 1999); *see also Arce v. Walker*, 139 F.3d 329, 337 (2d Cir. 1998) (upholding the dismissal of a plaintiff's due process claim where the plaintiff alleged he was deprived of exercise for 15 days (citing, *inter alia*, *Gill v. Pact Org.*, No. 95-cv-4510, 1997 WL 539948, at *10, 1997 U.S. Dist. LEXIS 13063, at *23–24 (S.D.N.Y. Aug. 28, 1997) (dismissing the plaintiff's due process claim because "loss of exercise privileges for twenty-six days does not constitute an atypical and significant hardship"))). Thus, Plaintiffs' request to amend is denied for the additional reason that amendment would be futile. *AEP Energy Servs. Gas Holding Co. v. Bank of America, N.A.*, 626 F.3d 699, 726 (2d Cir. 2010) ("Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim or fails to raise triable issues of fact.").

### 3.      Individual Plaintiffs' Claims

#### a.      Plaintiffs Launder, Manzella, Nunez

In *Martinaj I*, the Court held that Plaintiffs Launder, Manzella, and Nunez did not "plausibly allege an atypical and significant hardship under *Sandin*" because they had "assert[ed] virtually no allegations at all regarding the conditions to which they were exposed in SHU, aside from the fact that prison employees were prohibited from speaking with them." 2019 WL 652251, at *9, 2019 U.S. Dist. LEXIS 24896, at *23–24. In the Second Amended Complaint, these Plaintiffs add the following allegation: while they were being held in SHU, they were "interrogated by defendants . . . with regard to the escape of Matt and Sweat." (Dkt. No. 40, ¶ 230 (Launder); ¶ 276 (Manzella); ¶ 313 (Nunez)). Moving Defendants argue that "[t]his vague and conclusory allegation . . . 'does not constitute individualized, detailed facts regarding the conditions of [their] confinement' to show sufficient atypicality and harshness" because "[h]aving been allegedly 'interrogated' was not a condition of SHU confinement." (Dkt. No. 42-1, at 11 (quoting *Martinaj I*, 2019 WL 652251, at *2, 2019 U.S. Dist. LEXIS 24896, at *4)).

The Court agrees that, without more, the allegation that these Plaintiffs were "interrogated" while in SHU is not "a deprivation of sufficient gravity to support a claim of violation of the Due Process Clause." *Welch*, 196 F.3d at 394. As Defendants argue, Plaintiffs have not alleged any facts to suggest that the interrogations Launder, Manzella, and Nunez underwent differ from interrogations of inmates in the general population. *See Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999) ("Whether the conditions of [the plaintiff's] confinement constitute an atypical and significant hardship requires that they be considered in comparison to the hardships endured by prisoners in general population.").

Plaintiffs argue that the fact that there "was no end in sight" for their confinement to SHU is sufficient to plead a due process violation. (Dkt. No. 46, at 11). This argument is unavailing. In support, Plaintiffs cite *Zenon v. Downey*, No. 18-cv-0458, 2018 WL 6702851, at *4, 2018 U.S. Dist. LEXIS 215589, at *14 (N.D.N.Y. Dec. 20, 2018). There, presented with a similar set of facts, the court declined to dismiss the plaintiff's due process claim because, inter alia, the "[p]laintiff could see no light at the end of the tunnel; no one told him whether or when he would be released from solitary." *Id.* However, the court's decision did not rest on this allegation alone—the plaintiff in Zenon additionally alleged that he had spent 31 days in SHU and that he was "severely abused . . . on his way to the SHU, where he was locked up for twenty-four hours per day without contact with his family or medical attention for one month." *Id.* Plaintiffs offer no caselaw suggesting an allegation that an inmate initially placed in SHU for an indefinite period of time, but who served a SHU confinement of relative brevity, without more, is sufficient to implicate liberty interests under *Sandin*. Accordingly, the Court dismisses Launder, Manzella, and Nunez's due process claims.

