**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

BERNARDO MARTINAJ, JOHN AMANTE, FABIAN
ARISMENDI, STEVE ARMENTO, CHASE BURNETT,
PHILLIP COPELAND, HONG JI, JAMES LARNEY, ERIC
LAUNDER, ANTHONY MACK, RUDOLPH MANZELLA,
GEORGE MELENDEZ, MANUEL NUNEZ, SCOTT ROSS,
CHARLES W. TOLAND, JR., and SCOTT YOUNG,

                                        Plaintiffs,

v.                                                              9:18-cv-00257 (BKS/DJS)

SUPERINTENDENT DONALD UHLER, JOSEPH
BELLNIER, FIRST DEPUTY SUPERINTENDENT DONALD
QUINN, C.O. CHAD STICKNEY, C.O. TAMMER, C.O. J.
BISSONETTE, CERT OFFICER WIDDUN, LIEUTENANT
BRUCE SHUTTS, C.O. ST. LOUIS, CERT OFFICER No. 3441
or 3448, CERT OFFICER No. 1537, STATE TROOPERS 1–20,
CERT OFFICERS 1–20, CIU OFFICERS 1–20, and
CORRECTION OFFICERS 1–20,

                                        Defendants.

_____

**Appearances:**

_For Plaintiffs:_
Alan D. Levine
Office of Alan D. Levine
80-02 Kew Gardens Road, Suite 307
Kew Gardens, NY 11415

_For Defendants Uhler, Bellnier, Quinn, St. Louis, Bissonette, Stickney, and Shutts:_
Letitia A. James
Attorney General of the State of New York
Kostas D. Leris
Erik Pinsonnault
David C. White
Assistant Attorneys General, of Counsel
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

This action arises from alleged constitutional violations that occurred at Clinton Correctional Facility ("Clinton") and Upstate Correctional Facility ("Upstate") in the aftermath of David Sweat and Richard Matt's escape from Clinton in June 2015. Plaintiffs are sixteen inmates who were incarcerated at Clinton at the time of the escape. (Dkt. No. 40, ¶¶ 6-21). They bring this action under 42 U.S.C. § 1983, alleging that Defendant New York State Department of Corrections and Community Supervision ("DOCCS") superintendents, supervisors, Corrections Emergency Response Team ("CERT") officers, Crisis Intervention Unit ("CIU") officers, and correctional officers confiscated their personal property and violated their First, Fourth, Eighth, and Fourteenth Amendment rights through various acts of violence and misconduct. (Dkt. No. 40).[1]

Defendants Uhler, Bellnier, Racette, Quinn, Stickney, Bissonette, and St. Louis previously moved to dismiss the Complaint, (Dkt. No. 9), which the Court granted in part and denied in part. *Martinaj v. Uhler ("Martinaj I")*, No. 18-cv-00257, 2019 WL 652251, 2019 U.S. Dist. LEXIS 24896 (N.D.N.Y. Feb. 15, 2019). Plaintiffs filed a Second Amended Complaint, (Dkt. No. 40), and Defendants Uhler, Bellnier, Racette, Quinn, Stickney, Bissonette, St. Louis, and Shutts moved to dismiss certain of the claims. (Dkt. No. 42). The Court granted that motion in part. *Martinaj v. Uhler ("Martinaj II")*, No. 18-cv-00257, 2020 WL 3971523, 2020 U.S. Dist. LEXIS 123309 (N.D.N.Y. July 14, 2020).

---

[1] Plaintiffs have also named as defendants unnamed individuals, including "State Troopers 1-20," who are not the subject of the pending motion.

Defendants Uhler, Bellnier, Quinn, St. Louis, Bissonette, Stickney and Shutts ("Defendants") now move for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure against all Plaintiffs except Nunez, on the grounds that Plaintiffs failed to exhaust their administrative remedies with respect to certain Eighth Amendment excessive force and conditions of confinement claims. (Dkt. No. 58-9).[2] The parties have filed responsive briefings. (Dkt. Nos. 77, 82). For the following reasons, Defendants' motion is granted in part and denied in part.

## II.   BACKGROUND[3]

The Court assumes familiarity with the facts and procedural history of this case, as set forth in *Martinaj I* and *Martinaj II*. Generally, as set forth in more detail below, Plaintiffs have alleged that following the escape of David Sweat and Richard Matt, most of the Plaintiffs, who were all housed in the same Honor Block as the escapees, were subject to interrogation and beatings at Clinton and then transferred to a Special Housing Unit ("SHU") at Upstate where they were subjected to unusually harsh conditions. (Dkt. No. 40). Upstate is a maximum security prison comprised of SHU cells in which inmates are generally confined for 23 hours each day, primarily for disciplinary reasons. (Dkt. No. 58-3, at 5 n.3).

According to the Defendants, "approximately 60 inmates from Clinton CF were temporarily held intransit status at Upstate CF during the state of emergency in June 2015," and

---

[2] In *Martinaj I*, Plaintiffs stated that the Complaint did not assert Eighth Amendment conditions of confinement claims, and the Court ruled that any such claims were dismissed. 2019 WL 652251, at *6, 2019 U.S. Dist. LEXIS 24896, at *17 (N.D.N.Y. Feb. 15, 2019). Plaintiffs were allowed to amend, and in *Martinaj II*, "Plaintiffs clarified that they were asserting conditions of confinement claims" in the Second Amended Complaint. 2020 WL 3971523, at *15, 2020 U.S. Dist. LEXIS 123309, at *49 (N.D.N.Y. July 14, 2020).

[3] **The Court has only addressed the facts relevant to the excessive force claims and condition of confinement claims at issue here. The facts are drawn from Defendants' statement of material facts, (Dkt. No. 58-8), and attached exhibits, (Dkt. Nos. 58-2 through 58-7), and Plaintiff's response thereto, (Dkt. Nos. 78, 85), and attached exhibits, (Dkt. Nos. 79-1 through 79-16). The Second Amended Complaint, (Dkt. No. 40), has been cited only to establish the allegations at issue. The facts are construed in the light most favorable to Plaintiffs. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).**

"their personal property was withheld pending transfer to a new owning facility." (Dkt. No. 79-15, at 2). Defendants have cited to New York regulations which provide that, in addition to disciplinary and administrative reasons, inmates can be confined to SHU "for any other reason." N.Y. Comp. Codes R. & Regs. Tit. 7, § 301.7(a). (Dkt. No. 79-15, at 2).

Plaintiffs have alleged that in SHU at Upstate they were "maintained in complete isolation"; that a sign was placed on their door forbidding employees from speaking with them; various interrogations continued; and certain Plaintiffs were deprived of medicine and medical treatment. (*See generally* Dkt. No. 40). Plaintiffs variously assert that they were "denied access to various personal items generally permitted in SHU, including writing materials, soap or toiletries for four days . . . personal legal materials . . . and denied privileges generally extended to SHU inmates, including mail . . . visits . . . and access to law library materials." *Martinaj I*, 2019 WL 652251, at *8, 2019 U.S. Dist. LEXIS 24896, at *22-23 (record citations omitted).

The facts concerning the Plaintiffs' access to the grievance process while they were at Upstate are disputed. Plaintiffs Arismendi and Ji have asserted that they did not have access to writing material while at Upstate, and Arismendi asserted that he was only able to submit a grievance after obtaining paper and a pen from another inmate. (Dkt. No. 79-3, ¶ 1; Dkt. No. 85, at 2-3). Arismendi, Martinaj, Mack, and Manzella all asserted that they attempted to submit grievances at Upstate which never reached the grievance office. (Dkt. No. 79-1, at ¶ 1; Dkt. No. 79-3, ¶ 1; Dkt. No. 79-9, ¶ 2; Dkt. No. 79-10, ¶ 3). Martinaj, Armento, Copeland, Ross, and Toland were able to successfully file at least one grievance on a grievance form at Upstate. (Dkt. No. 58-3, at 47, 60, 64-65, 70). Other grievances from Armento, Burnett, and Copeland at Upstate were filed on blank paper. (*Id*. at 41, 58-59, 61-63).

The Inmate Grievance Program supervisor at Upstate, Donna Wilcox, submitted a declaration stating that "[t]hroughout the entire time that each plaintiff was incarcerated at Upstate they had full access to Upstate's grievance office, including the ability to file grievance complaints." (Dkt. No. 58-3, ¶ 16). Her declaration, however, does not provide any details describing how these Plaintiffs had "full access to Upstate's grievance office."

Grievances from Martinaj, Armento, Burnett, Copeland, Ross, and Toland, filed while they were at Upstate, and grieving their confinement there, (Dkt. No. 58-3, at 41, 47, 58-65), were consolidated into a single grievance, assigned number UST-56268-15 ("the consolidated grievance"), (Dkt. No. 58-7, at 42). The record reflects that the Inmate Grievance Resolution Committee (IGRC) responded to the grievances of Martinaj, Ross and Toland on July 7, 2015, noting that:

> We are attempting to have all Clinton CF hold inmates transferred. At this time, all Clinton inmates will receive all PIMS1 privileges.[4] This will include haircuts, regular library, law library, supplies from carts and mailing of letters. Due to this group of inmates do not have money accounts or personal property, postage will be paid by the facility. Personal property will not be given at this time. inmates will be given laundry bags and be allowed to send items to our laundry.

(Dkt. No. 79-1, at 5, Dkt. No. 79-12, at 4, Dkt. No. 79-13, at 23). Defendant Uhler concurred with the IGRC recommendation. (Dkt. No. 58-3, at 67, 76, 78).

The CORC records reflect that the six Plaintiffs in the consolidated grievance appealed to the CORC. (Dkt. No. 58-3, at 67-68, 71, 74, 76, 78; Dkt. No. 58-7, at 11, 42). The CORC upheld the determination of the Superintendent. (Dkt. No. 79-15, at 2). The CORC noted that:

---

[4] "PIMS" refers to the Progressive Inmate Movement System "established for all Special Housing Units (SHUs) with progressives increase in privileges in accordance" with its provisions. Department of Corrections and Community Supervision ("DOCCS") Directive No. 4933, Part 303, § 303.1(a). The Directive provides that disciplinary admissions, detention admissions, and keeplock admissions begin at PIMS Level I; and administrative segregation admissions, protective custody admissions and "other admissions" begin at PIMS Level II. (*Id.*). The parties have not addressed what regulations applied to the Clinton transferees before they received "PIMS1 privileges."

approximately 60 inmates from Clinton CF were temporarily held intransit status at Upstate CF during the state of emergency in June 2015 as outlined in Directive #4933, § 301.7, and . . . their personal property was withheld pending transfer to a new owning facility. CORC notes that the grievants received PIMS Level 1 privileges including haircuts, access to the General and Law Libraries, supplies from the supply cart and laundry services. CORC also notes that they were issued headphones and that the facility paid the postage costs for their outgoing correspondence. Further, it is noted that a facility Captain spoke with all of the inmates to address any questions of concerns, and that those inmates with a court deadline were given their personal legal work.