### b.      Plaintiffs Larney and Toland

Larney and Toland's due process claims were dismissed in *Martinaj I* because, while

they had asserted "that they were denied access to various personal items generally permitted in

SHU" and were "denied privileges generally extended to SHU inmates," they were confined to

SHU for an "exceedingly short" period of time. 2019 WL 652251, at *8, 2019 U.S. Dist. LEXIS

24896, at *22–23 (quoting *Palmer*, 364 F.3d at 65–66). In the Second Amended Complaint,

Larney and Toland additionally allege that they were interrogated while in SHU. (Dkt. No. 40, ¶

217 (Larney), ¶ 360 (Toland)). As discussed *supra* Section IV.A.3.a., this allegation is

insufficient. Accordingly, Larney and Toland's[7] due process claims are dismissed.

### c.      Plaintiff Copeland

In *Martinaj I*, Copeland's claim was dismissed for the same reason as Larney and Toland.

2019 WL 652251, at *8, 2019 U.S. Dist. LEXIS 24896, at *22–23. In the Second Amended

Complaint, Copeland adds the following allegations: (1) he is a "Rastafarian and, thus, a

vegetarian," and "[b]ecause he was not able to speak to any correction personnel during the time

he was in SHU . . . he was unable to convey the fact that he was to receive a special diet" and

"was forced to subsist on bread and water the entire time he was in SHU," (Dkt. No. 40, ¶¶ 163–

64), and (2) "he was denied access to writing materials and was denied medical care for his pre-

existing high blood pressure." (*Id.* ¶ 167). As a result of "his being denied treatment" for high

---

[7] Plaintiffs contend that Toland's allegations that his Quran was withheld do "not have to be analyzed exclusively as a violation of [Toland's] first amendment rights," and the "court should compare the restrictions on Toland's exercise of religion while in SHU to the restrictions placed on Muslims in general population." (Dkt. No. 46, at 14). The Court recognizes that it is "proper as an element of the *Sandin* atypicality analysis to compare the restrictions on [Toland's] exercise of religion" in SHU "to the restrictions placed on [Muslim] in the general population." *Taylor v. Rodriguez*, 238 F.3d 188, 197 (2d Cir. 2001). The Court notes that, even if Toland's allegations regarding his Quran are considered as part of his due process claim, he nevertheless fails to allege an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life" given the brevity of his confinement in SHU. *Zenon*, 2018 WL 6702851, at *3–4, 2018 U.S. Dist. LEXIS 215589, at *9 (quoting *Sandin*, 515 U.S. at 484); *see Arce v. Walker*, 139 F.3d 329, 336–37 (2d Cir. 1998) (finding that deprivation of exercise and access to communal religious services during an eighteen-day segregation was not an atypical and significant hardship).

blood pressure, his condition "dangerously worsened." (*Id.* ¶ 168). Moving Defendants argue

that, because of his "relatively short period of confinement in SHU (33 days), these alleged

conditions do not rise to the level of atypicality and harshness," because "Copeland does not

allege that anyone at Upstate knowingly failed to provide him a nutritiously adequate vegetarian

meal," he "fails to explain how his diet . . . impacted him," and "he fails to allege, with any

meaningful detail, 'how he was affected' by" the denial of his blood pressure medication. (Dkt.

No. 42-1, at 14 (quoting *Martinaj I*, 2019 WL 652251, at *9, 2019 U.S. Dist. LEXIS 24896, at

*25)).

The Court disagrees. Here, Copeland spent more than 30 days in SHU. (Dkt. No. 40,

¶ 169). He alleges that he could not request vegetarian meals and so was forced to subsist on

bread and water, was denied writing materials, and was denied medical care for high blood

pressure, which "dangerously worsened." (*Id.* ¶¶ 163–168). Considering Copeland's specific

allegations regarding the inadequate diet and nutrition, lack of medical care, and inability to

communicate his needs, the Court finds that he has plausibly alleged at this stage of the

proceedings that "the conditions [of his confinement] . . . were a 'dramatic departure from the

basic conditions' prisoners endure in the general population or during routine administrative

segregation." *Zenon*, 2018 WL 6702851, at *4, 2018 U.S. Dist. LEXIS 215589, at *14–15

(quoting *Sandin*, 515 U.S. at 484).