Additionally, CORC asserts that the inmates had access to medical and mental health care via sick call, and that meals were served in accordance with the statewide menu and portion control chart. CORC notes that there is no record of grievant Bu… being placed on a water deprivation order, and that grievants Bu… and To… had the opportunity to practice individual worship in the privacy of their cell. CORC has not been presented with sufficient evidence to substantiate a violation of their right or malfeasance by staff.

. . . .

CORC asserts that Correction Law grants DOCCS the discretion to transfer inmates between its correction facilities, and that monetary damages are not an available remedy through the inmate grievance mechanism.

. . . .

CORC notes that all of the grievants were transferred when space become available in a suitable facility and advises them to address further concerns to area supervisory staff for any remedial action warranted.

(*Id*.).

All of the Plaintiffs were ultimately transferred from SHU at Upstate to other facilities.

Martinaj, Armento, Arismendi, Ji, Larney, Launder, Mack, Ross, and Toland were transferred to

Auburn Correctional Facility ("Auburn"). (Dkt. No. 58-4, ¶ 15). Armento, Larney, and Toland

filed grievances while at Auburn concerning their transfer to the Upstate SHU. (Dkt. No. 58-4, at

39, 44-45; 54-55). In its July 29, 2015, response to those grievances, the IGRC noted that the

"decision was deadlocked." (Dkt. No. 79-4, at 16; Dkt. No. 79-8, at 8; Dkt. No. 79-13, at 13).

Two members of the IGRC "agree[d] with the findings of the investigation," that the grievant

was housed in SHU "per the Deputy Commissioner of Correctional Facilities per Directive

#4933, section #301.7." (Dkt. No. 79-4, at 13, 16; Dkt. No. 79-8, at 7-8; Dkt. No. 79-13, at 13-

14). However, two other members of the IGRC disagreed with the findings of the investigation.

While they "underst[oo]d what Directive #4933, section #301.7 states," they "disagree[d] with

this directive and agree[d] that it needs to be revised." (*Id*.). These two members of the IGRC

concluded that:

> [g]enerally, the only prisoners who are housed in SHU are those
> who are under one (1) or more of the following statuses: a
> disciplinary admission, a detention admission, an administrative
> segregation admission, protective custody, or a keeplock
> admission. The grievant was not under any of those statuses. This
> section of Directive #4933 basically created a provision which
> allows a prisoner to be placed in SHU for no legitimate reason at
> all, and subjects that prisoner to be stripped of the many amenities
> afforded to prisoners housed in general population, and only being
> afforded the same privileges as other prisoners in SHU, i.e. limited
> property, limited hygiene products, one non-legal visit per week,
> no non-legal telephone calls except for emergencies, no packages
> except for books, periodicals and legal materials, one hour of
> recreation per day, restricted commissary buys, limited shower
> availability, limited law library access, etc. This amounts to cruel
> and unusual punishment for a person who has no legitimate reason
> to be housed in SHU. Only being afforded these limited privileges
> amounts to being punished. The IGRC representatives agree that
> the grievant should never have been housed in SHU.

(*Id*.). Records indicate that Armento, Larney, and Toland all appealed these grievances to

CORC. (Dkt. No. 58-7, at 38, 54, 76).

Four of the Plaintiffs – John Amante, Chase Burnett, Phillip Copeland and George

Melendez – were transferred to Wende Correctional Facility ("Wende") from Upstate. (Dkt. No.

58-5, ¶ 13). Plaintiff Manzella was transferred to Attica Correctional Facility ("Attica") from Upstate. (Dkt. No. 58-6, ¶ 14). Each individual Plaintiff's relevant grievance history is outlined below. *See infra*, § IV.C.

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

IV.     DISCUSSION

A.     General Law Regarding Exhaustion of Administrative Remedies

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA's exhaustion requirement is designed to "afford[] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter*, 534 U.S. at 524-25. To properly exhaust his administrative remedies, an inmate must complete the administrative review process in accord with the applicable state procedural rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007).

The grievance procedure in New York is generally a three-tiered process. An inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the incident. N.Y. Comp. Codes R. & Regs. (NYCRR) tit.7, §§ 701.5(a)(1), (b).[5] An adverse decision of the IGRC may be appealed to the Superintendent of the Facility, *id.* at § 701.5(c), and adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC").[6]

Grievances claiming employee harassment, including claims of excessive force, "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited

---

[5] An inmate may submit a written request, within forty-five days, for permission to file a late grievance if there are mitigating circumstances. NYCRR tit.7, § 701.6(g).

[6] Affidavits reflect that such were the procedures at all of the relevant facilities – Clinton, Upstate, Auburn, Wende, and Attica. (Dkt. No. 58-2, ¶¶ 4-12; Dkt. No. 58-3, ¶¶ 4-13; Dkt. No. 58-4, ¶¶ 4-12; Dkt. No. 58-5, ¶¶ 4-11; Dkt. No. 58-6, ¶¶ 4-11).

procedure whereby the grievance goes directly to the facility superintendent. *Id.* at § 701.8; *see*, *e.g., Torres v. Carry*, 691 F. Supp. 2d 366, 369-70 (S.D.N.Y. 2009). If the grievance presents a "bona fide harassment issue," "then the superintendent must initiate an investigation, render a decision on the grievance, and inform the inmate of the decision within 25 days of receipt of the grievance." *Williams v. Priatno*, 829 F.3d 118, 120 (2d Cir. 2016); 7 NYCRR §§ 701.8(d), (f). The superintendent's decision may be appealed by filing a notice of decision to appeal with "the inmate grievance clerk within seven calendar days of receipt of that response." 7 NYCRR § 701.8(h).

"Under the PLRA, a prisoner need exhaust only 'available' administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). The Supreme Court has identified three examples of unavailable administrative procedures: (1) those that "operate[] as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) those that are "so opaque that [they] become[], practically speaking, incapable of use," where "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it;" and (3) those where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

Failure to exhaust administrative remedies is an affirmative defense; accordingly, a defendant bears the burden of persuasion on whether a plaintiff failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015); *Nelson v. Plumley*, No. 12-cv-422, 2015 WL 4326762, at *7, 2015 U.S. Dist. LEXIS 91905, at *20 (N.D.N.Y. July 14, 2015) ("As an affirmative defense, the party asserting failure to exhaust administrative remedies typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence.") (citation omitted). The defendant

discharges its initial burden of production by "demonstrating that a grievance process exists" and that the plaintiff failed to utilize the grievance procedure. *White v. Velie*, 709 F. App'x 35, 38 (2d Cir. 2017) (summary order); *Williams*, 829 F.3d at 126 n.6. ("[D]efendants bear the initial burden of establishing the affirmative defense of non-exhaustion by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures which demonstrate that a grievance process exists and applies to the underlying dispute.") (internal quotation marks omitted). The burden of production then shifts to the plaintiff, who must show that "other factors—for example, threats from correction officers—rendered a nominally available procedure unavailable as a matter of fact." *Hubbs*, 788 F.3d at 59; *see Ross*, 136 S. Ct. at 1856 ("Under the PLRA, a prisoner need exhaust only 'available' administrative remedies.").

## B.     Applicable Law Regarding Plaintiffs' Legal Claims

Defendants argue that Plaintiffs failed to exhaust administrative remedies with respect to certain of their excessive force and conditions of confinement claims. (Dkt. No. 58-9, at 16-26). In response, Plaintiffs assert that there are issues of fact as to whether the grievance process was unavailable under *Ross*. Specifically, Plaintiffs argue that the grievance process was not available to five of the Plaintiffs – Martinaj, Amante, Arismendi, Mack and Manzella – because these Plaintiffs "handed over grievances" at Upstate, and "the correction officers to whom they had handed their grievances had never turned them in." (Dkt. No. 77, at 5-6). Plaintiffs argue that the grievance process was unavailable, due to intimidation, as to the eleven Plaintiffs who described beatings at Clinton, before their transfer to Upstate. (*Id.* at 6-9). Finally, Plaintiffs argue, in a conclusory fashion, without caselaw support, that the grievances that the Plaintiffs did file were sufficient to exhaust their conditions of confinement claim. (*Id.* at 8).[7]

---

[7] The Court notes that it received little benefit from Plaintiffs' nine-page memorandum of law in opposition to Defendants' motion for summary judgment as to fifteen Plaintiffs. Plaintiffs' memorandum failed to address the facts concerning the fifteen Plaintiffs at issue. The Court further notes that Plaintiffs' response to Defendants' statement of material facts (Dkt. No. 78) included an admission that was erroneously inconsistent with the record evidence. (*See, e.g.,*

### 1.    Availability of Administrative Remedies under *Williams*[8]

In *Williams*, the Second Circuit addressed whether an inmate whose grievance was provided to a correction officer, but unfiled and unanswered, had satisfied the PLRA's exhaustion requirement. Williams alleged that while incarcerated at Downstate Correctional Facility, he was assaulted by corrections officers. 829 F.3d at 120. He was placed in SHU after the assault, where he drafted a grievance "detailing the officers' misconduct." *Id*. Williams "gave the grievance to a correction officer to forward to the grievance office on his behalf, in accordance with DOCCS grievance procedures that apply to inmates in the SHU." *Id*. at 120-21 (citing 7 NYCRR § 701.7). A week later, Williams informed the superintendent of Downstate Correctional Facility that he had not received a response to his grievance, and she responded that "she had no knowledge of the grievance and that she would look into it." *Id*. at 121. A week after that, Williams was transferred to another facility. *Id*. Williams never received a response to the grievance and alleged that the correction officer he gave it to never filed the grievance. *Id*.

Accepting the allegations in the complaint as true, the Second Circuit reversed the district court's dismissal of the complaint for failure to exhaust. The Second Circuit noted that the regulatory scheme "contemplate[s] appeals of grievances that were actually filed," and found that "the regulations plainly do not describe a mechanism for appealing a grievance that was never filed." *Id*. at 126. The Court found that because "the process of appealing an unfiled grievance is practically unavailable to inmates under current" regulations, defendants failed to meet their "initial burden" of establishing that a grievance process applied to the underlying dispute. *Id.* at 126 n.6. In *Williams*, the obscurity of the regulations "was compounded by the fact that Williams was transferred to another facility approximately two weeks after giving his

---

Dkt. No. 95). Plaintiffs are advised that the Court will not accept for filing any future briefing that is of similar poor quality.

[8] ***Williams v. Priatno*, 928 F.3d 118 (2d Cir. 2016).**

grievance to the corrections officer," and "[t]he regulations plainly do not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response." *Id*. at 126. The Court concluded that "the grievance procedures that were technically available to Williams are so opaque and confusing that they were, 'practically speaking, incapable of use.'" *Id*. (quoting *Ross*, 136 S. Ct. at 1859). Therefore, "in giving his grievance to the correction officer, [the plaintiff] exhausted all administrative remedies that were available to him." *Id*.