### d.      Plaintiff Armento

In *Martinaj I*, the Court dismissed Armento's due process claim because, inter alia, his

claim that his "'medical records . . . with regard to prescription medicines he was to be given on

a daily basis' were not transferred to Upstate" was "lacking in detail"; he did "not describe his

ailment or allege that he was actually denied prescription medication and, if so, how he was

affected during SHU." 2019 WL 652251, at *9, 2019 U.S. Dist. LEXIS 24896, at *25. In the

Second Amended Complaint, Armento adds that the medical records that were not transferred concerned his "prescription medications for high blood pressure and chronic back pain."[8] (Dkt. No. 40, ¶ 129). Armento has also alleged that "no one was permitted to speak with him, he was denied access to writing materials and he was not even provided with a grievance form." (*Id.* ¶ 130). Defendants contend that "adding a brief description of the medical *records* that were not transferred is insufficient" because he "still fails to allege that 'he was actually denied prescription medication' or 'how he was affected' at Upstate (for a temporary period of 14 days)." (Dkt. No. 42-1, at 12 (quoting *Martinaj I*, 2019 WL 652251, at *9, 2019 U.S. Dist. LEXIS 24896, at *25)). Plaintiffs claim that this allegation is sufficient because "[w]ithout such notice being provided to personnel at Upstate . . . he was thereby denied medical care and treatment" and "it would seem logical that the denial of such medications would have had a deleterious effect on [him]." (Dkt. No. 46, at 12).

Although neither party refers to it, the Court notes that the Second Amended Complaint alleges that Defendants "prevented [Armento] from receiving his prescribed medicine." (Dkt. No. 40, ¶ 136). The Court finds that Plaintiff has adequately alleged that that he was deprived of prescription medication for both high blood pressure and chronic back pain that he took on a daily basis. Although the period of Armento's confinement was relatively brief, given the allegation that he was precluded from communicating with anyone about his medical needs at this stage, the Court cannot say that as a matter of law Armento could not establish an "'atypical and significant hardship," and the Court declines to dismiss his due process claim absent a more fully developed record. *See Palmer*, 364 F.3d at 65–66.

---

[8] Armento also adds an allegation that he was interrogated while in SHU, (Dkt. No. 40, ¶ 131), but as discussed *supra* Section IV.A.1, this allegation is insufficient.

### e.   Plaintiff Melendez

Like Armento's claim, Melendez's due process claim was previously dismissed because while he "assert[ed] that he was 'provided only with over-the-counter medications' after undergoing gallbladder surgery . . . he alleges nothing from which to plausibly infer that the treatment he received in SHU was in any way different from that he would have received in the infirmary or in general population." *Martinaj I*, 2019 WL 652251, at *9, 2019 U.S. Dist. LEXIS 24896, at *25–26. Melendez was in the infirmary at Upstate for five days after his surgery, before being transferred to SHU. (Dkt. No. 40, ¶¶ 289–92). The only allegation that he added in the Second Amended Complaint was that that he "continued to be interrogated by defendants . . . with regard to the escape of Matt and Sweat." (*Id*., ¶ 296). As discussed *supra* Section IV.A.3.a., this allegation is insufficient. As such, his due process claim is dismissed.

### f.   Plaintiffs Arismendi and Ji

In the Second Amended Complaint, Arismendi adds allegations that he "was unable to obtain any medical treatment for the injuries that he had suffered as a result of the . . . beatings" because he was not "able to speak to any employees at Upstate." (Dkt. No. 40, ¶ 113). He also adds that he "continued to be interrogated by defendants . . . with regard to the escape of Matt and Sweat." (*Id.* ¶ 114). Similarly, Ji adds allegations that while in SHU, he was interrogated and "he was not permitted . . . medical care, including treatment for the injuries he had suffered at Clinton." (*Id.* ¶¶ 191, 193). Moving Defendants contend that Arismendi "fails to support a general description of the alleged injuries or what necessary medical care (if any) was denied, and his conclusory allegation of being 'interrogated' is insufficient to support a due process claim," and Ji's "allegation about denial of medical care was not substantially enhanced by vaguely linking the alleged medical needs to injuries sustained at Clinton." (Dkt. No. 42-1, at 10, 13).