Following *Williams*, this Court has found that the grievance appeal process is unavailable to inmates who have submitted grievances that were unfiled and unanswered. *See Hamlett v. Stotler*, No. 17-cv-0939, 2019 WL 4306999, at *9, 2019 U.S. Dist. LEXIS 142026, at *26 (N.D.N.Y. Aug. 15, 2019) (applying *Williams* and holding that administrate remedies were unavailable for an inmate who submitted a grievance that was unfiled and unanswered), *report recommendation adopted*, 2019 WL 4305449, 2019 U.S. Dist. LEXIS 154525 (N.D.N.Y. Sept. 11, 2019); *Zulu v. Barnhart*, No. 16-cv-1408, 2019 WL 2997226, at *13, U.S. Dist. LEXIS, at *34 (N.D.N.Y. April 22, 2019) (finding that the grievance appeal process was unavailable where "plaintiff credibly met his burden of production by documenting his efforts to file grievances"), *report recommendation adopted*, 2019 WL 2150628, 2019 U.S. Dist. LEXIS 83511 (N.D.N.Y. May 17, 2019); *Coleman v. Nolan*, No. 15-cv-40, 2018 WL 4732778, at *8-11, 2018 U.S. Dist. LEXIS 169979, at *29 (Oct. 2, 2018) (finding that *Williams* establishes that grievance process was unavailable where "plaintiff credibly testified that, despite two attempts, plaintiff's grievances with respect to defendant['s] alleged assault were never filed"); *see also Trahan v. Capozzola*, No. 12-4353, 2017 WL 9512406, at *5, 2017 U.S. Dist. LEXIS 99594, *14-16 (E.D.N.Y. June 26, 2017) (denying motion for summary judgment with respect to an unfiled and

unanswered grievance because the defendants failed to meet their initial burden of showing that a grievance process exists and applies to the underlying dispute).

Here, as set forth in more detail below, the Court has concluded that an evidentiary hearing, in accord with *Williams*, is necessary for the claims of Plaintiffs Arismendi, Ji and Manzella.

### 2.      Unavailability Due to Intimidation

Plaintiffs assert that eleven of the Plaintiffs have "exhausted their grievances concerning use of excessive force" because "they hesitated to grieve their suddenly harsh treatment" out of fear of "further violence at Upstate Correctional Facility" and intimidation by their "sudden change in [] circumstances." (Dkt. No. 77, at 6-8).[9] Defendants respond that "Plaintiffs' generalized claims of fear of retaliation are insufficient to render the grievance process unavailable"; Defendants note that most of the Plaintiffs did not submit a declaration in support of this claim. (Dkt. No. 82, at 10-11).

The grievance process is rendered unavailable when prison officials "thwart inmates from taking advantage of [it] through machination, misrepresentation, or intimidation," *Ross*, 136 S. Ct. at 1860. However, "a generalized fear of retaliation" is "insufficient as a matter of law to support a finding that the grievance process was unavailable to overcome her failure to exhaust administrative remedies under the PLRA." *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 312 (2d. Cir. 2020). An inmate must point to some affirmative action by a prison official that prevented the inmate from availing himself of the grievance procedures. *See Grafton v. Hesse*, 783 F. App'x 29, 31 (2d Cir. 2019) ("We have held that where there has been no affirmative action by prison staff actually preventing prisoners from pursuing administrative remedies, those remedies are not unavailable under the PLRA." (citing *Ruggiero v. Cty. Of Orange*, 467 F.3d

---

[9] While Plaintiffs also included a twelfth Plaintiff, Manual Nunez, in this argument, Nunez's claims are not the subject of the present motion. (Dkt. No. 77, at 6; Dkt. No. 58-9, at 8 n.3).

170, 178 (2d Cir. 2006))). "[V]erbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers" have been held to "constitute such affirmative action." *Amador v. Andrews*, 655 F.3d 89, 103 (2d Cir. 2011). The inquiry into whether grievance procedures were available is "an objective one: that is, would a similarly situated individual of ordinary firmness have deemed [the grievance procedures] available." *Lucente,* 980 F.3d at 311-12.

In *Lucente*, the Second Circuit held that a plaintiff's allegations that she was afraid to report a correctional officer's sexual misconduct "because of her fear of the ongoing danger of being further sexually assaulted and sexually harassed" and "because she had learned of the beating of a female inmate" at another facility was insufficient to support a finding that the grievance process was unavailable because "neither of those fears related to threats or intimidation in connection with the grievance process itself." 980 F.3d at 312. The Court noted that the plaintiff "was never threatened, or even warned, by [the defendant] or anyone else, not to complain or file a grievance." *Id.* The Court found no support for a rule that would "allow any inmate who was claiming that a prison guard violated § 1983 based upon an act of violence or other hostile act in the jail to avoid the PLRA exhaustion requirement because of a generalized fear that any grievance or complaint could lead to more violence by that guard." *Id*. While a "threat need not explicitly reference the grievance system in order to deter a reasonable inmate from filing a grievance, there must be some basis in the record from which the district court could determine that a reasonable prisoner of ordinary firmness would have understood the prison official's actions to threaten retaliation if the prisoner chose to utilize the prison's grievance system." *McBride v. Lopez*, 807 F.3d 982, 988 (9th Cir. 2015) (cited with approval in *Lucente*, 980 F.3d at 313).

15

Here, as a threshold matter, the Court cannot consider factual assertions made in a memorandum of law that are unsupported by evidence in the record. Arguments in a brief are not evidence. *See Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003) ("[D]efendants' memorandum of law . . . is not evidence at all."). Only four of the Plaintiffs have submitted affidavits addressing retaliation or intimidation – Ji, Mack, Manzella, and Ross – and the Court considers their individual claims below. (Dkt. No. 79-9, ¶ 4; Dkt. No. 79-10, ¶ 2; Dkt. No. 79-12, ¶ 1; Dkt. No. 85, at 3). Plaintiffs state, in their memorandum of law, that there were no specific threats regarding the grievance process. (*See* Dkt. No. 77, at 8 ("[N]o plaintiff in this action has specifically stated that he was told by any of the persons who had assaulted him that he would be further assaulted should he file a grievance.")).[10] The Court notes that, in accord with *Lucente*, allegations of beatings are in and of themselves insufficient to raise an issue of fact as to the unavailability of the grievance process. 980 F.3d at 312-13. On this record, claims by Plaintiffs who did not provide evidence of retaliation or intimidation are rejected, and the Court considers below the claims of the four Plaintiffs who did file an affidavit.

---

[10] The Second Amended Complaint alleges that the Defendants who beat Martinaj on June 6, 2015, "threatened [him] with waterboarding and told him that, if he told anyone what they were doing to him, he would be killed." (Dkt. No. 40, ¶ 50). As this complaint is unverified; this alleged threat is not referenced in the affidavit Martinaj filed in opposition to the Defendants' motion; and Plaintiffs have not referred to it in their briefing; the Court does not address it.

### 3.     Sufficiency of a Grievance

To exhaust his claim, a plaintiff is required to provide "a specific description of the problem." *Espinal v. Goord*, 558 F.3d 119, 127 (2d Cir. 2009). "The PLRA's exhaustion requirement is designed to "afford[ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) (quoting *Porter*, 534 U.S. at 524-25). The test for sufficiency is analogous to that for notice pleading: "as in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006) (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)) (internal marks and quotations omitted). "In order to exhaust, therefore, inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson*, 380 F.3d at 697 (internal citation omitted).

Here the Defendants have asserted that certain grievances were insufficient to, inter alia, grieve a conditions of confinement claim.[11] In order to evaluate the sufficiency of the grievances to alert officials to such a claim, the Court notes that the Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. To prevail on an Eighth Amendment claim a plaintiff must prove "both an objective element – that the prison officials' transgression was 'sufficiently serious'–and a subjective element – that the official acted, or omitted to act, with a 'sufficiently culpable state of mind,' i.e., with 'deliberate indifference to inmate health or safety.'" *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

---

[11] Defendants have not challenged the legal sufficiency of the Plaintiffs' conditions of confinement claims, and the Court does not consider that issue here.

Defendants appear to challenge whether the grievances sufficiently alerted officials to conditions that were objectively serious. A condition is objectively serious if it deprives the inmate of "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (internal quotation marks omitted). "Ultimately to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Id.* An inmate must show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). Health includes the risk of serious damage to "physical and mental soundness." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (quoting *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)). "The conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)). Thus, the question of "whether incarceration in the SHU violates the Eighth Amendment . . . depends on the duration and conditions of the confinement." *Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015). "An Eighth Amendment claim predicated on SHU confinement typically accrues only after an inmate has been confined in SHU for a prolonged period of time." *Id.*

Here, the fact that inmates described their grievances as due process violations, without referring to the Eighth Amendment, is not determinative; a grievance need not identify legal theories. *Brownell*, 446 F.3d at 310. In considering whether grievances challenging "illegal SHU confinement" were sufficient to "alert[ ] the prison to the nature of the wrong for which redress is sought," *Johnson*, 380 F.3d at 697 (quoting *Strong*, 297 F.3d at 650), the Court has considered the fact that grievances led prison officials to investigate and address the conditions under which the Clinton transferees were held. Specifically, the Court has considered the fact that two

members of the IGRC at Auburn concluded that the conditions imposed constituted cruel and unusual punishment, and that the CORC response to the consolidate grievance considered the conditions imposed, but concluded that there was not "sufficient evidence to substantiate a violation of [the inmates' rights] or malfeasance by staff." (Dkt. No. 79-15, at 2). It thus appears that at least some of the grievances provided sufficient information about the SHU confinement "to allow prison officials to take appropriate responsive measures," *Johnson*, 380 F.3d at 697 (internal citation omitted), and the Court rejects the Defendants' argument that none of the grievances were sufficient to exhaust a conditions of confinement claim. *See, e.g., Baskerville v. Blot*, 224 F. Supp. 2d 723, 729 (S.D.N.Y. 2002) (denying summary judgment where the final decision by CORC indicated that the allegations contained in the complaint "had been investigated at some point during the administrative process," explaining that "the apparent investigation of [the] plaintiff's [] claim[s] and the rendering of a decision by the CORC" is consistent "with the purpose of the PLRA"). [12]

---

[12] The Court has not relied upon the assertions in the Defendants' statement of material facts as to whether the Plaintiffs have grieved a "conditions of confinement claim" because the Defendants are not applying the standard applied here.