The Court agrees with Moving Defendants. As discussed *supra* Section IV.A.3.a.,

Arismendi and Ji's allegations regarding being interrogated are insufficient. Further, the

allegations that they were unable to obtain medical treatment while in SHU is vague, and do not

specify what injuries they had or what kind of medical care was necessary. Arismendi and Ji

were in SHU for a short period of time—18 and 15 days, respectively—and they have not

alleged sufficient facts to show their conditions of confinement "were so atypical compared to

ordinary prison life as to give rise to a protected liberty interest, particularly in light of the

relative brevity of that confinement." *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 277 (N.D.N.Y.

2018) (quoting *Allah v. Poole*, 506 F.Supp.2d 174, 191 (W.D.N.Y. 2007) (dismissing the

plaintiff's due process claim for failing to establish a liberty interest after being confined to SHU

for fourteen days without his "personal property, hygiene products, stamps, and commissary"

and without a "functioning toilet or running water for four days"). Therefore, the Court dismisses

Arismendi and Ji's due process claims.

### g.      Plaintiff Amante

In the Second Amended Complaint, Amante alleges that, during his 28 days in SHU, he

was "maintained in complete isolation." (Dkt. No. 40, ¶ 83). Moving Defendants argue that his

allegations still "fall short of providing 'individualized, detailed facts regarding the conditions of

[his] confinement necessary' to plausibly allege that his SHU experience was atypical." (Dkt.

No. 42-1, at 10 (quoting *Martinaj I*, 2019 WL 652251, at *2, 2019 U.S. Dist. LEXIS 24896, at

*4)).

The Court agrees. Amante's allegation that he was kept in isolation is vague, and he

offers no additional facts about the conditions of his confinement. Even if the Court were to infer

this allegation to mean that Amante was confined to his cell for 24 hours a day without exercise,

considering the brevity of his stay in SHU, this would be insufficient to create a liberty interest.

*See Arce*, 139 F.3d at 337  (upholding the dismissal of a plaintiff's due process claim where the plaintiff alleged he was deprived of exercise for 15 days) (citing, inter alia *Gill*, 1997 WL 539948, at *10, 1997 U.S. Dist. LEXIS 13063, at *23–24 (dismissing the plaintiff's due process claim because "loss of exercise privileges for twenty-six days does not constitute an atypical and significant hardship")).

Accordingly, the Court dismisses Amante's claim because he has failed to allege specific facts showing that his confinement imposed an "'atypical and significant hardship on [him] in relation to the ordinary incidents of prison life.'" *Zenon*, 2018 WL 6702851, at *3–4, 2018 U.S. Dist. LEXIS 215589, at *9 (quoting *Sandin*, 515 U.S. at 484).

### h.    Plaintiff Young

In the Complaint, Young did not assert a due process claim. *Martinaj I*, 2019 WL 652251, at *2 n.4, 2019 U.S. Dist. LEXIS 24896, at *3 n.4. In the Second Amended Complaint, Young alleges that he was sentenced to twenty days in keeplock as the result of a false disciplinary charge, and this violated his right to due process. (Dkt. No. 40, ¶¶ 403–05). Moving Defendants contend that "22[9] days of keeplock confinement alone is insufficient to create a liberty interest triggering due process protection." (Dkt. No. 42-1, at 9). The Court agrees. Young was in keeplock less than 30 days, and there is "no indication that [he] endured unusual SHU conditions." *Palmer*, 364 F.3d at 66; *see also Colon v. Annucci*, 344 F. Supp. 3d 612, 633 (S.D.N.Y. 2018) (holding that the plaintiff did not possess a "liberty interest implicating the Fourteenth Amendment" when he was "sentenced to only thirty days in keeplock"). Accordingly, his due process claim is dismissed.

---

[9] Moving Defendants refer to the fact that Young spent 22 days in keeplock, but it is not clear where this number comes from—Young alleges that he was "sentenced to 20 days in keeplock." (Dkt. No. 40, ¶ 404).