C.   **Analysis of the Individual Plaintiffs' Claims**[13]

1.   **Plaintiff Martinaj**

Defendants argue that Martinaj failed to exhaust his excessive force claim and conditions of confinement claim. (Dkt. No. 58-9, at 18-19). According to the Second Amended Complaint "SAC"), Martinaj was assaulted twice at Clinton following the escape of Matt and Sweat: once on June 6, 2015, and once on June 10, 2015. (Dkt. No. 40, ¶¶ 48-49, 53). On June 6, 2015, three unidentified individuals wearing DOCCS insignia took Martinaj into a closet and "proceeded to choke him and smash the back of his head on a pipe for approximately twenty minutes" and "curse at [him] while they punched him in his right and left sides" before threatening him not to disclose the assault, handcuffing him, and taking him back to his cell. (*Id*. ¶¶ 45, 48-51). On June 10, 2015, a group of Defendant CERT Officers 1-20 came to Martinaj's cell, "dragged him out and took him to another room, where he was strip searched." (*Id*. ¶ 53). Martinaj was then transferred to Upstate, where he was placed in SHU. (*Id*. ¶ 56). He was kept in SHU from June 10, 2015 until June 26, 2015, and during that time a sign on his door warned all employees not to speak to him. (*Id*. ¶¶ 56, 58). Martinaj had no "verbal contact" with any correction officers, nurses, or counselors during this time period, with the exception of interrogations by employees of DOCCS and the State Police. (*Id*. ¶¶ 59-60). Also during this time period, Martinaj was prohibited from seeing a counselor who had come to visit him, denied medication to treat his migraines which resulted in pain and vomiting, and denied correspondence from his mother. (*Id*. ¶¶ 62-63, 66). Martinaj was kept "in complete isolation . . . for the entire time he was kept in the SHU," though he was "double-bunked with another inmate" in SHU on June 20, 2015. (*Id*. ¶¶ 57, 61).

---

[13] **The Court has addressed the Plaintiffs' claims in the order in which they were addressed by Defendants, with Martinaj first and the remaining Plaintiffs in alphabetical order.**

Martinaj submitted a grievance dated June 21, 2015, while he was incarcerated at Upstate. (Dkt. No. 58-3, at 47). Martinaj stated that he: had "been illegally confined to SHU since June 10, 2015," was "denied visitation rights," had "less rights than SHU inmates," and that his "door ha[d] a sign on it stating; 'do not talk,' hindering [him] from asking staff about [his] situation." (*Id*.). This grievance was assigned number UST-56268-15 and consolidated with grievances filed by Armento, Copeland, Burnett, Toland, and Ross. (Dkt. No. 58-7, at 42). Martinaj received a response from the IGRC on July 7, 2015, informing him that they were "attempting to have all Clinton CF hold inmates transferred," and that "[a]t this time" he would receive "all PIMS 1 privileges"[14] including "haircuts, regular library, law library, supplies from carts, and mailing of letters." (Dkt. No. 79-1, at 5). The Superintendent concurred with the IGRC. (*Id*. at 8). Martinaj appealed that determination to the CORC, noting that the Superintendent's response did not address: his denial of "contact with the outside world," his inability to write "to the courts" or contact his attorney, his denial of "medical and mental health care," and his denial of visits from his family. (Dkt. No. 58-3, at 67-68). In its decision on appeal the CORC asserted that "the inmates received PIMS Level 1 privileges," and "had access to medical and mental health care via sick call." (Dkt. No. 79-15, at 2). The Court finds that Martinaj's grievance regarding the conditions at Upstate was sufficient to "alert[ ] the prison to the nature of the wrong for which redress is sought." *Johnson*, 380 F.3d at 697 (quoting *Strong*, 297 F.3d at 650).

Martinaj has submitted a declaration stating that he attempted to serve another grievance which was "never delivered to the IGRC," concerning "the assault by two groups of CERT team corrections officers before my removal from Clinton Correctional Facility." (Dkt. No. 79-1, ¶ 1).

---

[14] *See* supra note 4.

Upstate does not have a record of that grievance; Martinaj states that he believes it "was destroyed by DOCCS personnel at Upstate." (*Id.*).

On July 9, 2015, Martinaj wrote a letter to the Inmate Grievance Supervisor at Upstate inquiring about the status of two grievances he filed while he was at Upstate. (Dkt. No. 79-1, at 6). Martinaj asserted that one was "against the Superintendent of Upstate C.F. for denying me all access to the outside world," and "the other" was "against Mental Health for not receiving any assistance from them despite numerous letters and pleas everytime [sic] they did their rounds." (*Id.*). In a response dated July 13, 2019 the Inmate Grievance Program official noted that the only grievance on file for Martinaj was the consolidated grievance, UST-56268-15. (*Id.* at 7). Although Martinaj's letter does refer to having filed a second grievance that did not reach the IGRC, his letter characterizes that grievance as a grievance "against Mental Health." There is nothing in his letter to the IGRC referring to excessive force or corroborating Martinaj's affidavit that "the first grievance" that he "attempted to file" "concerned the assault by two groups of CERT team correction officers before my removal from Clinton Correctional Facility." (Dkt. No. 79-1, at ¶ 1).

In Martinaj's sworn statement asserting that he attempted to submit a grievance concerning the excessive force incidents, he did not provide any information regarding how he "attempted" to serve that grievance. The record reflects that Martinaj successfully filed one grievance at Upstate concerning conditions there (Dkt. No. 79-1, at 2-4), and there is no documentary evidence supporting his claim that he attempted to file another grievance concerning excessive force. The only evidence regarding another grievance by Martinaj at Upstate is not consistent with his assertion. Martinaj's July 9, 2015 letter to the Inmate Grievance Supervisor at Upstate sought the status of "two grievances that I filed while I was

22

housed at Upstate," but Martinaj said that "one grievance" was "against the Superintendent of Upstate C.F. for denying me all access to the outside world, and the other was against Mental Health for not receiving any assistance from them despite numerous letters and pleas." (*Id.* at 6). Thus, Martinaj had previously characterized his other grievance at Upstate as a grievance "against Mental Health." On this record, the Court does not find that Martinaj has raised a triable issue of fact as to whether he exhausted administrative remedies with respect to his excessive force claim. *See Means v. Olmsted,* No. 17-cv-746, 2019 WL 4395289, at *7, 2019 U.S. Dist. LEXIS 93324, at *17 (N.D.N.Y. June 3, 2019) (noting that an "unsupported assertion" that the plaintiff filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact, and collecting cases), *report and recommendation adopted*, 2019 WL 3451127 (N.D.N.Y. July 31, 2019); *Bradshaw v. Fletcher*, No. 19-cv-00428, 2021 WL 248236, at *4, 2021 U.S. Dist. LEXIS 13676, at *12 (N.D.N.Y. Jan. 26, 2021) (finding that the plaintiff's general conclusory and unsupported allegations asserting that officials repeatedly failed to file his grievances were insufficient to raise a material issue of fact).

2.      **Plaintiff Amante**

Defendants argue that Amante failed to exhaust his excessive force claim and conditions of confinement claim. (Dkt. No. 58-9, at 19-20). According to the SAC, on the morning of June 16, 2015, CERT Defendants "tightly handcuffed" Amante and led him out of his cell in his underwear to a different area of Clinton where he was "interrogated and threatened" for "approximately three hours" by "defendants who are members of the State Police and defendants who are employed by" DOCCS. (Dkt. No. 40, ¶ 76). Approximately one hour later, Amante was transferred to Upstate where he was confined to SHU. (*Id*. ¶¶ 77-80). Amante "was maintained in complete isolation": "[a] sign was placed on [his] door, warning all employees not to speak to him." (*Id*. ¶¶ 82-83). The only exception to this isolation were continued interrogations "by defendants hereto with regard to the escape of Matt and Sweat." (*Id*. ¶ 84).

Amante filed a grievance on July 14, 2015, after he had been transferred to Wende asserting that the transfer to Upstate "without due process." (Dkt. No. 58-5, at 17). Amante sought "to fine [sic] out why I was sent to up-state and lock-down for [27] days and then transferred to Wende the furthest prison I could have been sent in the state." (*Id*.).[15] In response to Amante's appeals, the Wende Superintendent determined that Amante "was sent to Upstate SHU and then to Wende per direction from Central Office Classification and Movement," and the CORC upheld that determination noting that the transfer to Upstate was in accord with Directive # 4933. (Dkt. No 79-2, at 3-5).

In his grievance, Amante asserted that he filed two other grievances "while at Upstate," and that "no one ever came to see me or wrote back to me in regards to my my [sic] complaint." (Dkt. No. 58-5, at 17.). There is, however, nothing in the record regarding the substance of the other two alleged grievances or any allegations concerning how they were filed. Amante did not

---

[15] Amante also sought a transfer to a facility closer to New York City. (Dkt. No. 58-5, at 17).

file a declaration in response to the Defendants' motion, which included an affidavit from the Upstate IGP supervisor stating that Amante did not file any grievances at Upstate. (Dkt. No. 58-3, at 8). Because the only grievance in the record does not contain any facts regarding excessive force or conditions at Upstate – beyond the allegation that he was on "lock down for (27) days" – it did not put officials on notice of an excessive force or conditions of confinement claim, and Defendants' motion must be granted as to Amante.

### 3.    Plaintiff Arismendi

Defendants argue that Arismendi failed to exhaust his excessive force claim and conditions of confinement claim. (Dkt. No. 58-9, at 22). According to the SAC, "[o]n or about June 15, 2015," two individual Defendant employees of DOCCS "burst into [Arismendi's] cell and began to scream at him." (Dkt. No. 40, ¶ 94). Arismendi "responded to them in Spanish, telling them that he neither spoke nor understood English," and Defendants proceeded to strike Arismendi "in the face several times," before turning him around, throwing him against a wall, and "repeatedly punch[ing] him in his back." (*Id*. ¶¶ 95-96). Arismendi was taken into another room, and then interrogated. (*Id*. ¶¶ 101-03). Arismendi was then placed on a bus and transferred to Upstate, where he was immediately placed in SHU. (*Id*. ¶ 110). A sign was placed on his door instructing employees not to speak to him and, as a result, Arismendi alleges that "he was unable to obtain any medical treatment for the injuries that he had suffered as a result of the aforementioned beatings and abuse." (*Id*. ¶ 113). While in SHU, "Arismendi continued to be interrogated" regarding "the escape of Matt and Sweat." (*Id*. ¶ 114).

Arismendi has submitted a declaration stating that within "a few days" of arriving at Upstate, "he managed to write a grievance in which [he] complained about being beaten by officers at Clinton." (Dkt. No. 79-3, ¶ 1). Although his cell door had "a sign that [he] was not to be spoken to," and he was "not permitted to have writing materials," Arismendi asserted that he

was able to "get paper and something to use in writing the grievance from other inmates housed in SHU." (*Id.*). He averred that once he completed his grievance, he "left it in the cell door for a correction officer to deliver," but that he learned "several months later that [his] grievance had never been filed." (*Id.*). By the time he "inquired about [his] grievance, [he] was told that [he] was beyond the time limit for requesting permission to file a late grievance." (*Id.*).

In a November 10, 2015 letter addressed to Upstate's IGP Supervisor, Arismendi stated that he was "patiently awaiting for [a] reply to [his] grievance that [he] filed when [he] was housed Upstate SHU." (*Id.* at 4). Arismendi wrote that he was "beaten by officers at Clinton CF during interrogations into the aftermath of the infamous escape," and then sent to Upstate and "placed in SHU for no reason." (*Id.*). Arismendi stated that he "was deprived of everything during my time there. I was not allowed to see medical staff; I was not allowed writing material, access to the law library, access to my family, etc." (*Id.*). Arismendi said that he "managed to write a grievance with the help of [his] neighbors, and [] sent it in while [] housed in Upstate" but never received a response. (*Id.*).