#### i.      Plaintiffs Burnett, Martinaj, Ross, and Mack

Moving Defendants do not offer any specific arguments as to why Burnett, Martinaj, Ross, and Mack's due process claims should be dismissed, other than their general assertion that "the Court should dismiss Plaintiffs' Fourteenth Amendment Due Process claims because, even after amending their pleadings, Plaintiffs fail to allege that they were deprived of an actual protected liberty interest by being *temporarily* confined" in SHU. (Dkt. No. 42-1, at 8).

In *Martinaj I*, the Court declined to dismiss Burnett, Martinaj, and Ross's due process claims because they "ha[d] alleged additional facts—beyond being deprived of their personal property, certain SHU privileges, and any contact with prison officials—which plausibly indicate that the conditions to which they were subjected were sufficiently atypical and harsh so as to implicate denial of a liberty interest." 2019 WL 652251, at *10, 2019 U.S. Dist. LEXIS 24896, at *27. Defendant has made no arguments that this conclusion should be revisited in light of the Second Amended Complaint, and accordingly, the Court declines to dismiss their due process claims.

Mack's claim was previously dismissed, and in the Second Amended Complaint he added allegations that: (1) he "was often unable to eat the food that was provided to him while he was in SHU because it had been contaminated with saliva and urine," (2) "[o]n other occasions while he was in SHU . . . he was not fed at all," and (3) "his health has been, and remains, endangered" because he was "not permitted to take his CPAP machine" and "has never been provided a replacement CPAP machine," which he uses because "he suffers from sleep apnea, a potentially serious sleep disorder." (Dkt. No. 40, ¶¶ 252–53, 257–58). Mack's eighteen days in SHU was relatively brief. However, considering these additional allegations, combined with Mack's allegations that he "was not permitted to speak to correction officers or medical personnel, nor were they permitted to speak to him," the Court finds that he has plausibly alleged

that the conditions he was subjected to were sufficiently atypical and harsh. *See Headley v. Fisher*, No. 06-cv-6331, 2010 WL 2595091, at *4, 2010 U.S. Dist. LEXIS 63836, at *10 (S.D.N.Y. June 28, 2010) ("[U]nder certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." (quoting *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983))). Accordingly, the Court declines to dismiss his due process claim.

### B. Plaintiff Copeland's Excessive Force Claim

Moving Defendants contend that Copeland's excessive force claim should be dismissed because he "does not claim that any excessive *physical* force was used against him," and "alleges, at most, generalized verbal abuse, which is insufficient to state a claim." (Dkt. No. 42-1, at 18). Plaintiffs do not respond this point, but generally argue that "[e]ach of the plaintiffs in this case contends that the treatment he alleges in his cause of action is sufficient to state a plausible claim pursuant to . . . [the] eighth amendment[]" because "[f]orce used against a prisoner that is not aimed at maintaining or restoring discipline in a good faith manner or that does not serve a legitimate penalogical [sic] objective but is rather malicious, sadistic, and intended to cause harm violates the eighth amendment." (Dkt. No. 46, at 17). In reply, Moving Defendants argue that "[b]ecause Plaintiffs do not squarely oppose dismissal of Copeland's excessive force claim, such claim has been abandoned." (Dkt. No. 49, at 8).

Even assuming Copeland has not abandoned this claim, he nevertheless fails to state a claim for excessive force. As Defendants contend, "[a]llegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983." *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996); *see also Tafari v. McCarthy*, 714 F. Supp. 2d 317, 365 (N.D.N.Y. 2010) (dismissing an excessive force claim because "[a]bsent physical injury, verbal threats and abuse are insufficient to support a constitutional violation"). Copeland alleges that he was "threatened and cursed at," and this "abuse" was done in the presence of Racette and Quinn.

29

(Dkt. No. 40, ¶¶ 158–59). He does not allege that he was physically assaulted or injured. His excessive force claim is therefore dismissed.