The IGP Supervisor replied on November 16, 2015, noting that a complaint on these issues was never received, and that Arismendi "should have inquired into the status of [his] complaint sooner." (*Id.* at 5). On December 10, 2015, Arismendi wrote to the IGP Supervisor at Auburn, seeking the "return of documents that I sent you in order to show that I needed to file a late grievance, not because I failed to file it, but [because] it mysteriously disappeared from the Upstate CF Grievance Dept." (*Id.* at 6). Upstate does not have a record of any grievance filed by Arismendi while he was at Upstate. (Dkt. No. 58-3, ¶ 62).

Arismendi's sworn declaration, which is corroborated by his follow-up letter to the IGP Supervisor at Upstate, raises a material issue of fact as to whether he submitted a grievance

26

while confined at Upstate, that went unfiled and unanswered, such that under *Williams* the grievance process was not available. *See Hamlett*, 2019 WL 4306999, at *9, 2019 U.S. Dist. LEXIS 142026, at *26, *report and recommendation adopted*, 2019 WL 4305449, 2019 U.S. Dist. LEXIS 154525 (N.D.N.Y. Sept. 11, 2019); *Zulu*, 2019 WL 2997226, at *13, 2019 U.S. Dist. LEXIS 68704 at *34, *report and recommendation adopted*, 2019 WL 2150628, 2019 U.S. Dist. LEXIS 83511 (N.D.N.Y. May 17, 2019); *Coleman*, 2018 WL 4732778, at *8-11, 2018 U.S. Dist. LEXIS 169979, at *29. Therefore, Defendants' motion is denied with respect to Arismendi's excessive force claim, and an evidentiary hearing will be held on the issue of exhaustion. While Arismendi's declaration refers to a grievance he filed regarding excessive force, his letter inquiring about this grievance refers to both excessive force and the conditions of confinement at Upstate, including "not allowed to see medical staff." In light of the fact that the Court will hold an evidentiary hearing, the scope of the grievance Arismendi allegedly attempted to file will be resolved at the evidentiary hearing. Defendants' motion is therefore denied with respect to Arismendi's excessive force and conditions of confinement claims.

### 4.      Plaintiff Armento

Defendants argue that Armento failed to exhaust any excessive force claim. (Dkt. No. 58-9, at 20-21).[16] According to the SAC, "[o]n or about June 12, 2015," Armento was "removed from his cell at [Clinton], interrogated, placed in a van and driven to [Upstate]." (Dkt. No. 40 at ¶ 123). Armento was threatened "with an increase in his sentence if he did not provide" information about the escape. (*Id*. at ¶ 124). Upon arrival at Upstate, Armento "was immediately placed in SHU." (*Id*. at ¶ 125). "While he was being held in SHU," he "continued to be interrogated" about the escape of Matt and Sweat. (*Id*. at ¶ 131).

---

[16] Defendants have not moved to dismiss Armento's conditions of confinement claim. (Dkt. No. 58-9, at 20-21).

Armento filed three grievances, but none of the grievances contains any allegation of excessive force. On June 24, 2015, while incarcerated at Upstate, Armento filed two grievances: one alleging that he has not been given his prescribed medications, which "are needed" and he has "been on for a decade"; and another grieving his transfer to Upstate without property or records, and being treated as if he had been given "a ticket." (Dkt. No. 79-4, at 5, 7; Dkt. No. 58-3, at 41, 70). On July 10, 2105, while he was confined at Auburn, Armento filed a grievance complaining about his "illegal confinement" at Upstate. (Dkt. No. 58-4, at 39). Armento did not file a grievance concerning an excessive force claim. (Dkt. No. 58-8, ¶ 12; Dkt. No. 78, ¶ 12).

Because Armento did not file any grievance concerning an excessive force claim,[17] and the three grievances he did file contain no facts that would have put officials on notice of an excessive force claim, Defendants' motion is granted as to any excessive force claim by Armento.

---

[17] Indeed, although Armento filed a declaration in opposition to Defendants' motion, he makes no assertion that he filed a grievance regarding excessive force. (Dkt. No. 79-4, at 2–3).

5.      **Plaintiff Burnett**

Defendants argue that Burnett failed to exhaust his excessive force claim and conditions of confinement claim. (Dkt. No. 58-9, at 21). According to the SAC, "on or about June 10, 2015 or June 15, 2015," Burnett was "physically abused by the defendant who removed him from his cell [at Clinton], was punched in the back of his head by Defendant Stickney while he was handcuffed, was cursed at, was not allowed to speak, and was forced to walk with his head down." (Dkt. No. 40, ¶ 140). While "being walked through the prison by Defendant Stickney," "Defendant Stickney forcefully threw the handcuffed and shackled Burnett down the [] flight of stairs." (*Id*. ¶¶ 142-43). Burnett was transferred to Upstate, where he was "immediately placed in SHU, where he remained for more than one month." (*Id*. ¶ 144). "A sign was placed on Burnett's cell door instructing [Clinton employees] not to speak to him," and during his time in SHU Burnett "continued to be interrogated by Defendants." (*Id*. ¶¶ 145-47). Burnett requested medical treatment for injuries inflicted by Defendant Stickney, but those requests "were consistently ignored because the DOCCS employees at [Upstate] were not permitted to speak to him." (*Id*. ¶ 148). Burnett was "not permitted to call his wife, was given no writing materials, was denied soap and shampoo for personal hygiene, was denied a visit with his wife when she came to the prison to see him," and did not have a functioning shower in SHU. (*Id*. ¶ 150).

Burnett filed three grievances, none of which contained any allegation of excessive force. The first grievance, filed during his incarceration at Upstate, was dated June 30, 2015, and was consolidated in UST-56268-15, and appealed to the CORC. (Dkt. No. 58-3, at 61-63; Dkt. No. 58-7, at 42). In this grievance Burnett complained about his transfer to SHU at Upstate with "'no' disciplinary action or disposition against" him, and without any personal or state property. (Dkt. No. 58-3, at 61). Burnett noted that he was "still" in SHU after fifteen days. (*Id*.). Burnett filed another grievance dated July 9, 2015, while incarcerated at Wende, concerning lost

personal property and seeking replacement for his lost personal property. (Dkt. No. 79-5, at 2).

On October 22, 2015, Burnett filed another grievance at Wende complaining about his

"inhumane treatment and unjust confinement to a S.H.U. Unit . . . for a period of over three

weeks," and loss of personal property. (*Id*. at 3). Since Burnett appealed the consolidated

grievance complaining of his confinement in a SHU environment for at least fifteen days without

any of his property, Defendants' motion is denied as to the conditions of confinement claim.

However, because Burnett did not assert any allegations regarding excessive force in any

grievance, Defendants' motion is granted as to Burnett's excessive force claim.

### 6.      Plaintiff Copeland

Defendants argue that Copeland failed to exhaust his excessive force claim and his

conditions of confinement claim. (Dkt. No. 58-9, at 21-22). Since Copeland's excessive force

claim was dismissed in *Martinaj II*, 2020 WL 3971523, at *13, 2020 U.S. Dist. LEXIS 123309,

at *43-44, the Court only considers whether Copeland has exhausted his conditions of

confinement claim. According to the SAC, on or about June 20, 2015, Copeland was transferred

to Upstate, where he was "immediately placed in a cell in SHU, which had a sign on its cell

door" "instructing that no one was to talk to him." (Dkt. No. 40, ¶¶ 161-62). Copeland is a

Rastafarian, and because he was unable to speak with anyone, he was unable to "convey the fact

that he was to receive a special diet and, thus, was forced to subsist on bread and water the entire

time that he was in SHU." (*Id*. ¶ 164). Copeland alleged that during his time in SHU, he was

"denied access to writing materials and was denied medical care for his pre-existing high blood

pressure." (*Id*. ¶ 167).

Copeland filed two grievances at Upstate about his confinement there. The first, filed at

Upstate on June 24, 2015, and consolidated in UST-56268-15, grieved his placement in SHU

status when he had not violated any rule, and without the opportunity to inventory his personal

property or obtain his legal work. (Dkt. No. 58-3, at 58-59). Copeland noted that he was "in the process of appealing a recent parole decision." (*Id*. at 58). The second grievance was filed at Upstate on July 6, 2015 and was also included in the consolidated action, UST-56268-15. (*Id*. at 60). In that grievance Copeland complained that "its now going on 30 days that I've been here with no disciplinary reason," and he complained about personal property that "was missing or taken apart." (*Id*. at 60).

As Defendants note, the grievances Copeland filed did not contain any reference to having been denied medical attention or needing a special diet, and nothing in these grievances would have alerted prison officials to investigate these claims. Copeland did not therefore exhaust his administrative remedies regarding these issues. *See, e.g.*, *McCardle v. Ponte*, No. 17-cv-2806, 2018 WL 5045337, at *3, 2018 U.S. Dist. LEXIS 178661, at *7-8 (S.D.N.Y. Oct. 17, 2018) (finding inmate's grievance complaining about a "chemical agent" spray in the intake area and "forced standing" failed to exhaust his claims pertaining to "bedding, food, water, sanitation and medical care"). However, under the unique facts of this case, where the Plaintiffs allege that they were transferred to unusually harsh conditions in the SHU at Upstate without any disciplinary reason; two members of the IGRC at Auburn considered the conditions cruel and unusual punishment; the consolidated grievance considered the conditions imposed on the Clinton transferees; and Copeland grieved the fact that "it was now going on 30 days that [he had] been here with no disciplinary reasons"; the Court finds that his grievance was sufficient to exhaust a conditions of confinement claim based upon the imposition of these conditions for thirty days.

### 7.      Plaintiff Ji

Defendants argue that Ji failed to exhaust his administrative remedies regarding his excessive force claim and conditions of confinement claim. (Dkt. No. 58-9, at 6, 22-23). According to the SAC, "[o]n or about June 10, 2015," "individual defendants assigned to CERT stormed into Plaintiff Ji's cell," "forcibly removed him," and then proceeded to beat him "in his ribs and his back with batons." (Dkt. No. 40, ¶¶ 175-76). At least one of the Defendant CERT Officers choked Ji while demanding "that he provide information on the two escapees." (*Id*. ¶ 177). One of the notes left by the escapees along their escape route had a "crude caricature of an Asian with 'have a nice day' written on it," and the defendants accused Ji of having provided the caricature. (*Id*. ¶¶ 179-80). As Ji walked down the corridor, one of the Defendants "slammed [Ji's] head into a wall, whereupon he was punched, choked and cursed at." (*Id*. ¶ 185). Ji fell to the floor, and several CERT Officers "kicked and stomped him." (*Id*. ¶ 186). Ji was "dragged to a visiting room, stripped naked, interrogated," and threatened before being "smacked very hard one last time" and told to get dressed. (*Id*. ¶¶ 187-88). Ji was then put on a bus; transferred to Upstate without any of his property; and placed in SHU with a sign on his cell door stating "that no one was to talk to him." (*Id*. ¶¶ 189, 192). While he was held in SHU, "Ji continued to be interrogated by defendants hereto with regard to the escape of Matt and Sweat." (*Id*. ¶ 191). In SHU, Ji was also denied medical care – including for injuries sustained as a result of the alleged assault – and denied visitations, law library access, a change of clothes, and access to mental health. (*Id*. ¶ 193).