### C.      Personal Property Claims

In the Second Amended Complaint, several Plaintiffs allege loss or damage to their personal property. (*See, e.g.,* Dkt. No. 40, ¶¶ 133, 192, 350–51). Moving Defendants argue that "[t]o the extent any of the Plaintiffs assert claims for loss or damage or personal property, those claims should be dismissed as they're not actionable in federal court under 42 U.S.C. § 1983" because there are adequate post-deprivation remedies in the New York Court of Claims. (Dkt. No. 42-1, at 19–20 (citing *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001))). In reply, Moving Defendants further contend that "[b]ecause Plaintiffs do not oppose dismissal of the personal property claims, such claims have been abandoned." (Dkt. No. 49, at 9 (citing *Forney*, 96 F. Supp. 3d at 11)).

Plaintiffs did not respond to Moving Defendants' argument that any personal property claims are not actionable under § 1983. While Plaintiffs discuss personal property in their opposition to the motion to dismiss, they only discuss the loss and damage of their property as it pertains to their Fourteenth Amendment Due Process claims related to their confinement in SHU and their Eighth Amendment conditions of confinement claims. (*See* Dkt. No. 46, at 8, 14, 18). They do not clarify whether they are asserting deprivation of property claims; nor do they offer any argument as to how any such claims would be cognizable under § 1983. *See Acevedo v. Fischer*, No. 12-cv-6866, 2014 WL 5015470, at *13, 2014 U.S. Dist. LEXIS 139057, at *41 (S.D.N.Y. Sept. 29, 2014) ("[T]he Second Circuit has determined that 'New York in fact affords an adequate post-deprivation remedy in the form of, inter alia, a Court of Claims action.'" (quoting *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001))). The Court therefore finds any personal property claims to be abandoned, and, to the extent Plaintiffs assert deprivation of

property claims, they are dismissed. *See Mainella v. Golub Corp.*, No. 15-cv-1082, 2018 WL 1587049, at *7, 2018 U.S. Dist. LEXIS 51119, at *20 (N.D.N.Y. Mar. 28, 2018) ("Where a plaintiff fails to respond to a defendant's arguments regarding some of her claims but responds to its arguments regarding other claims, the courts generally assume that the plaintiff has abandoned those claims.").

### D.     Medical Indifference Claims

Moving Defendants note that "[t]he Second Amended Complaint does not explicitly assert a medical indifference claim, but several Plaintiffs allege lack of medical records or medication during their temporary stays at Upstate." (Dkt. No. 42-1, at 20). Defendants contend that "to the extent that the Second Amended Complaint is construed to assert medical indifference claims, any such claims should be dismissed because the allegations fail to meet the pleading standard and Plaintiffs fail to allege personal involvement by the [Moving] Defendants." (*Id.* at 21). Defendants argue that none of the Plaintiffs has plausibly alleged facts sufficient to meet either the objective or the subjective standards of a medical indifference claim. (*Id.* at 21–23). In reply, Moving Defendants further assert that because "Plaintiffs do not provide any opposition to dismissal of the medical indifference claims [in their opposition] . . . such claims have been abandoned." (Dkt. No. 49, at 9).

The Court agrees with Moving Defendants that any medical indifference claims asserted by Plaintiffs have been abandoned. *See Mainella*, 2018 WL 1587049, at *7, 2018 U.S. Dist. LEXIS 51119, at *20. Plaintiffs did not respond to the Defendants' argument that any Eighth Amendment medical indifference claims should be dismissed for failure to state a claim. Plaintiffs only discuss their allegations related to a lack of medical care in relation to their Fourteenth Amendment Due Process claims and Eighth Amendment conditions of confinement

claims. (*See* Dkt. No. 46, at 12, 18). Accordingly, to the extent any Plaintiffs were asserting medical indifference claims, these claims have been abandoned and are therefore dismissed.

### E.    Plaintiff Toland's Freedom of Religion Claim

Moving Defendants argue that Toland's allegation that he was "unreasonably prevented from practicing his religious rites and celebrating Ramadan" should be dismissed because it is "a legal conclusion rather than a specific factual allegation." (Dkt. No. 42-1, at 23 (quoting Dkt. No. 40, ¶ 359)). Moving Defendants further argue that the Court should find this claim abandoned because Plaintiff's "narrative of [Toland's allegations]" does not "provide any opposition to the Moving Defendants' argument that Toland's First Amendment freedom of religion claim should be dismissed." (Dkt. No. 49, at 9).