The SAC describes two threats. It alleges that as Ji was being walked out of his cell, he was told that "if he looked at any of the members of the CERT team, they would kill him," and that after a beating Ji was "told that if he ever related any information about this incident to

anyone, he would be beaten by correction officers, no matter what state prison he was in." (*Id*. ¶¶ 184, 187).

Ji filed a grievance dated July 5, 2015, after he had been transferred to Auburn. (Dkt. No. 58-4, at 41). In it, he grieved his confinement in SHU at Upstate where he was "placed under a gag order" and "denied access to a pen, paper, envelopes, stamps, and a grievance form." (*Id*.). Ji asserted that this was his "first opportunity to file this grievance." (*Id*.). As described in more detail above, two members of the IGRC who considered Ji's grievance concluded that he was housed in SHU "per the Deputy Commissioner per Directive #4933, section #301.7," and two members of the IGRC concluded that Ji's SHU confinement amounted to cruel and unusual punishment. (Dkt. No. 79-7, at 10-11). The Superintendent denied Ji's grievance, citing to Directive #4933, Sec 301.7 which permits the Deputy Commissioner for Correctional Facilities to have an inmate admitted to a special housing unit "for any other reason." (*Id*. at 8). Ji appealed to the CORC, stating that he was "denied access to everything" and cited the regulations concerning deprivation orders, N.Y. Comp. Codes R & Regs. tit 7, § 305.2.[18] (*Id*. at 8-9). The CORC responded, inter alia:

> approximately 60 inmates from Clinton CF were temporarily held intransit status at Upstate CF during the state of emergency in June 2015 as outlined in Directive #4933, § 301.7, and that their personal property was withheld pending transfer to a new owning facility. CORC notes that the grievants received PIMS Level 1 privileges including haircuts, access to the General and Law Libraries, supplies from the supply cart and laundry services. CORC also notes that they were issued headphones and that the facility paid the postage costs for their outgoing correspondence. Further, it is noted that a facility Captain spoke with all of the inmates to address any questions of concerns, and that those inmates with a court deadline were given their personal legal work. CORC further notes that the inmates were subsequently transferred when space became available in a suitable facility.

---

[18] 7 NYCRR § 305.2 sets forth the requirements for imposing a deprivation order, that denies, restricts or limits "an essential service to an incarcerated individual."

> CORC notes that the grievant was entitled to $7.65 unemployed pay while housed at Upstate CF, and that it was posted to his account on 11/12/15. CORC asserts that Correction Law grants DOCCS the discretion to transfer inmates between its correction facilities, and that the grievant has no absolute right to a particular housing unit, rate of pay or program assignment.

(*Id*. at 6).

Ji has submitted a declaration stating that he filed his grievance "as soon as he could" because at Upstate he was "denied access to a pen, paper . . . and a grievance form," and placed under a gag order. (Dkt. No. 85, ¶ 1). Ji asserted that he did not grieve the physical abuse "because [he] had been beaten, threatened, transferred and isolated in SHU without a hearing," and "was afraid" if he did file a grievance, he "would be retaliated against." (*Id*. ¶ 3). In light of Ji's sworn declaration that he was afraid to file a grievance about physical abuse because he had "been beaten, threatened, transferred and isolated in SHU without a hearing," where he was denied access to a pen, paper and a grievance form, the Court finds that Ji has raised an issue of fact as to whether prison officials thwarted Ji from taking advantage of the grievance process through intimidation as to his excessive force claim.

The Court finds that Ji's grievance was sufficient to alert prison officials as to his conditions of confinement claim: in fact, two members of the IGRC concluded that the conditions under which he was confinement at Upstate constituted cruel and unusual punishment. (Dkt. No. 79-7, at 10-11). Having appealed the Superintendent's denial of his grievance to the CORC and complained about the gag order and the denial of "access to everything," (*id*. at 9), the Court finds that his grievance was sufficient as to his conditions of confinement claim. Defendants' motion as to Ji is therefore denied.

34

**8.      Plaintiff Larney**

Defendants argue that Larney failed to exhaust his excessive force claim. (Dkt. No. 58-9, at 23). According to the SAC, "[o]n or about June 6, 2015," Larney was taken out of his cell, restrained, and taken to "one of the officers' stations located within the honor block." (Dkt. No. 40, ¶ 200). Larney was then "interrogated" by "two of the State Trooper defendants and one of the CIU defendants" with "regard to Matt Sweat" before being taken back to his cell. (*Id*. ¶¶ 201-03). Larney was escorted to an area of the prison where disciplinary hearings are held and was "violently interrogated by three defendants wearing jackets with the letters 'CIU' stenciled on them," who smacked him repeatedly in the back of his head and threatened him when he informed them that he did not know anything about the escape. (*Id*. ¶¶ 204-05, 207). Larney was subject to the same treatment "on two more occasions, always by three CIU defendants." (*Id*. ¶ 209). "On or about June 12, 2015," Larney was transferred to Upstate where he was immediately placed in SHU with a sign on his door notifying everyone that he was not allowed to speak to anyone. (*Id*. ¶¶ 210-215). Larney was "not permitted to make phone calls, nor to have pen, paper, envelopes or stamps," or access to the law library. (*Id*. ¶ 216).

Larney filed a grievance on July 15, 2015, after he had been transferred to Auburn, but there are no allegations concerning excessive force in his grievance. (Dkt. No. 58-4, at 44-45). Larney grieved his placement in SHU for fourteen days, during which he was "ordered not to communicate with anyone nor would anyone be allowed to communicate with me," and "denied access to a pen, paper, envelopes, stamps, and a grievance form." (*Id*. at 44). Larney's grievance was denied by the Superintendent, and he appealed to the CORC on August 10, 2015. (Dkt. No. 79-8, at 3, 9). Because Larney did not file a grievance with respect to his excessive force claim, (Dkt. No. 58-8, ¶ 21; Dkt. No. 78, ¶ 21), Defendants' motion is granted as to that claim.

### 9.    Plaintiff Launder

Defendants argue that Launder failed to exhaust his excessive force claim and conditions of confinement claim. (Dkt. No. 58-9, at 6, 23). According to the SAC, "[o]n or about June 12, 2015," Launder was "taken from his cell by several of the individual defendants, stripped, searched, put into a van with five other inmates, and transported to Upstate." (Dkt. No. 40, ¶ 225). He was immediately placed in SHU, where he was "not permitted any privileges, nor was he permitted to speak with anyone, nor to be spoken to," and he was not "provided with a change of underwear" for four days. (*Id*. ¶¶ 228-29).

Launder did not file or appeal a grievance concerning excessive force at Clinton or the conditions of confinement at Upstate. (Dkt. No. 58-3, ¶¶ 72-73; Dkt. No. 58-4, ¶¶ 58-59; Dkt. No. 58-7, ¶ 97). Therefore, Defendants' motion is granted for both claims as to Launder.

### 10.     Plaintiff Mack

Defendants argue that Mack failed to exhaust his excessive force claim and conditions of confinement claim. (Dkt. No. 58-9, at 24). According to the SAC, "[o]n or about June 15, 2015," Mack was removed from his cell by "several of the CERT defendants," "tightly handcuffed," "shackled," and "had his head intentionally banged against the cell bars." (Dkt. No. 40, ¶ 238). Mack was taken to a visiting area "where his wrists were very tightly hand-cuffed, and his ankles were shackled so tightly that they bled." (*Id*. ¶ 241). Mack was then interrogated "regarding Matt and Sweat," at which time he heard a "supervisor of the CERT team," Defendant Widdun, order[] members of the CERT team to "make the restraints so tight that the inmates' veins would burst." (*Id*. ¶¶ 242-43). After being interrogated, Mack was transported to Upstate where he was immediately placed in SHU and a sign was placed on his door that read "Clinton - - No talk." (*Id*. ¶¶ 245, 247, 249). While in SHU, Mack was not permitted to speak to anyone – including medical personnel – and Upstate personnel were not allowed to speak to him. (*Id*. ¶ 250). He was also denied the ability to contact his family, provided food contaminated with saliva and urine which he was therefore unable to eat, or not fed at all. (*Id*. ¶ 253). When he was transferred to Upstate, he was not allowed to bring his CPAP machine with him – a device "that he must when he sleeps because he suffers from sleep apnea, a potentially serious sleep disorder in which breathing repeatedly stops and starts." (*Id*. ¶ 257).

Mack filed a grievance on July 17, 2015, after he had been transferred to Auburn. (Dkt. No. 58-4, at 47-50). He grieved his "illegal confinement" in SHU for 18 days. (*Id*. at 47). Mack stated that there was a sign in front of his cell stating "Clinton no talk," was that he was "ordered not to communicate or even talk to civilian and correction officer workers," and was "denied the right to write my family and/or call them to let them know what was going on." (*Id*.). Mack asserted that he has "TB which is dormant," but that the order directing no communication put

the "other inmates life at risk to catch TB," and put his life at risk because employees were told not to communicate with him. (*Id.* at 47-48). Records reflect that Mack appealed this grievance to CORC, but the record does not reflect the responses by the IGRC and the Superintendent. (Dkt. No. 58-7, at 62). The Court finds that Mack has sufficiently grieved a conditions of confinement claim.

Mack has submitted a declaration stating that on two occasions, he "prepared grievances concerning the physical abuse [he] had received immediately before [he] was removed from Clinton []," and that while he "managed to give those grievances to correction officers to deliver for" him, as far as he is aware, they "never provided those grievances to the Inmate Grievance Office at Upstate Correctional Facility." (Dkt. No. 79-9, ¶ 2). Mack asserts that he "did not go into any detail about the beating I had received at Clinton" in the grievance he did file when he was at Auburn because he "was afraid of retaliation from correction officers if [he] made such statements." (*Id.* ¶ 4).

The Court notes that there is no corroboration of Mack's assertion that he attempted to file grievances regarding the physical abuse, and that there are no details in his affidavit regarding any such attempts. (*Id.* ¶ 2). The grievance Mack filed at Auburn does not contain anything that corroborates any attempt to file an earlier grievance. (Dkt. No. 58-4, at 47-50). In fact, Mack reported in the Auburn grievance that "this is the first opportunity I have had to file this grievance," which is arguably inconsistent with his assertion that he filed two prior grievances about physical abuse. (*Id.* at 50). Moreover, Mack's assertion that he filed grievances at Upstate regarding physical abuse also appears to be inconsistent with his claim that he did not describe physical abuse in the grievance he filed at Auburn, because he "was afraid of retaliation from correction officers if [he] made such statements." (Dkt. No. 79-9, ¶ 4). Given these

inconsistencies regarding Mack's claims, and absent any other details beyond Mack's conclusory claim that he attempted to file two grievances, the Court finds that Mack has failed to raise a genuine issue of material fact as to unavailability. *See Grayson v. Courtney*, No. 16-cv-1118, 2018 WL 6933296, at *6, 2018 U.S. Dist. LEXIS 205127, at *15-17 (N.D.N.Y. Dec. 3, 2018) (finding that "given the complete lack of corroboration of plaintiff's inconsistent claims about his purported attempt(s) to file a grievance," "no rational fact finder could conclude that plaintiff actually attempted to file such a grievance"), *report and recommendation adopted*, 2019 WL 110951, 2019 U.S. Dist. LEXIS 1576 (N.D.N.Y. Jan. 4, 2019).