The Court finds that Toland did not abandon his claim. In opposition to Moving Defendants' motion to dismiss, Plaintiffs narrated the underlying facts of Toland's claim—that Captain John Doe intentionally and purposefully denied "his Quran for use during Ramadan," (Dkt. No. 46, at 14)—and argued that these allegations do "not have to be analyzed *exclusively* as a violation of [Toland's] first amendment rights." (*Id.* (emphasis added)). Toland thus indicated he was not intending to withdraw his freedom of religion claim and articulated facts— the withholding of his Quran—sufficient to rebut Moving Defendants' assertion that the Second Amended Complaint solely contained legal conclusions.[10] Accordingly, the Court declines to dismiss Toland's freedom of religion claim.

---

[10] The Second Amended Complaint alleges that Toland told Defendants Uhler and Captain Doe that he needed his Quran for prayer and study during Ramadan, and that they refused to give Toland his Quran. (Dkt. No. 40, ¶¶ 357– 58). Moving Defendants did not address the merits of Toland's First Amendment Freedom of Religion claim, and the Court does not address that issue.

### F.      Eighth Amendment Conditions of Confinement Claims

In *Martinaj I*, the Court dismissed Plaintiffs' conditions of confinement claims because Plaintiffs had "contend[ed] that the Complaint does not assert an Eighth Amendment conditions of confinement claim, but rather . . . their allegations regarding conditions in SHU at Upstate support their assertion that, with regard to their Fourteenth Amendment due process claim, they were deprived of a liberty interest." 2019 WL 652251, at *6, 2019 U.S. Dist. LEXIS 24896, at *17. The Second Amended Complaint alleges violations of the "right to be free from cruel and unusual punishments, guaranteed . . . by the eighth amendment to the Constitution of the United States." (*See, e.g.*, Dkt. No. 40, ¶¶ 71, 90, 120, 136). Moving Defendants argue that "[n]othing in the Second Amended Complaint suggests that Plaintiffs now intend to change course and assert Eighth Amendment conditions of confinement claims" but "[o]ut of an abundance of caution, [they] respectfully ask the Court to dismiss any conditions of confinement claims that could be construed in the Second Amended Complaint." (Dkt. No. 42-1, at 24). Defendants did not otherwise brief the viability of these claims in their motion to dismiss. In response, Plaintiffs clarified that they were asserting conditions of confinement claims and argued that they "have credibly and plausibly alleged that the conditions in which they were confined at Upstate . . . constituted cruel and unusual punishment." (Dkt. No. 46, at 18). In reply, Moving Defendants contend that "such claims are duplicative of the Fourteenth Amendment due process claims and, in any event, Plaintiffs wholly fail to state a conditions of confinement claim and those claims should be dismissed for the same reasons set forth in the Court's prior decision." (Dkt. No. 49, at 9–10).

Given that the Court previously dismissed the conditions of confinement claims because Plaintiffs had withdrawn them, Moving Defendants' argument that they should be dismissed here "for the same reasons" is unavailing in light of the Second Amended Complaint and Plaintiffs'

response. Moving Defendants' other argument, that Plaintiffs have "failed to state a claim," is vague and conclusory, and does not raise any specific arguments as to why Plaintiffs' conditions of confinement claims are meritless. Accordingly, the Court declines to dismiss them at this stage.[11]

### G.    Plaintiff Young's Retaliation Claim

The Court dismissed Young's retaliation claim in *Martinaj I* because he failed to respond "to the [M]oving Defendants argument that this claim should be dismissed as to them for a lack of personal involvement," so the Court found the claim "to have been abandoned." 2019 WL 652251, at *6 n.5, 2019 U.S. Dist. LEXIS 24896, at *17 n.5. Here, Moving Defendants move again on the same grounds and argue Young's retaliation claim should be "dismissed for lack of personal involvement by any of the Defendants." (Dkt. No. 42-1, at 24). Plaintiffs do not address this argument, and Moving Defendants thus argue that Young has abandoned his retaliation claim. (Dkt. No. 49, at 10). The Court agrees. Given Plaintiffs' failure to address Moving Defendants' argument, the Court finds this claim to be abandoned. *Mainella*, 2018 WL 1587049, at *7, 2018 U.S. Dist. LEXIS 51119, at *20.