### 11.    Plaintiff Manzella

Defendants argue that Manzella failed to exhaust his excessive force claim and his conditions of confinement claim. (Dkt. No. 58-9, at 7, 24). According to the SAC, "[o]n or about June 15, 2015, one of the CERT defendants stormed" into Manzella's cell, handcuffed him, "pushed him into the cell bars and punched him in the ribs." (Dkt. No. 40, ¶ 264). He was then walked out of his cell and into a hallway with "several CERT defendants" "where they beat and kicked him." (*Id*. ¶¶ 266, 269). Manzella, was "brought into the roll call room" where he was made to remove his clothing before being questioned and about "Matt and Sweat" and "verbally threatened by the CERT defendants." (*Id*. ¶¶ 270-71). Manzella was given his clothes back, shackled, and transferred to Upstate. (*Id*. ¶¶ 272-73). Upon arrival at Upstate, he was immediately placed in SHU, "where he was not allowed to speak or be spoken to," and was continually "interrogated by defendants hereto with regard to the escape of Matt and Sweat." (*Id*. ¶¶ 274, 276).

Manzella has submitted a declaration stating that he was "made a special target for physical abuse" because he worked next to Sweat in the tailor shop at Clinton and was housed with both Sweat and Matt in the Honor Block. (Dkt. No. 79-10, ¶ 1). He averred that he "was

threatened with further physical abuse" after arriving at Upstate. (*Id.*). He stated that he had "very little faith" in the grievance system, and had been told "[o]n previous occasions" that "it was not good for [his] health for [him] to make complaints against their fellow correction officers." (*Id.* ¶ 2). Manzella asserted that he was "frightened for [his] life if [he] were to make to a complaint about the force used against [him] before [he] was put on the bus to go to Upstate," and that thought "the correction officials were so angry with [him] that they were going to keep [him] in SHU for the rest of [his] time in prison." (*Id.*). He averred that despite this, on or about June 25, 2015, he did attempt to file a grievance about the "very difficult conditions" under which he was held in SHU but that the "grievance somehow never made it to the Inmate Grievance Office." (*Id.* ¶ 3).

Manzella filed a grievance on January 18, 2016 while he was incarcerated at Wende, alleging that on or about June 15, 2015, he had been "viciously threatened and pushed around at Clinton," and "hit with open hands across [the] face," transferred to Upstate and held in SHU for 29 days, "violating my due process rights to be free for wrongful confinement." (*Id.* at 4-5). Manzella reported that he submitted a grievance at Upstate on or about June 25, 2015, but did not receive any disposition, and still had not received an answer. (*Id.* at 5). There was no record of a grievance received from Manzella at Upstate, and the IGP Supervisor informed that Manzella that the "assault instance [he] refer[red] to is now untimely and cannot be accepted by the IGRC office." (*Id.* at 6; Dkt. No. 58-3, ¶ 87).

Although Manzella's assertion that he did not file a grievance because he had been previously told by corrections officers that "it was not good for [his] health for [him] to make complaints against their fellow correction officers," lacks any details as to when they were made or in what context, construing all of the facts in the light most favorable to Manzella, including

his allegation that he was "threatened with further physical abuse" after arriving at Upstate and the fact that the alleged assault occurred before officers transferred him[19] into "very difficult conditions" in SHU, where Manzella feared he might be kept for the rest of his time in prison, the Court finds that he has raised sufficient evidence to create a triable issue of fact as to whether the grievance process was unavailable to Manzella due to intimidation. Manzella's alleged fear of retaliation while at Upstate were he to file a grievance is somewhat undercut by his statement that he did, in fact, submit a grievance concerning being "held in SHU under very difficult conditions." (Dkt. No. 79-10, ¶ 3). But viewed in the light most favorable to Manzella, the evidence of the allegedly quick succession of events, namely the alleged assault on June 15, 2015, followed by a transfer the same day, and physical threat upon arrival at Upstate, Manzella's subsequent filing of a grievance seeking better conditions of confinement does not necessarily belie his alleged fear of filing a grievance regarding excessive force, about which he remained silent. *See Amador*, 655 F.3d at 103 ("Prior cases have held that verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers constitute such affirmative action."). Thus, Defendants' motion is denied as to Manzella's excessive force claim.

Further, Manzella's sworn statement that he filed a grievance at Upstate concerning "very difficult conditions" in SHU finds some support in his January 18, 2016 grievance where he inquired about his "June 25th" grievance. (Dkt. No. 79-10, at 4-5). While Manzella has not explained why he waited until January to make an inquiry about a grievance he allegedly filed in June, viewing the facts in the light most favorable to Manzella, the Court finds there is an issue of material fact under *Williams* as to the availability of the grievance process. Therefore,

---

[19] According to Defendants' records, Manzella was transferred on June 15, 2015, the same day he allegedly was beaten. (Dkt. No. 58-3, at 34).  It appears that Manzella had been at Clinton since 1995. (Dkt. No. 58-3, at 34).

Defendants' motion is denied with respect to Manzella's excessive force and conditions of confinement claim and an evidentiary hearing will be held on the issue of exhaustion.

### 12.    Plaintiff Melendez

Defendants argue that Melendez failed to exhaust his excessive force claim and conditions of confinement claim. (Dkt. No. 58-9, at 7, 25). According to the SAC, Melendez was transported to Upstate on June 24, 2015, after his gallbladder was removed, on an emergency basis, at the Alice Hyde Medical Center on or about June 23, 2015. (Dkt. No. 40, ¶¶ 288-89). Melendez was placed in the infirmary at Upstate and, on June 29, 2015, moved from the infirmary to SHU. (*Id*. ¶¶ 290-92). During his time in the infirmary and in SHU at Upstate, Melendez was only provided "over-the-counter pain medications, although he was in a painful post-surgical condition." (*Id*. ¶ 295). He was "kept isolated in solitary confinement with a sign posted on his cell door forbidding anyone to speak to him." (*Id*. ¶ 299). He continued to be interrogated "by defendants hereto with regard to the escape of Matt and Sweat." (*Id*. ¶ 296).

According to the Wende IGP Supervisor, Joyce Krygier, Melendez filed one relevant grievance after he had been transferred to Wende, grievance number WDE-41062-15. (Dkt. No. 58-5, ¶ 42). In this July 26, 2015 grievance Melendez complained about having been transferred to Upstate after coming out of the hospital, "with no due process whatsoever or any information." (*Id.* at 23). Melendez asserted that he was left at Upstate "with no property, with only the clothes I had on . . . in SHU status, without being able to call my family, go to commissary, get any packages, or have any of the freedom that regular prisoners enjoy" for 26 days. (*Id.*). There are no allegations of any excessive force. IGP Supervisor Krygier asserts that this grievance was "informally resolved." (Dkt. No. 58-5, ¶ 42 n.4). Defendants' records indicate that this grievance was informally resolved on September 1, 2015, and Plaintiffs have not

introduced any evidence to the contrary. (Dkt. No. 79-11, at 11). There is no record that this grievance was appealed to the CORC. (Dkt. No. 58-7, at 69).

Melendez has submitted a copy of what appear to be other grievances, without explanation, including: a unnumbered grievance dated July 5, 2015, grieving having been transferred to Upstate and placement in SHU after his surgery "without any due process" and "without any property" (Dkt. No. 79-11, at 2-3). However, there is nothing in the record indicating that this grievance was ever filed or appealed to the CORC. (*See* Dkt. No. 58-7, at 69 (log of grievances appealed to the CORC by Melendez)).[20]

Because Melendez has failed to exhaust any claim regarding excessive force or conditions of confinement, the Defendants' motion is granted as to Melendez.

### 13.    Plaintiff Ross

Defendants argue that Ross failed to exhaust his excessive force claim. (Dkt. No. 58-9, at 25). According to the SAC, "[o]n or about June 15, 2015," Ross was "forcibly removed from his cell by several of the CERT defendants," and handcuffed. (Dkt. No. 40, ¶¶ 319-20). He was then "dragged" through the prison, one of his handcuffed wrists was twisted, his left ankle was "stomp[ed]" on, and he was pushed down a flight of stairs before being placed on a bus to Upstate. (*Id*. ¶¶ 320, 321).

Ross filed a grievance on July 3, 2015, while incarcerated at Upstate. (Dkt. No. 58-3, at 65). In it, he asserted that he was "snatched by N.Y.S. D.O.C. 'CERT' team from Clinton," taken to Upstate, and placed in SHU for 18 days with no disciplinary or administrative sanctions and/or hearing. (*Id*.). Ross asserted that he was being penalized "worse than a SHU inmate," with "no property at all, no commissary, no changes of clothes," "no stamps," "no nothing." He

---

[20] The other grievances submitted by Melendez in response to the Defendants' motion do not concern the allegations here. (*See* Dkt. No. 79-11, at 9 (August 10, 2015 grievance seeking back pay for the time he was in SHU at Upstate); Dkt. No. 79-11, at 7 (August 10, 2015 grievance regarding missing property); Dkt. No. 79-11, at 12 (July 27, 2015 grievance regarding missing property)).

sought to be "removed from SHU" and compensated "for every day [he] illegally spent in SHU." (*Id.*). This grievance was consolidated in UST-56268-15. (Dkt. No. 79-15, at 2; Dkt. No. 58-7, at 42). Ross has submitted a declaration stating that his use of the word "snatched" in the grievance was a "shorthand description of the excessive force" he had experienced, and that he did not go into further details because he "was afraid that [he] would be retaliated against for including such details." (Dkt. No. 79-12, ¶ 1).

Ross's use of the word "snatched" is not enough to put the Defendants on notice that he was grieving an excessive force claim. *See Dailey v. Fuller*, No. 15-cv-01051, at 2016 WL 7732236, at *8, 2016 U.S. Dist. LEXIS 168482, at *19-20 (N.D.N.Y. Dec. 5, 2016) (finding that an inmate's grievance "may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally" and failure to describe "*any* problem in his grievance concerning the lack of medical treatment" meant his medical indifference claim had not been exhausted), *report recommendation adopted*, 2017 WL 108056, 2017 U.S. Dist. LEXIS 3925 (N.D.N.Y. Jan. 11, 2017). However, construing the facts in the light most favorable to Ross, and in light of the unusual facts of this case, which involve not just an alleged assault, but an assault shortly before a transfer[21] to conditions where Ross avers that he "was being treated even more harshly than an ordinary inmate confined to SHU," the Court finds that Ross has raised a triable issue of fact as to whether the grievance process was unavailable to him due to intimidation. Accordingly, Defendants' motion as to Ross' excessive force claim is denied.