### H.    Defendant Racette's Personal Involvement

Moving Defendants contend that "Racette should be dismissed because Plaintiffs fail to allege any personal involvement on [his] part." (Dkt. No. 42-1, at 16–18). This argument is in line with the Court's decision in *Martinaj I*, where it dismissed the due process claims against Racette because, without more, "his supervisory position at Clinton [was] insufficient to

---

[11] The Court also declines to dismiss Plaintiffs' Fourth Amendment claims. Although Plaintiffs failed to identify any basis for a Fourth Amendment claim during oral argument, the Court declines to rule on it at this stage because Moving Defendants first sought dismissal of this claim in their reply brief. *See Jiles v. Rochester Genesee Reg'l Transp. Auth.*, 317 F. Supp. 3d 695, 701 (W.D.N.Y. 2018) ("[I]t is well settled that courts should not consider arguments first raised in a party's reply brief which afford no opportunity for response from the opposing party." (quoting *Haywin Textile Prods., Inc. v. Int'l Fin. Inv.*, 137 F. Supp. 2d 431, 434 n.2 (S.D.N.Y. 2001))).

establish his personal liability." 2019 WL 652251, at *12, 2019 U.S. Dist. LEXIS 24896, at *35. Here, Moving Defendants argue that "there is no allegation that Racette had any involvement in the claimed denial of Plaintiffs' procedural due process rights (or any other alleged constitutional violations)."[12] (Dkt. No. 42-1, at 17). Plaintiffs do not respond to Moving Defendants' arguments, and Moving Defendants thus argue that "the Court should deem the claims against Racette to be abandoned." (Dkt. No. 49, at 8 (citing *Forney v. Forney*, 96 F. Supp. 3d 7, 11 (E.D.N.Y. 2015)). The Court agrees and dismisses the claims against Racette. *See Mainella*, 2018 WL 1587049, at *7, 2018 U.S. Dist. LEXIS 51119, at *20.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants Uhler, Bellnier, Racette, Quinn, Stickney, Bissonette, St. Louis, and Shutts' partial motion to dismiss (Dkt. No. 42-1) is **GRANTED in part and denied in part**; and it is further

**ORDERED** that Plaintiffs Amante, Arismendi, Ji, Larney, Launder, Manzella, Melendez, Nunez, Toland, and Young's Fourteenth Amendment procedural due process claims are **DISMISSED**; and it is further

**ORDERED** that Plaintiffs' (i) Eighth Amendment medical indifference claims and (ii) personal property claims against Defendants Uhler, Bellnier, Racette, Quinn, Stickney, Bisonette, St. Louis, and Shutts are **DISMISSED**; and it is further

**ORDERED** that Plaintiff Copeland's Eighth Amendment excessive force claim is **DISMISSED**; and it is further

---

[12] The Court notes that while Copeland alleges that Racette was present during his "interrogation, search and abuse," (Dkt. No. 40, ¶ 159), Copeland's excessive force claim has been dismissed and thus this allegation is insufficient to establish Racette's personal liability. *See supra* Section IV.B.

**ORDERED** that Plaintiff Young's First Amendment retaliation claim against Defendants Uhler, Bellnier, Racette, Quinn, Stickney, Bisonette, St. Louis, and Shutts is **DISMISSED**; and it is further

**ORDERED** that Plaintiffs' § 1983 claims against Defendant Racette are **DISMISSED**; and it is further

**ORDERED** that the Clerk is directed to terminate Defendant Racette; and it is further

**ORDERED** that Defendants' motion (Dkt. No. 42) is otherwise **DENIED**.

**IT IS SO ORDERED.**

Dated:  July 14, 2020
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge

36