---

[21] Defendants' records indicate that Ross was transferred the same day as the alleged assault. (Dkt. No. 58-3, at 37).

### 14.    Plaintiff Toland

Defendants argue that Toland failed to exhaust his excessive force claim and conditions of confinement claim. (Dkt. No. 58-9, at 26). According to the SAC, "[o]n or about June 15, 2015," "several CERT defendants came into [Toland's] cell, handcuffed him very tightly and forcibly removed him from his cell." (Dkt. No. 40, ¶ 336). They walked him through the prison, and twice slammed his forehead into a wall. (*Id*. ¶ 337). He was taken into a room, forced to strip, searched, given a new set of clothing, shackled, and taken outside. (*Id*. ¶ 340). Toland was slapped and threatened before being placed on a bus and transported to Upstate. (*Id*. ¶¶ 342-45). At Upstate, Toland was immediately placed in SHU with a sign on his cell door informing personnel that he not to be spoken to. (*Id*. ¶¶ 346, 348). Toland is Muslim, and Ramadan commenced while Toland was being held in SHU. (*Id*. ¶¶ 353-54). Toland requested his Quran for use during Ramadan, which he was repeatedly denied. (*Id*. ¶¶ 355-58). He also was not given any soap or toiletries for the first four days he spent in SHU. (*Id*. ¶ 349). Toland's personal property, which had been left at Clinton when he was transferred, was either destroyed or returned to him damaged. (*Id*. ¶¶ 350-52).

Defendants identified three relevant grievances filed by Toland: the consolidated grievance, AUB-67507-15, and AUB-67516-15.

### a.    The Consolidated Grievance, UST-56268-15

In a grievance filed at Upstate on June 30, 2015, Toland asked for his Quran and legal paperwork, and wanted to know why he was being held there. (Dkt. No. 58-3, at 64). Toland stated that he had been at Upstate for 16 days; that he was fasting for Ramadan; and that, as a Muslim he was required to read his Quran during the fast. (*Id.*). Toland asserted that he had previously filed a grievance on June 19, 2015.

Toland has submitted copies of two letters dated June 19, 2015 to the Superintendent at Upstate asking for his Quran and some legal work and asking for an inventory of his property. (Dkt. No. 79-13, at 16, 21). Toland noted that he "had to be given a pen and a few sheets of paper from another inmate or I wouldn't be able to write this letter to you. We can't seem to get any form of supplies because nobody stops at our cell including the sick call nurse." (*Id*. at 16-17). It is not clear if Toland considers these letters as his "June 19, 2015 grievance."[22] The IGP Supervisor at Upstate never received a June 19, 2015 grievance from Toland. (*Id*. at 8). In a June 29, 2015 letter to the Upstate Grievance Committee Supervisor inquiring about the June 19, 2015 grievance, Toland noted that he has "not seen a grievance representative once" in the two weeks he has been there and that there have not been any grievance forms on the morning supply cart since I have been here." (*Id*. at 6). In any event, Defendants' records reflect that upon receiving Toland's June 29, 2015 letter, the IGRC officer spoke with him and advised him to submit the complaint again. (*Id.*). Toland's June 30, 2015 grievance was received and consolidated in the consolidated grievance, UST-56268-15. (*Id.* at 4).

---

[22] The letters do not satisfy the grievance requirement. *See Noel v. Makowski*, No. 17-cv-198, 2019 WL 3859021, at *4, 2019 U.S. Dist. LEXIS 139146, at *10 (W.D.N.Y. Aug. 16, 2019) ("Numerous courts have indeed held that letters to prison superintendents do not constitute grievances."); *Muhammad v. Pico*, No. 02-cv-1052, 2003 WL 21792158, at *8, 2003 U.S. Dist. LEXIS 13402, at *32 (S.D.N.Y. Aug. 5, 2003) ("District court decisions in this circuit have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements.").

> **b.** **July 2 and 8, 2015 Grievances Regarding Upstate SHU, AUB-67516-15, AUB-67511-15**

On July 2, 2015, and July 8, 2015, after he had been transferred to Auburn, Toland filed grievances complaining about have been placed in SHU at Upstate for 18 days without having broken any rule or issued any misbehavior report. (Dkt. No. 58-4, at 54-55). The grievances were consolidated into AUB-67516-15. As described in more detail above, two members of the IGRC who considered Toland's grievance concluded that he was housed in SHU "per the Deputy Commissioner per Directive #4933, section #301.7," and two members of the IGRC concluded that Toland's SHU confinement amounted to cruel and unusual punishment. (Dkt. No. 79-13, at 13-14). The Superintendent denied Toland's grievance, citing to Directive #4933, Sec 301.7 which permits the Deputy Commissioner for Correctional Facilities to have an inmate admitted to a special housing unit "for any other reason." (*Id*. at 12). Toland appealed this grievance to CORC. (*Id*. at 9).

On July 8, 2015, Toland filed a grievance at Auburn complaining about the fact that he had not heard anything about his grievances: AUB-67511-15. (Dkt. No. 79-13, at 4). This appears to have been construed as a grievance regarding the status of his grievance about Upstate. (*Id.*). The Superintendent noted that Toland is one of the grievants in the consolidated grievance, UST-56268-15. (*Id*. at 5). Toland appealed the Superintendent's decision, stating that he "was deprived of his Quaran, legal work and address book. Staff did not adhere to Directive #4933 at all. I was not given the supplies or property that is mandate [sic] by Directive #4933." (*Id.*). The CORC responded to the appeal, consistent with its response to the consolidated grievance. (*Id*. at 8; Dkt. No. 79-15, at 2).

### c.    July 8, 2015 Grievance Regarding Damaged Property, AUB-67507-15[23]

On July 8, 2015, Toland filed a grievance complaining that Defendant Bissonette intentionally damaged Plaintiff's property: AUB-67507-15. (Dkt. No. 85, at 6). Toland sought "to know why my property was broken and why this officer threw 2 bags of flour in 2 different draft bags." (*Id.*). Toland requested compensation for the broken items, and asked that the rest of his property be returned. (*Id.*).

### d.    Toland's Declaration

Toland has submitted a declaration in opposition to the Defendants' motion to dismiss, with a copy of his July 8, 2015 grievance regarding damaged property, AUB-67507-15, asserting that he did grieve the use of force against him because he began this grievance by saying that he was "taken by force" from his cell. (Dkt. No. 85, at 4-6). This grievance, however, does not describe any unlawful use of force; Plaintiff complains about the destruction of his property by the correction officer who packaged up his property at Clinton. (*Id.* at 6). In the "action requested" form of the grievance Plaintiff states "I want to know why my property was broken and why this officer threw 2 bags of flour in 2 different draft bags, there was no reason. I want the rest of my property sent to me and I want my broken items to be paid for and replaced." (*Id.*) This grievance was insufficient to alert officials to any claim that officers at Clinton had used excessive force, and Defendants' motion is therefore granted with respect to Toland's excessive force claim.

However, with respect to Toland's conditions of confinement claim, he did grieve his inability to obtain a Quran for worship during Ramadan, his inability to receive his legal

---

[23] Toland filed another grievance on July 2, 2021, AUB-67522-15, seeking his Quran, legal work, address book and property inventory. (Dkt. No. 79-13, at 19). The Superintendent noted that Toland is one of the grievants in the consolidated grievance, UST-56268-15, and advised Toland to file a claim if he was missing any property. (*Id.* at 18). Toland appealed that decision. (*Id.*).

paperwork, and having been placed in SHU at Upstate for 18 days without any disciplinary basis; and two members of the IGRC concluded that Toland's SHU confinement amounted to cruel and unusual punishment. (Dkt. No. 79-13, at 13-14). The CORC considered the conditions of confinement in the consolidated grievance. (Dkt. No. 79-15, at 2). Therefore, Defendants' motion is denied with respect to Toland's conditions of confinement claim.

### 15.   Plaintiff Young

Defendants argue that Young failed to exhaust his conditions of confinement claim. (Dkt. No. 58-9, at 27). Young was not transferred to Upstate, and it is not clear that Young intends to assert a conditions of confinement claim. To the extent Young does assert such a claim it would appear to be based on his sentence to twenty days of keeplock at Clinton following the issuance of an allegedly false disciplinary violation. (Dkt. No. 40, ¶¶ 403-05). The complaint does not describe any conditions of that confinement. In any event, Young has not filed any grievance concerning conditions of confinement in keeplock.

The two grievances in the record, a June 16, 2015 grievance and a June 23, 2015 grievance, which were consolidated and assigned grievance number CL-67025-15, concern an assault by officers on June 10, 2015, and do not allege any facts regarding any conditions of confinement. (Dkt. No. 58-2, at 31-38, 39-45). Young admits that he has not filed any grievance concerning a conditions of confinement claim related to his keeplock at Clinton. (Dkt. No. 58-8, ¶ 33; Dkt. No. 78, ¶ 33). Defendants' motion is therefore granted as to any condition of confinement claim by Young.

D.    **Dismissal With Prejudice**

Defendants note that because the time in which to exhaust has expired, dismissal should be with prejudice because any attempt to exhaust would be futile. Plaintiffs have not responded to that argument. The Court agrees that dismissal should be with prejudice because the time limitations contained in the exhaustion procedures, 7 NYCRR § 701.7, have finally expired. *See Felix v. Simon*, 303 Fed. App'x 21, 22 (2d Cir. 2008) ("[D]ismissal with prejudice, when remedies are no long available, is required in the absence of any justification for not pursing such remedies." (quoting *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004))).

V.    CONCLUSION

For these reasons, it is hereby

ORDERED that the Moving Defendants' motion for partial summary judgment (Dkt. No. 58) is **GRANTED** in part and **DENIED** in part; and it is further

ORDERED that the excessive force claims of Plaintiffs Martinaj, Armento, Burnett, Larney, Mack, and Toland are **DISMISSED with prejudice** as to the Moving Defendants; and it is further

ORDERED that the excessive force claims and condition of confinement claims of Plaintiffs Amante, Launder, and Melendez are **DISMISSED with prejudice** as to the Moving Defendants; and it is further

ORDERED that the conditions of confinement claim of Plaintiff Young is **DISMISSED with prejudice** as to the Moving Defendants; and it is further

ORDERED that the Court will hold an evidentiary exhaustion hearing as to whether the grievance process was available for Plaintiff Arismendi's excessive force and conditions of confinement claims, Ji's excessive force claim, Manzella's excessive force and conditions of confinement claim; and Ross' excessive force claim; and it is further

ORDERED that Defendants' motion for partial summary judgment (Dkt. No. 58) is

otherwise **DENIED**.


Dated: August 26, 2021
         Syracuse, New York


Brenda K. Sannes
U.S. District Judge